FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

2018 JAN 26 PM 1:23

**ROBIN GOODSPEED, CHRIS SEVIER,**
**JOHN GUNTER JR, WHITNEY KOH,**
**JOAN GRACE HARLEY,**
*Plaintiffs*

STEPHAN HARRIS, CLERK
CHEYENNE

V.

**MATT MEAD, in his official capacity as**
**Governor of Wyoming, WENDY SOTO,**
**in her capacity as the Executive Director**
**of the Commission on Judicial Conduct**
**and Ethics, PETER K. MICHAEL, in his**
**capacity as Attorney General, SUSAN**
**SAUNDERS, in his official capacity as**
**the Clerk of Campbell County**
*Defendants*

Case No: 18-CV-19-F

**COMPLAINT FOR INJUNCTIVE**
**RELIEF**

**JURY DEMAND**

## COMPLAINT FOR INJUNCTIVE RELIEF

### INTRODUCTION

1. NOW COMES, Plaintiff Robin Goodspeed, an ex-gay, Christ Follower, and a taxpayer living

in Wyoming;[1] Plaintiff Chris Sevier, a former Judge Advocate General, combat Infantry Officer,

a former United States Attorney, Congressional Liaison for Special Investigations, taxpayer of

this state, lobbyist, and self-identified objectophile; and SGM John Gunter Jr, a state and federal

Lobbyist and self-identified polygamist; Whitney Kohl, an ex-gay, taxpayer, and self-identified

polygamist; and Joan Grace Harley, an ex-transgender, taxpayer, and self-identified polygamists

for declaratory and injunctive relief against the Governor, Attorney General, Clerk of Campbell

County, and the Executive Director of the commission on Judicial Conduct and Ethics.[2]   Like in

*Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), "this case concerns only what States may do under

---

[1] (See DE _ Goodspeed ¶¶ 1-20)

[2] The Commission on Judicial Conduct and Ethics does not know the objective difference between right and wrong, real and fake, ethical and unethical, and secular and non-secular. The Commission wrongfully censured the Honorable Judge Neely for merely saying that she did not want to officiate parody marriages.

the Constitution" in determining (1) how the Constitution permits the States to legally define marriage and (2) which types of marriages the States can legally recognize. While many secular humanist have said that America was "ready" for legally recognized "gay marriage," the United States is never "ready" for government action that violates the Constitution. The Plaintiffs are not bigots for respectfully asking that this Court uphold the Constitution. This case is not based on emotion but on only what the Constitution allows. Nothing more. As the Court is being asked to interpret the Constitution in an unresolved controversy under the correct Constitutional prescription, Stare Decisis does not keep *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) from being overruled. The Supreme Court has held, "questions which merely lurk in the record, neither brought to attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Industries, Inc. v. Aviall Services, Inc.* 543 U.S. 157 (2004). The Establishment Clause claims were "lurking" in the record but undecided in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015). "[Stare Decisis] is at its weakest when [the courts] interpret the Constitution because [their] interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 63, 116 S.Ct. 1114, 1127, 134 L.Ed.2d 252 (1996); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 94, 56 S.Ct. 720, 744, 80 L.Ed. 1033 (1936) (Stone and Cardozo, JJ., concurring in result) ("The doctrine of stare decisis ... has only a limited application in the field of constitutional law").

2. Under 8(e)(2), the Plaintiffs exercise their rights to file a lawsuit with alternative Constitutional claims under the First and Fourteenth Amendments.[3] These alternatives claims do

---

[3]Rule 8(e) (2), Fed. R. Civ. P., specifically provides that a party may plead in the alternative, even where the alternative claims are inconsistent: "A party may set forth two or more statements of a claim or

not have to be consistent and they can compete. *Blazer v. Black*, 196 F.2d 139, 144 (10th Cir. 1952).[4]

3. This is an "if not this, then that" lawsuit. If the Establishment Clause does not enjoin the State from legally recognizing non-secular parody marriages, then the Plaintiffs warrant the same rights to marry under the Equal Protection and Due Process Clause of the Fourteenth Amendment and visa versa. Either way, the current definition of marriage and the State's decision to only legally recognize one form of non-secular parody marriage is wildly unconstitutional from every angle.

4. First, the Plaintiffs have brought a cause of action where they contend that legally recognized gay marriage, transgender policies, and sexual orientation discrimination statutes are (1) a non-secular," (2) an indefensible legal weapon against non-observers of the religion of Secular Humanism, and (3) an excessive entanglement the government with the religion Secular Humanism as prohibited by the Establishment Clause. The Supreme Court in *Torcaso v.*

---

defense alternately or hypothetically, either in one count or defense or in separate counts or defenses." When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

[4]*Blazer v. Black*, 196 F.2d 139, 144 (10th Cir. 1952) (explaining that a party is "at liberty to state as many separate claims as he wishe[s], regardless of consistency, whether based upon legal or equitable grounds or both"); *Clark v. Associates Commercial Corp.*, 149 F.R.D. 629, 634 (D.Kan.1993) (recognizing a party's right under Rule8(e)(2) to plead alternative and inconsistent claims; *Lader v . Dahlberg*, 2 F.R.D. 49,50 (S.D.N.Y.1941) (noting that the Federal Rules of Civil Procedure "contemplate a disposition of all issues between litigants in a single lawsuit," whether alleged in the alternative or hypothetically and whether or not consistent with one another). So, for example, "[c]ourts have permitted plaintiffs to sue on a contract and at the same time alternatively repudiate the agreement and seek recovery on a quantum meruit claim or allege fraud or some other tort theory." 5 Wright & Miller, § 1283 at pp. 535-37. And in *Lann v. Hill*, 436 F. Supp. 463, 465 (W.D.Okla. 1977), the court noted that when a party pleads alternative and inconsistent claims, "the Court will determine if it has subject matter jurisdiction over either of the possible actions under which Plaintiff might proceed."

*Watkins,* 367 U.S., 488 (1961) already found that Secular Humanism is a religion for purposes of

the Establishment Clause. The evidence will show in this case that legally recognized gay

marriage manages to fail every prong of the *Lemon* and coercion tests by a landslide.[5] Second,

the Plaintiffs brought an alternative cause of action under the Equal Protection and Substantive

Due Process Clause of the Fourteenth Amendment arguing that the Plaintiffs and others warrant

the same "existing," "fundamental," and "individual" right to marry based on their "personal

---

[5]The general rules regarding standing to challenge governmental actions are designed to ensure that courts are addressing actual cases that can be resolved by the judicial system. However, in some circumstances, individuals may seek to challenge governmental actions for which neither those individuals nor any other individuals could meet standing requirements. Indeed, the Supreme Court has noted that in some instances "it can be argued that if [someone with a generalized grievance] is not permitted to litigate this issue, no one can do so." *United States v. Richardson,* 418 U.S. 166 (1974). Generally, the court has noted, "lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert [one's] views in the political forum or at the polls." However, the ability of individuals to effect change through political and democratic means does not eliminate all cases where a large group of individuals would be affected by the challenged governmental action. In particular, the Court has specifically allowed taxpayer standing for claims arising under the Establishment Clause. Under the *Flast* exception to the general prohibition on taxpayer standing, taxpayers may raise challenges of actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause which is applicable to the states under the Fourteenth Amendment. *Flast v. Cohen,* 392 U.S. 83 (1968). The Court has maintained its interpretation of this exception, refusing to extend it to permit taxpayer lawsuits challenging executive actions or taxpayer lawsuits challenging actions taken under powers other than taxing and spending. *Valley Forge Coll. v. Americans United,* 454 U.S. 464 (1982)(refusing to allow a taxpayer challenge of government transfer of property to a sectarian institution without charge because the action was taken by an executive agency exercising power under the Property Clause); *Hein v. Freedom from Religion Foundation,* 551 U.S. 587 (2007) (refusing to allow a taxpayer challenge of activities of the White House Office of Faith-Based and Community Initiatives because the funding was made through discretionary executive spending). These exceptions, the Court has explained, result because the Establishment Clause is a constitutional limit on the government's ability to act. According to the Court, the framers of the Constitution feared abuse of governmental power that might result in favoring "one religion over another." *Flast,* 392 U.S. at 103-04. It is difficult to imagine circumstances in which potential abuses of the Establishment Clause could be enforced without this exception. Accordingly, for the purposes of their causes of action under the Establishment Clause, the Plaintiffs' self-asserted sex-based identity narrative do not matter. The Plaintiffs could self-identify as twinkies and still move to have the State enjoined from legally recognizing gay marriage, transgender policies, and the enforcement of fake gay civil rights statutes like CADA for violating the prongs of the *Lemon* test under the Establishment Clause for putting "religion over nonreligion" and for discriminating against "religion and religion."

choice" and "personal autonomy" in step with their self-asserted sex-based identity narrative to

the same extent that self-identified homosexuals are afforded in the wake of *Obergefell*.[6] If Stare

Decisis applies under *Obergefell* to all individuals who seek to enter into a parody marriage

based on their sexual orientation, then the Plaintiffs are entitled to legally marry in accordance

with their self-asserted sex-based identity narrative just as self-identified homosexuals are

permitted. Id. To avoid confusion and for clarity's sake, here is the holding in *Obergefell*:

"These considerations lead to the conclusion that the right to marry is a fundamental right
inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of
the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that
liberty. The Court now holds that [self-identified homosexuals] may exercise the fundamental
right to [legally] marry. No longer may this liberty be denied to them. *Baker* v. *Nelson* must be
and now is overruled, and the State laws challenged by Petitioners in these cases are now held
invalid to the extent they exclude [self-identified homosexuals] from civil marriage on the same
terms and conditions as opposite- sex couples [in a secular marriage]." *Obergefell* at 22-23.

5. If precedent controls, then "the conclusion" that this Court must reach is that "the right to

marry is a fundamental right inherent in the liberty of the person, and under the Due Process and

Equal Protection Clauses of the Fourteenth Amendment [self-identified objectophiles and

polygamists] may not be deprived of that right and that liberty." Id. Plaintiff Sevier is a "person"

with the same "liberty," "dignity," "autonomy" interests as self-identified homosexuals. Id. The

same is true as applied to self-identified polygamists and zoophiles. The Plaintiffs and others

cannot "be deprived of" the right to legally marry in step with their self-asserted sex-based

identity narrative as a matter of "liberty" any more or less that self-identified homosexuals can.

---

[6] *Obergefell*, 192 L. Ed. 2d 609 1-28. *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (fundamental right);
*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 63940 (1974) (personal choice); *Loving v. Virginia*, 388
U.S. 1, 12 (1967) (existing right/individual right); *Lawrence v. Texas,* 539 U.S. 558 (2003) (intimate
choice)

6. As taxpayers, the Plaintiffs have standing to pursue Establishment Clause causes of action under *Flast v. Cohen,* 392 U.S. 83 (1968) to enjoin the State from legally recognizing gay marriage. Likewise, the Plaintiffs have standing to pursue Equal Protection and Substantive Due Process Causes of Action under *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), as self-identified members of the true minority of a suspect class under sexual orientation classification.

### APPLYING LIBERAL LOGIC IN *OBERGEFELL* TO CONSTITUTIONAL INTERPRETATION FOR PURPOSES OF STANDING IN UNSETTLED MARRIAGE MATTERS

7. Under this alternative cause of action pursuant to the Equal Protection and Substantive Due Process Clauses, the Plaintiffs' cause of action amounts to an "if this, then that" lawsuit. If self-identified homosexuals are given the Constitutional right to marry, then so are self-identified objectophiles, polygamists, and zoophiles. Justice Roberts could not have made that any clearer in his dissent in *Obergefell.*[7]

---

[7] "One immediate question invited by the majority's position is whether States may retain the definition of marriage as a union of two people. Cf. *Brown* v. *Buhman,* 947 F. Supp. 2d 1170 (Utah 2013), appeal pending, No. 14- 4117 (CA10). Although the majority randomly inserts the adjective "two" in various places, it offers no reason at all why the two-person element of the core definition of marriage may be preserved while the man-woman element may not. Indeed, from the standpoint of history and tradition, a leap from opposite-sex marriage to same-sex marriage is much greater than one from a two-person union to plural unions, which have deep roots in some cultures around the world. If the majority is willing to take the big leap, it is hard to see how it can say no to the shorter one. It is striking how much of the majority's reasoning would apply with equal force to the claim of a fundamental right to plural marriage. If "[t]here is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices," *ante,* at 13, why would there be any less dignity in the bond between three people who, in exercising their autonomy, seek to make the profound choice to marry? If a same-sex couple has the constitutional right to marry because their children would otherwise "suffer the stigma of knowing their families are somehow lesser," *ante,* at 15, why wouldn't the same reasoning apply to a family of three or more persons raising children? If not having the opportunity to marry "serves to disrespect and subordinate" gay and lesbian couples, why wouldn't the same "imposition of this disability," *ante,* at 22, serve to disrespect and subordinate people who find fulfillment in polyamorous relationships? See Bennett, Polyamory: The Next Sexual Revolution? Newsweek, July 28, 2009 (estimating 500,000 polyamorous families in the United States); Li, Married Lesbian "Throuple" Expecting First Child, N. Y. Post, Apr. 23, 2014; Otter, Three May Not Be a Crowd: The Case for a Constitutional Right to Plural Marriage, 64 Emory L. J. 1977 (2015). I do not mean to equate marriage between same-sex couples with plural marriages in all respects. There may well be relevant differences that compel different legal analysis. But if there are, petitioners have not pointed to any. When asked about a plural marital union at oral argument, petitioners asserted that a State "doesn't have such an institution." Tr. of Oral Arg. on Question 2, p. 6. But that is exactly the point: the States at issue here do not have an institution of same-sex marriage, either." *Obergefell* at 22 (Roberts Dissenting)

8.  For better or worse, the Plaintiffs simply ask that they and others be afforded the same benefits and treatment under the law based on their self-asserted sex-based identity narratives that self-identified homosexuals are permitted to enjoy or, otherwise, the Court must hold that legally recognized gay marriage is a sham and enjoin the State from legally recognizing gay marriage under the Establishment Clause for failing the prongs of *Lemon*.

9.  The Majority in *Obergefell* stated: "For the history of marriage is one of both continuity and change. As new dimensions of freedom have become apparent to new generations, the institution of marriage has been strengthened by evolution over time." *Obergefell* at 6.  In applying liberal logic, if marriage "has been strengthened by evol[ving] over time," legally recognizing person-object, person-animal, and more than two people marriages will make marriage "stronger" all the more.  *Id.* at 6.  Otherwise, gay marriage is a non-secular sham flowing from the church of Secular Humanism.

10.  The Majority in *Obergefell* stated:

"The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell* at 2.

 In light of that liberal logic, the Plaintiffs must be permitted to "express their identity" as objectophiles and polygamists through marriage, just as self-identified homosexuals are permitted. *Obergefell* at 1. Otherwise, gay marriage is a non-secular sham that entangles government with the religion of Secular Humanism.

11. If "marriage is essential to our most profound hopes and aspirations" for self-identified homosexuals, the same is true for self-identified polygamists and objectophiles. *Id.* at 3.

12. The Secular Humanist Majority in *Obergefell* stated, "[Self-identified Homosexuals] ask for equal dignity in the eyes of the law and the Constitution grants them that right." *Obergefell* at 1. If that that is true, then the "Constitution grants" the Plaintiff "that right" as well, based on their "asking."

**Fundamental Right For Polygamists And Objectophiles Too Or It's A Sham**

13. If parody marriage is a "fundamental right" for self-identified homosexuals, it is clearly a fundamental right for self-identified polygamists and objectophiles on identical legal bases.[8] Otherwise, gay marriage is a non-secular sham crafted to unapologetically establish Secular Humanism as the National religion.

14. *Obergefell* Majority stated, "The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest." Id. at 4. That stream of logic reasoning not only permits self-identified homosexuals to marry, but self-identified polygamists and objectophiles as well. Otherwise, gay marriage is a non-secular sham crafted to imperialistically establish Secular Humanism as the National religion.

15. The *Obergefell* Majority stated:

"The marriage laws at issue are in essence unequal: [self-identified homosexuals] are denied benefits afforded [to individuals in man-woman marriage] and are barred from exercising a fundamental right. Especially against a long history of disapproval of their relationships, this denial works a grave and continuing harm, serving to disrespect and subordinate [self-identified] gays and lesbians." Id. at 4.

---

[8] *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967) *Zablocki* v. *Redhail*, 434 U. S. 374, 384 (1978), *Turner* v. *Safley*, 482 U. S. 78, 95 (1987)., *M. L. B.* v. *S. L. J.*, 519 U. S. 102, 116 (1996); *Cleveland Bd. of Ed.* v. *LaFleur*, 414 U. S. 632, 639–640 (1974);; *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942); *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923). *Obergefell* at 11.

If that logic permits self-identified homosexuals to marry to normalize their ideological beliefs,

it permits self-identified polygamists and objectophiles to marry as well, who have also faced a

"long history of disapproval." Otherwise, gay marriage is a non-secular sham that establishes

Secular Humanism as the supreme religion.

**Individual Right For Polygamists And Objectophiles Too Or It's A Non-secular Sham**
16. The Majority in *Obergefell* stated:

"The Due Process Clause of the Fourteenth Amendment long has been interpreted to protect
certain fundamental rights central to individual dignity and autonomy." Id. at 12. While relying
on *Loving*, the Majority also stated, "The first premise of the Court's cases is that the right to
personal choice regarding marriage is inherent in the concept of individual autonomy." Id.

In applying that liberal logic here, Plaintiff Sevier is an "individual" who has the "autonomous

right" to marry an object as a matter of "dignity" and "personal choice." Id. Same goes with the

self-identified polygamists litigants as to plural marriage, which simply involves three

individuals. If self-identified polygamists and objectophiless are not allowed the individual right

to legally marry, legally recognized gay marriage is a non-secular sham.

**Existing Right For Polygamists And Objectophiles Too Or It's A Sham**
17. The *Obergefell* Majority floated:

"The dynamic of our constitutional system is that individuals need not await legislative action
before asserting a fundamental right. The Nation's courts are open to injured individuals who
come to them to vindicate their own direct, personal stake in our basic charter. An individual can
invoke a right to constitutional protection when he or she is harmed, even if the broader public
disagrees and even if the legislature refuses to act." *Obergefell* at 25.

Just as self-identified homosexuals did not have to wait to assert the individual and fundamental

right to marry, neither do self-identified polygamists and objectophiles. Id. at 5. Since

self-identified homosexuals, didn't have to wait, that means that self-identified polygamists and

objectophiles do not have to wait either. If that is not the case, legally recognized gay marriage is

a sham being used to validate a series of naked assertions and unproven faith based assumptions

that are at best implicitly religious and not disproven. The Majority in *Obergefell* stated that "the past alone does not rule the present," which means that the Plaintiffs and others must enjoy the same right to marry as self-identified homosexuals at present. *Obergefell* at 11. Otherwise, gay marriage is a non-secular sham that fails the prongs of *Lemon*.

**Intimate Choice For Polygamists And Objectophiles Too Or It's A Non-Secular Sham**
18. The Majority in *Obergefell* stated "Like other choices protected by the Due Process Clause, decisions concerning marriage are among the most intimate that an individual can make." *Obergefell* at 3. Just as marriage is "intimate" for self-identified homosexuals, it follows that marriage is is an "intimate" choice for self-identified objectophiles, zoophiles, and polygamists too. *Lawrence*, supra, at 567. *Obergefell* at 14. Using "intimacy" as a basis to justify legally recognized gay marriage is another emotional appeal to shoehorn the edits of the religion of Secular Humanism into a legal reality that fails to get around the Establishment Clause under *Holloman*, 370 F.3 1252 at 1285-1286. (Emotional appeals do not usurp the Establishment Clause no matter how well intended on the surface).

19. The *Obergefell* Majority stated, "in *Lawrence v. Texas*, the Court held that private intimacy of same-sex couples cannot be declared a crime, yet it does not follow that freedom stops there." *Obergefell* at 14. Additionally, it "does not follow that freedom stops there either" for self-identified polygamists, zoophiles, pedafiles, and objectophiles either. Either all individuals in the non-obvious class of sexual orientation are to be provided civil rights to marry or the Secular Humanist Majority in *Obergefell* was just monkeying with the Fourteenth Amendment to the point that they can be impeached for treason. The Majority in *Obergefell* stated, "outlaw to outcast may be a step forward, but it does not achieve the full promise of liberty." Applying that liberal logic here, polygamists and objectophiles should be allowed to progress forward from

"outlaw to outcast to the full promise of liberty as well." If that analysis is not true, then legally

recognized gay marriage is a sham and *Obergefell* must be overruled for having been staged on

the wrong Constitutional narrative.

**Sexual Orientation Is A Protected Class For All Individuals Or It's A Non-secular Sham**
20. The Majority in *Obergefell* stated, "indeed, as the Supreme Judicial Court of Massachusetts

has explained the decision whether and whom to marry is among life's momentous acts of

self-definition, and this is true for all persons, whatever their sexual orientation." *Goodridge v.*

*Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003); *Goodridge,* 440 Mass., at

322, 798 N. E. 2d, at 955. *Obergefell* at 13. In applying that liberal logic "all persons, whatever

their sexual orientation" includes the Plaintiff Sevier whose "sexual orientation" is that of an

objectofile. For the Plaintiffs and self-identified polygamists to have the right to legally marry an

object or multiple people is "among life's momentous acts of self-definition" for them too.

**Emotional Appeals**
21. The third reason why Supreme Court expanded marriage to parody forms was because "the

right to marry safeguards children." *Obergefell* at 15. Yet, "many [self-identified homosexuals,

polygamists, and objectophiles] provide loving and nurturing homes to their children, whether

biological or adopted" too. Just as in the case with homosexuals, there are a lot of children being

raised by objectophiles and polygamists as well. "Excluding [polygamists and objectophiles]

from marriage thus conflicts with the central premise of the right to marry, inflicting stigma,

uncertainty, and humiliation on the children of [polygamists and objectophiles] through no fault

of their own."

22. The *Obergefell* Majority stated, "no union is more profound than marriage, for it embodies

the highest ideals of love, fidelity, devotion, sacrifice and family." If that is true for

self-identified homosexuals, it is true for self-identified polygamists, zoophiles, and
objectophiles too.

## B. **JURISDICTION AND VENUE**

23. This action raises questions under the Constitution of the United States and 42 U.S.C. §

1983, and thus this Court has jurisdiction over all claims for relief pursuant 28 U.S.C. § 1331.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all Defendants reside

in this District and in this State. Venue is also proper because a substantial part of the events

giving rise to the claims occurred in this district.

25. This Court has the authority to enter a declaratory judgment and to provide preliminary and

permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure,

and 28 U.S.C. §§ 2201 and 2202.

## **NATURE OF THE CASE**

26. Currently, the legal definition of marriage is either too underinclusive or overinclusive to

survive any level of scrutiny under either the Establishment Clause or the Equal Protection and

Substantive Due Process Clauses. Shy of continued judicial tyranny, there are five possible

outcomes in this action as set forth in the Plaintiffs' already written motions for summary

judgment that are summarized below:

A. **Option One**: The Court must find that all self-asserted sex-based identity narratives that
are questionably (1) moral, (2) real, and (3) legal are subjected to the exclusive
jurisdiction of the Establishment Clause to include homosexuality, polygamy, zoophilia,
objectophilia, and others, since they are all part of the overall religion of western
postmodern moral relativism, expressive individualism, evangelical atheism, and Secular
Humanism. *Torcaso v. Watkins,* 367 U.S. 488 (1961). The Court must declare that the
Establishment Clause is (1) the correct Constitutional narrative, (2) the ultimate DOMA §
3, and (3) the National marriage ban that tells all 50 states how they can legally define
marriage. The Court must hold that legally recognized gay marriage, transgender
bathroom policies, and any statute that treats sexual orientation as a civil right are a
non-secular shams that fail every prong of the *Lemon* test and coercion test under the

Establishment Clause by a landslide. *Lynch v. Donnelly,* 465 U.S. 668, 687-94 (1984); *Lee v. Weisman,* 505 U.S. 577 (1992); *School District v. Doe,* 530 U.S. 290 (2000); *County of Allegheny v. ACLU,* 492 U.S. 573 (1989). All that is need to force the court to enjoin is proof that gay marriage, transgender bathroom policies, and sexual orientation civil rights statutes fail just of one of three prongs. *Edwards v. Aguillard,* 482 U.S. 578, 583 (1987);; *Agostini v. Felton,* 521 U.S. 203, 218 (1997). The Plaintiff will show that legally recognized gay marriage and fake sexual orientation civil rights statutes violate all three prongs of *Lemon* from every angle. It is not a close call. Ultimately, this Court must hold that bright line rule in *State v. Holm,* 137 P.3d 726, 734 (Utah 2006) applies to all parody marriages across the board no matter who it offends. The bright line rule permits self-identified transgenders, unicorns, wizards, objectophiles, homosexuals, zoophiles, and polygamists to have wedding ceremonies in step with the Freedom Of Expression Clause but prevents the government from legally recognize those kinds of marriages because they are not secular. The Establishment Clause was never designed to only prevent the government from respecting unproven truth claims of "institutionalized religions" but of non-institutionalized religions as well. Our government was never designed to be used by moral relativists to enshrine their religious worldview in the hopes that they would feel less inadequate and ashamed about a belief system that is faith-based, obscene, and categorically subversive to human flourishing. On balance, legally recognized gay marriage is the greatest non-secular sham ever codified by the United States Judiciary, since the inception of American Jurisprudence. Legally recognized gay marriage has been a total disaster from a factual and Constitutional perspective. This Court's job is to apply the law, not make it up. The Court must overrule *Obergefell* and enjoin the state no matter who it offends. Though the heavens may fall, the Court is being asked to do justice.

B. **Option Two**: The Court could enjoin the state from legally recognizing gay marriage, transgender bathroom policies, and statutes that pretend that sexual orientation is a suspect class under res ipsa loquitur because the government is promoting obscenity and eroding community standards of decency. Homosexual speech is "obscene." "Any school boy knows that a homosexual act is immoral, indecent, lewd, and obscene. Adult persons are even more conscious that this is true." *Schlegel v. United States*, 416 F. 2d 1372, 1378 (Ct.Cl.1969). Obscene speech is unprotected. *Miller v. California.* 413 U.S. 15, 3034 (1973). States have a compelling interest to uphold community standards of decency, not to erode them for political gain. *Paris Adult Theatre I v. Slaton,* 413 US 49, at 63, 69 (1973). According to the Supreme Court, community standards of decency do not evolve, and if they do, it is not always for the better. "To simply adjust the definition of obscenity to social realities has always failed to be persuasive beforethe Courts of the United States." *Ginsberg v. New York,* 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), *Mishkin v. State of New York,* 383 U.S. 502, 509, 86 S. Ct. 958, 16 L. Ed. 2d 56 (1966), and *Bookcase, Inc. v. Broderick,* 18 N.Y.2d 71, 271 N.Y.S.2d 947, 951, 218 N.E.2d 668, 671 (1966).

C. **Option Three:** the Court must enjoin the state for discrimination against "religion and religion" under the Establishment Clause. Homosexuality, zoophilia, objectophilia,

polygamy are merely different denominational sects within the overall church of moral relativism, since they are all based on similar unproven faith based assumptions and naked assertions that are implicitly religious in nature. (DE _ Quinlan ¶¶ 1-37; DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo; ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34. See Amicus Brief of Garden State Families). As members of a minority sect within the church of moral relativism, the Plaintiffs have standing to enjoin the state so that gay marriage gets the same treatment under the law as objectophile and polygamy marriage. *McCreary Cnty, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Engel v. Vitale*, 370 12 U.S. 421, 431 (1962). Here is an illustration so that the Court and the Defendants can understand: the legislature could give tax breaks to the Lutheran Church, but it would have to give tax breaks to the Methodist Church as well, since both denominations are part of the overall religion of Christianity. Otherwise, discrimination against religion and religion results. At the moment that the State refused to endorse other forms of parody marriage while at the same time providing a constellation of benefits to married self-identified homosexuals, the State violated the Plaintiff's Constitutional rights and gave them Article III standing to enjoin for discrimination of religion and religion.

D. **Option Four**, In order to try and save "gay marriage," the Court could grant the Plaintiffs the same marriage rights and benefits as the homosexuals under the Establishment Clause to cure the discrimination against "religion and religion." *Hobbie v. Unemployment Appeals Commission*, 480 U.S. 136, 144-45 (1987). But this option is not as valid as the first three options because it continues to place "religion over non-religion" at the expense of the Constitution. Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion." *Lee v. Weissman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU*, 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). If this Court agreed to legally recognize polygamy marriage and man-object marriage in order to save gay marriage, the Court only only further be putting "religion over non-religion" in an unconstitutional manner that erodes valid Constitutional rights. That is, if the government were to legally endorse all other parody marriages to restore the integrity of the Fourteenth Amendment, it would only further entangle the government with the religion of Secular Humanism in violation of the Establishment Clause.

A. **Option Five:** The Court could continue to pretend that the Fourteenth Amendment informs the States how to define marriage, honoring Stare Decisis and providing the Plaintiffs and others the same civil rights and benefits afford to self-identified homosexuals in accordance with the holdings in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015). If marriage really is an "existing right," "individual right," "fundamental right" based on a "personal choice" for self-identified homosexuals under the Equal Protection and Due Process Clause as prior courts pretended, then very obviously self-identified

zoophiles, polygamists, and objectophiles deserve those identical rights to legally marry in step with their self-asserted sex-based identity narratives no matter how morally repugnant. *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (fundamental right); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 63940 (1974) (personal choice); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (existing right/individual right); *Lawrence v. Texas*, 539 U.S. 558 (2003) (intimate choice). This is not a question of a "slippery slope;" this is a question of how the Constitution works. If "sexual orientation" really was a matter of "civil rights," then all of the non-obvious classes of sexual orientation warrant those same civil rights to include objectophiles, zoophiles, and polygamists no matter how "morally disapprov[ing]" anyone found them to be. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 27879, 96 S. Ct. 2574, 2578, 49 L. Ed. 2d 493 (1976); *Lawrence v. Texas*, 539 U.S. 558 (2003). After all, "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare. . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 635 (1996). In his dissent read from the bench in *Obergefell*, the Honorable Chief Justice Roberts already admitted that if "gay rights" are "civil rights" then "polygamy rights" are also "civil rights." [9] So there you have it: "no psychoanalysis or dissection is *Obergefell* required here, where there is abundant evidence, including his own words, of the Chief Justice's purpose."*Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003). Due to the infiltration of blind Secular Humanists on the bench, there is no shortage of cases that pretend that sexual orientation is a suspect class, and surely there are other non-obvious classes that warrant the same protection as the largest minority (the homosexual class).[10]

---

[9] "Indeed, from the standpoint of history and tradition, a leap from opposite-sex marriage to same-sex marriage is much greater than one from a two person union to plural unions, which have deep roots in some cultures around the world. If the majority is willing to take the big leap, it is hard to see how it can say no to the shorter one. It is striking how much of the majority's reasoning would apply with equal force to the claim of a fundamental right to plural marriage. If "[t]here is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices," ante, at 13, why would there be any less dignity in the bond between three people who, in exercising their autonomy, seek to make the profound choice to marry? If a same-sex couple has the constitutional right to marry because their children would otherwise "suffer the stigma of knowing their families are somehow lesser," ante, at 15, why wouldn't the same reasoning apply to a family of three or more persons raising children? If not having the opportunity to marry "serves to disrespect and subordinate" gay and lesbian couples, why wouldn't the same "imposition of this disability," ante, at 22, serve to disrespect. *Obergefell* at 21 (Justice Roberts Dissenting).

[10] If gay marriage is a sham, then so are the holdings in countless other cases. See *Lalli v. Lalli*, 439 U.S. 259, 264-65 (1978);;;; *Craig v. Boren*, 429 U.S. 190, 197-98 (1976)(indicating that sexual orientation is a basis for suspect classification). Courts have stated that sexual orientation has no "relation to [the] ability" of a person 'to perform or contribute to society." *City of Cleburne*, 473 U.S. at 440-41;;;; see *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 3 18-19 (D. Conn. 2012) ("[T]he long-held consensus of the psychological and medical community is that 'homosexuality per se implies no impairment in judgment, stability, reliability or general or social or vocational capabilities.") (quoting 1973 RESOLUTION OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION);;;; *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1002 (N.D. Cal. 2010) ("[B]y every available metric, opposite-sex couples are not better than their

## THE PARTIES

27. Plaintiff Robin Goodspeed is a Wyoming taxpayer. She self-identified as a homosexual for

years before converting to a new identity narrative. (See Declaration of DE _ Goodspeed ¶¶

---

same-sex counterparts;;;; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal.");;;; see also *Watkins v. US. Army*, 875 F.2d 699, 725 (9th Cir. 1989) ("Sexual orientation plainly has no relevance to a person's ability to perform or contribute to society.") The Courts also contend sexual orientation is immutable. As the Supreme Court acknowledged, sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual even if one could make a choice. *Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom"). See, e.g., *Perry*, 704 F. Supp. 2d at 964-66 (holding sexual orientation is fundamental to a person's identity);;;; *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (holding that sexual orientation and sexual identity are immutable). Furthermore, the scientific consensus is that sexual orientation is an immutable characteristic. See *Pedersen*, 881 F. Supp. 2d at 320-21 (finding that the immutability of sexual orientation "is supported by studies which document the prevalence of long-lasting and committed relationships between same-sex couples as an indication of the enduring nature of the characteristic.");;;; *Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation.");;;; see also *G.M. Herek*, et al., Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults in a US. Probability Sample, 7 SEXUALITY REs. & Soc. POL'Y 176, 186, 188 (2010) (noting that in a national survey, 95 percent of gay men and 84 percent of lesbian women reported that they "had little or no choice about their sexual orientation.") Certain classes of sexual orientation constitute a minority group that lacks sufficient political power to protect themselves against discriminatory laws that lack political power and deserve suspect classification. See, e.g., *SmithKline Beecham Corp. v. Abbott Labs*, 740 F.3d 471, 480-84 (9th Cir. 2014) (holding use of peremptory strike against gay juror failed heightened scrutiny);;;; see also *Pedersen*, 881 F. Supp. 2d at 294 (finding statutory classifications based on sexual orientation are entitled to heightened scrutiny);;;; *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 314-33 (N.D. Cal. 2012) (same). See *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (citing *Dep't of Agr. v. Moreno*, 413 U.S. 528, 534 (1973)) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare. . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.") (emphasis added). Then, in 2003, the Court held that homosexuals had a protected liberty interest to engage in private, sexual activity;;;; that homosexuals' moral and sexual choices were entitled to constitutional protection;;;; and that "moral disapproval" did not provide a legitimate justification for a Texas law criminalizing sodomy. See *Lawrence*, 539 U.S. at 564, 571. The Court held that the Constitution protects "personal decisions relating to marriage, procreation, contraception, family relationships, [and] child rearing" and that homosexuals "may seek autonomy for these purposes." Id. at 574. Most recently, in 2013, the United Supreme Court held that the Constitution prevented the federal government from treating state-sanctioned heterosexual marriages differently than state-sanctioned same-sex marriages, and that such differentiation "demean[ed] the couple, whose moral and sexual choices the Constitution protects." See *Windsor*, 133 S. Ct. at 2694.

1-20). Plaintiff Goodspeed has testified repeatedly that homosexuality is a religious doctrine that comes out of the religion of Secular Humanism. Plaintiff Goodspeed does not want a penny from the Government going towards the promotion of homosexual ideology or the government's entanglement with the religion of Secular Humanism.

28. The Plaintiff Sevier is a former Combat infantry Officer, Judge Advocate General, United States Attorney, author of legislation, and Congressional Liaison between the Senate and the House. In step with his rights under the Freedom of Expression Clause, Plaintiff Sevier self-identifies as an "objectophile." He self-asserts that his sexual orientation is that of Objectophillia.[11] He sought a marriage license from the County Clerk - having met all of the requirements - and was arbitrarily denied for procedural and other reasons that self-identified homosexuals once were. Plaintiff Sevier is a taxpayer of this state. He is a member of the Special Forces Of Liberty, which has a chapter in this State. (See Declaration of Special Forces Of Liberty). As a taxpayer, Plaintiff Sevier moves under the Establishment Clause to enjoin the state from legally respecting any parody marriage. Plaintiff Sevier does not want self-identified homosexuals to receive special benefits and rights over self-identified objectophiles, who are all in the same ideological spectrum. However, if and only if, the Court wants to continue to pretend that marriage is a civil right or that sexual orientation is a civil rights matter, Plaintiff Sevier moves under the Fourteenth Amendment for equal treatment under the law. Like Judge Ruth Neely, Plaintiff Sevier has been maliciously and relentlessly targeted, persecuted, and harangued

---

[11] Object sexuality or objectophilia is a form of sexuality focused on particular inanimate objects. Those individuals with this expressed preference may feel strong feelings of attraction, love, and commitment to certain items or structures of their fixation.

by an immoral ethics commision in Tennessee. These Ethic's State ran commissions fail to know the objective difference between immoral and immoral, right and wrong, real and fake.

29. Plaintiff Gunter self-identifies as a polygamists. He wants to marry multiple wives. He wants to add Plaintiff Kohl and Plaintiff Grace as his spouses. Plaintiff Gunter wants to have a wedding in this state. He and the other Plaintiffs approached the clerk's office in county at issue about issuing marriage licenses to reflect their self-asserted sexual orientation and sex-based identity narratives and the Clerk said no for procedural and other reasons. Plaintiff Gunter is a taxpayer. He is a member of the Special Forces of Liberty, which has a chapter in this State. Plaintiff Gunter moves under the Establishment Clause to enjoin the State from legally respecting any form of parody marriage and from enforcing any statute that treats sexual orientation as a civil rights matter. If and only if the Court continues to find that marriage is a civil right, Plaintiff Gunter moves under the Fourteenth Amendment to enjoy the equal protection under the law.

30. Plaintiff Grace Harley was born as a woman but self-identified as a transgender for 18 years. Due to feelings of inadequacy and insecurity, she was manipulated and seduced into buying into the self-serving religious doctrine floated by the LGBTQ church under the false guise of secularism. "Joan the woman" become "Joe the man." She once married a female. In 1992, she left the transgender identity narrative behind completely converting to a totally different one having been radically transformed by the truth. She now self-identifies as a polygamist. As an African American growing up in the south she experienced discrimination because of her skin color. Once she became an ex-gay, she has been relentlessly threatened and harassed by the believers in the homosexual ideological religion. Plaintiff Grace Harley is a licensed Reverend. She is outspoken against the lies advocated by the LGBTQ church despite the personal threat to

her safety and wellbeing. She now self-identifies as a polygamist. (See Declaration of Harley).

Plaintiff Grace Harley is a taxpayer of this State. She is a member of the Special Forces of

Liberty, which has a chapter in this State. She seeks the same relief as Plaintiff Gunter.

31. Plaintiff Kohl was straight. She was engaged to a man. But he was mean to her. So she

decided to self-identify as a lesbian and then legally married a woman only to discover that it

was "hell on earth." She now self-identifies as a polygamist and wants the government to pay

respect to her new and modern beliefs on marriage, sex, and morality. She seeks the same relief

as Plaintiff Gunter.

32. Defendant Peter K. Michael , is the Attorney General of this State. ("Attorney General"). In

his official capacity, the Attorney General is the chief legal officer of this State. It is the

Attorney General's duty to see that the laws of the State are uniformly and adequately enforced.

The laws that the Attorney General enforces is giving benefits to individuals who self-identify as

homosexual who marry based on their self-asserted identity narrative but not to objectophiles,

zoophiles, and polygamists. The Attorney General's office is giving special treatment to

individuals who self-identify as homosexual under the law but not those who have a different

sex-based self-asserted identity narrative and who are members of the smaller denominational

sect within the church of moral relativism. The Attorney General is violating his Article VI duty

owed to the Constitution by overseeing the distribution of a constellation of benefits to

self-identified homosexuals in a manner that entangles the government with the religion of

Secular Humanism.

33. Defendant Matt Mead is the Governor of the State of Wyoming ("Governor"). In his official

capacity, the Governor is the chief executive officer of this State. It is his responsibility to ensure

that the laws of the State are properly enforced. The Governor is overseeing laws that give

benefits to homosexuals who are married but not objectophiles, zoophiles, and polygamists in

violation of both the First and Fourteenth Amendments.

34. Wendy Soto is the executive director of commission on Judicial Ethics and Conduct. The

Commission on Judicial Ethics and Conduct is a sham. The Commission objectively fails to

understand the difference between right and wrong, real and fake, secular and non-secular. The

Commission on Judicial Ethics is like the thought police. Like Lois Lerner at the IRS or the

Tennessee Board of Professional Responsibility, the Commission on Judicial Ethics targets

Christians. These State ethic commissions operate out of sense of a moral superiority complex

that is dangerous. Their intent is not justice. They seek to stifle, intimidate, harm, and

marginalize people who disagree with their religious ideology grounded in moral relativism.[12]

The Honorable Judge Neely was the Commission's latest victim. The State run Ethics

Commissions are rife with Secular Humanists who form conclusions about Christians and people

they consider to be part of the "basket of deplorables" as referred to by former Secretary of State

Clinton. These commissions then set out to find evidence to meet that conclusion. These

---

[12] Like Judge Neely, Plaintiff Sevier was greatly harmed, targeted, and harassed by the immensely dishonest ethics commission in Tennessee, who intentionally uses the office to target anyone who interferes with their religious worldview and selfish political agenda. See Sevier v. Jones, NO. 3-11-0435 (M.D. Tenn. Feb. 15, 2012) and *Sevier v. Windle,* 3:2011-cv-00246 (March 15, 2011). Krisann Hodges at the BPR should be in jail. The BPR picks lawyers to target who interfere with the personal ambitions of its employees. They invent fake ethical charges and harass lawyers whose religious beliefs do not match their own. In the case of Plaintiff Sevier, the BPR attempted to use his Military Service in Iraq to hurt him for suing the BPR in Federal District Court for a litany of corrupt dealings. The lack of accountability over the Ethics commission make them a disgrace and embarrassment to the Judiciary. The ethics commissions are themselves incredibly immoral often times and there is no adequate checks and balances over them. The Ethics commissions are typically managed by third tier attorneys who were at the bottom of their class in law school. Many - if not most - of the lawyers on the ethics commission lack the objective ability to determine the difference between right and wrong, real and fake, and secular and non-secular. These ethics commissions are a waste of taxpayer dollars. They commit incredible acts of intellectual dishonesty and are by and large rife with inept human beings, who would make good reporters at MSNBC or CNN, but they are horrible lawyers. The moral superiority complexes manifested by ethics commissions that lack accountability make them a major threat to American Democracy and the integrity of the Judicial branch.

commissions are an insult to the Constitution and the rule of law. The people working at these

commissions are by and large intellectually challenged and horrible people.

35. Defendant Susan Saunders is the Clerk of Campbell County Wyoming. The Clerk is

responsible for maintaining vital records of marriages, issuing marriage licenses, and performing

civil marriage ceremonies in Campbell County. Defendant Saunders issues marriage licenses to

individuals who self-identify as homosexual but refuses to issue marriage licenses to zoophiles,

objectophiles, and polygamists on a basis that can only be described as procedurally arbitrary.

36. Defendants, and those subject to their supervision, direction, and control, are responsible for

the enforcement of marriage policies, transgender bathroom policies, and the enforcement of

fake sexual orientation discrimination statutes that assert that gay rights are civil rights, and other

laws and policies that have caused the Plaintiffs and others to be injured and socially

marginalized. The relief requested in this action is sought against each Defendant, as well as

against each Defendant's officers, employees, and agents, and against all persons acting in

cooperation with Defendant(s), under their supervision, at their direction, or under their control.

## UNDISPUTED MATERIAL FACTS

37. Robin Goodspeed is a taxpayer living in Wyoming. She self-identified as a lesbian for years.

She indoctrinated herself in LGBTQ ideology that is part of the religion of Secular Humanism.

She turned to Christianity and converted to a brand new identity narrative leaving behind

lebsianism completely. She has testified in many cases that homosexuality is a doctrine that is

religious in nature.

38. Mrs. Goodspeed has been antagonized by the phony tolerant LGBTQ church and Secular

Humanists for being an outspoken ex gay. In the wake of Obergefell, Mrs. Goodspeed has been

subjected to increased persecution and the threat of persecution by Secular Humanists and the LGBTQ community. Mrs. Goodspeed does not want a penny of her taxpaying dollars going to the Defendants in their efforts to respect, endorse, promote, and recognize gay marriage and policies that treat self-asserted sexual orientation that fails to check out with the human design as if it is a civil rights matter.

39. The Defendants in this action have a duty under Article VI to uphold the Constitution.

40. The decision of the Wyoming Supreme Court to censure the Honorable Judge Neely was a decision issued by Secular Humanist that violated the Establishment Clause. Defendant Soto knowingly and unethically brought a frivolous ethics complaint against Justice Neely, which ultimately compelled Secular Humanists on the Wyoming Supreme Court to make an outrageously unconstitutional decision that undermines the confidence in the judiciary for objectively not being able to determine the difference between right and wrong, real and fake, and secular and non-secular.[13]

41. Defendant Soto is Executive Director of the Commission on Judicial Ethics and Conduct. Defendant Soto does not know the objective difference between right and wrong, real and fake, ethical and unethical, and secular and non-secular. Defendant Soto knows that homosexuality is immoral and that it erodes community standards of decency. Defendant Soto knows that homosexuality is not really a civil rights issue. Defendant Soto, acting under the color of law, censured the Honorable Judge Ruth Neely for a comment she made to reporters about her reservations about officiating a parody marriage ceremony as a state official.[14]

---

[13]http://www.nationalreview.com/article/445754/wyoming-supreme-court-censures-christian-judge-over-same-sex-marriage

[14] https://www.cbsnews.com/news/ruth-neely-wyoming-judge-against-same-sex-marriage-censured/

42. Plaintiff Sevier self-identifies as a objectophile, who married an object in New Mexico with female like features.[15] He approached the Clerk's office in County at issue and asked that the clerk either legally recognize his out-of-state marriage or that the Clerk issue him a new marriage license. The clerk refused to do so, just as the Clerk's in Utah, Colorado, Alabama, Arkansas, Mississippi, and Kentucky refused for procedural and moral reasons. See *Sevier et. al. v. Herbert et. al,* 2:16-cv-00659 (C.D. U.T. 2016);; *Sevier et. al. v. Hickenlooper et. al., 17-cv-1750 (C.O.D. 2017);; Sevier et. al. v. Ivey et. al.,* 2:17-cv-01473 (N.D. A.L. 2017);; *Gunter et. al. v. Bryant et. al.,* 3:17-cv-00177-NBB-RP *(N.D M.S 2017);; Sevier et. al. v. Brown et. al.,* 3:17-cv-05046 (N.D. C.A. 2017);; *Kohl et. al. v. Hutchinsen et. al.,* 4:17-cv-00598 (E.D. A.R. 2017):

43. Plaintiffs Kohl, Gunter, and Grace Harley self-identified as polygamists. They approached the County Clerk about having a marriage issued to them that reflected their self-asserted sexual orientation. The clerk refused to do so. (DE _ Kohl ¶¶ 1-12; DE _ ¶¶ Grace Harley 1-25; DE _ Gunter ¶¶ 1-9).

44. In this state, the Clerks are issuing marriage licenses to self-identified homosexuals based on their sexual orientation or self-asserted sex-based identity narrative. The Governor and State officials are providing full marriage benefits and privileges to legally married self-identified homosexuals but not to self-identified polygamists and objectophiles for procedural and moral reason.

---

[15] http://www.wnd.com/2017/07/man-marries-computer-demands-cake-by-christian-baker/

45. No one can really prove or disprove that they were "born in the wrong body," just as there is

no proof that there is a "rape gene," there is a dispute in the medical profession whether there is a

"gay gene." (DE _ Dr. King ¶¶ 1-20;  DE _ Dr. Cretella  ¶¶ 1-20).[16]

46.  There are former gay activists who self-identified as homosexual and who indoctrinated

themselves with the LGBTQ ideology only to completely leave the lifestyle behind converting to

a totally different sex-based identity narrative. (DE _ Quinlan ¶¶ 1-37;  DE _ Pastor Cothran ¶¶

1-50; DE _ Dr. King ¶¶ 1-20;  DE _Dr. Cretella  ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace

Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo;  ¶¶ 1-21;  Pastor Farr ¶¶ 1-33; DE 24

Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski  ¶¶ 1-34. See Amicus Brief of Garden State

Families).[17] Many former homosexuals have testified under oath that homosexuality has nothing

to do with immutability and that it is a religious doctrinal belief system that is part of the religion

of Secular Humanism.

47. Two self-identified homosexuals successfully prevailed against Masterpiece Cakeshop and

Jack Phillips in Colorado administrative court and before the Colorado Court of Appeals for

discrimination under Colo. Rev. Stat. § 24-34-601 et. seq. That action is pending before the

United States Supreme Court. The Plaintiffs have a lawsuit pending against Masterpiece

Cakeshop and Jack Phillips for refusing to design and provide wedding cakes in support of their

wedding ceremonies held in accordance with their self-asserted sexual orientation. *Harley v.*

*Masterpiece Cakeshop ltd.* 17-cv-1666 (C.O.D 2017) (See Exhibits) The Plaintiffs in this action

---

[16]  http://www.cnsnews.com/blog/michael-w-chapman/johns-hopkins-psychiatrist-there-no-gay-gene

[17] Besides Michael Jackson, no one in human history changed their skin color as an act of will, and even the king of pop had to undergo a series of chemical peels.

moved to intervene before the United States Supreme *Court in Colorado Civil Rights Commission v. Masterpiece Cakeshop ltd.* 16-1111 (2016), as intervening respondents.

48. Licensed ministers who are experts in religion are attesting that homosexuality is part of the religion of Secular Humanism. DE_ Pastor Cuozzo ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34.

49. The Supreme Court found that institutionalized religions are regulated by the Establishment Clause in *Torcaso v. Watkins,* 367 U.S. 488 (1961) stating that "among religions in this country, which do not teach what would generally be considered a belief in the existence of God, are Buddhism, Toaism, Ethical Culture, Secular Humanism, and others." See also *Washington Ethical Society v. District of Columbia,* 101 U.S.App.D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v. U.S,* 1970398 U.S. 333 (U.S. Cal. June 15)

50. The LGBTQ community is "organized, full, and provide[s] a comprehensive code by which individuals may guide their daily activities." *Real Alternatives, Inc. v. Burwell,* 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), aff'd sub nom. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* No. 16-1275, 2017 WL 3324690 (3d Cir. Aug. 4, 2017).[18]

---

[18] In *Real Alternatives,* the court stated: "we detect a difference in the "philosophical views" espoused by [the plaintiffs], and the "secular moral system[s]...equivalent to religion except for non-belief in God" that Judge Easterbrook describes in *Center for Inquiry,* 758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except belief in a deity." *Id.* at 872. These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities. Instead having a cross or the ten commandments, the LGBTQ church has the gay pride flag and their own commandments, such as if you disagree with LGBTQ ideology you are a bigot worth marginalizing. The unproven naked truth claims evangelized by the LGBTQ church such as (1) there is a gay gene, that (2) people can be born in the wrong body, that (3) same-sex sexual activity checks out with the human design, that (4) same-sex buggery is not immoral, and

51. Plaintiff Sevier, as a self-identified objectophiles, moved to intervene in these same-sex marriage actions under Fed. R. Civ. P. 24: *Bradacs v. Haley*, 58 F.Supp.3d 514 (2014);; *Brenner v. Scott*, 2014 WL 1652418 (2014);; *General Synod of The United Church of Christ v. Cooper*, 3:14cv213 (WD. NC 2014);; *Kitchen v. Herbert*, 755 F. 3d 1193, 1223 (CA10 2014);;;; *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014);; *Majors v. Horne*, 14 F. Supp. 3d 1313 (Ariz. 2014);;;; *Deleon v. Abbott*, 791 F3d 619 (5th Cir 2015);; *Tanco v. Haslam*, 7 F. Supp. 3d 759 (MD Tenn. 2014);; *Bourke v. Beshear*, 996 F. Supp. 2d 542 (WD Ky. 2014);; and *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015). Every time Plaintiff Sevier moved to intervene, the homosexual litigants opposed his intervention. (DE 11 Sevier ¶¶ 1-18). In *Brenner*, Judge Hinkle found that the legal basis for man-object marriage "removed from reality." (See Exhibits)

52. States have a compelling interest in upholding community standards of decency. See *Paris Adult Theatre I v. Slaton*, 413 US 49, at 63, 69 (1973).

46. Two years after *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) and there has hardly been the "land rush" in gay marriage that was promised. The raw numbers tell the tale. Prior to the *Obergefell* decision two years ago, the 7.9 percent of gays who were married would have amounted to 154,000 married gay couples. Two years later, this had grown to 10.2 percent or 198,000 married couples. (See exhibits and public record).

53. Following the *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), Christians throughout the United States have been socially ostracized and hauled into court for not supporting gay marriage - see public record. Ex-gays have been targeted by the LGBTQ community. (DE _ Quinlan ¶¶

---

that (5) people come out of the closet baptized gay consists of a series of unproven faith based assumptions that are hyper religious and take a huge amount of faith to believe are even real, since these truth claims buck common sense and are more likely than not shallow qualifiers hoping to justify immoral sexual conduct that is indecent, immoral, and questionably legal.

1-37;  DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20;  DE _Dr. Cretella  ¶¶ 1-20; DE _

Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo;  ¶¶

1-21;  Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski  ¶¶ 1-34. See

Amicus Brief of Garden State Families); *Moore v. Judicial Inquiry Commission of the State of*

*Alabama,*, 2016200 F.Supp.3d 1328 (M.D. Ala.August 04);; *Patterson v. Indiana Newspapers,*

*Inc.* , 2009589 F.3d 357 (C.A.7 Ind.December 08);; *Gadling-Cole v. West Chester University*,

2012868 F.Supp.2d 390 (E.D. Pa.March 30). These Christians believe that to support sexual

immorality is itself an act of immorality and they do not want their tax payer dollars going

towards the government's entanglement with the religion of Secular Humanism.

54.  Man-man, woman-woman, man-object, man-animal, and man-multiperson marriage are all

equally not part of American heritage and tradition (See obscenity codes). (See Exhibit).

55.  Following *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), the LGBTQ community has been

entering public schools to advocate its ideology on sex, gender, faith, marriage, and morality.

See DE_ Pastor Penkoski  ¶¶ 1-34. "State issued gay married licenses" has amounted to a

"license" for the LGBTQ church to infiltrate elementary schools with the purpose of

indoctrinating minors to their worldview on sex that was illegal until recently.  *Lawrence v.*

*Texas*, 539 U.S. at 579  overturned *Bowers v. Hardwick*, 478 U.S. 186 (1986).

56.  There are Christians and other non-obverses of LGBTQ ideological narratives living in the

United States who will not support any form of gay marriage no matter how much government

pressure is put on them.  (See public record). See *Sevier v. Davis* 17-5654 (6th Cir. 2017) and

*Harley v. Masterpiece Cakeshop*, 17-cv-1666 (C.O.D. 2017). These Americans believe that

silence in the face of evil is to cooperate with it. They believe that homosexuality is subversive to

human flourishing and that it fails to check out with the human design as a member of self-evident common sense and truth. (DE _ Quinlan ¶¶ 1-37; DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo; ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34. See Amicus Brief of Garden State Families).

57. To say that "there are no absolutes" is an "absolute." Without "faith," there is no basis for "morality," and without "morality," there is no basis for "law."(See DE_ Pastor Cuozzo ¶¶ 1-21; Pastor Farr ¶¶ 1-33)

58. In the Wake of the *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) and *United States v. Windsor,* 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013), (1) fire Chiefs have been fired;[19] (2) The Chief Justice of the Alabama Supreme Court has been subjected to prosecution by the ethics commissions and suspended;[20] (3) County Clerks have been thrown in jail and subjected to merciless civil litigation;[21] (4) Christian Florists have been sued for providing artistic services in support of gay marriage ceremonies;[22] (5) Christian Bakers have been sued for refusing to use their artistic talents to design wedding cakes for gay marriage ceremonies;[23] (6) Law Professors have been harassed, bullied, and threatened for believing that gay marriage is immoral and unconstitutional;[24] (7) Ex-gay conventions have been disrupted by people who will not tolerant

---

[19] http://www.nationalreview.com/corner/428779/federal-court-keeps-atlanta-fire-chiefs-case-alive

[20] http://www.cnn.com/2016/09/30/politics/alabama-chief-justice-suspended/index.html
[21] www.npr.org/sections/thetwo-way/2017/05/03/526615385/gay-couples-lawsuit-against-kentucky-clerk-is-back-on-after-appeals-court-ruling
[22]

http://www.theblaze.com/news/2017/02/17/christian-florist-who-refused-to-make-gay-wedding-arrangements-to-take-case-to-u-s-supreme-court/
[23] https://www.nytimes.com/2017/06/26/us/politics/supreme-court-wedding-cake-gay-couple-masterpiece-cakeshop.html

[24] http://www.vanderbiltpoliticalreview.com/the-carol-swain-petition-hurts-the-cause-more-than-it-helps-but-theres-a-better-way/

the idea that homosexuality is not immutable due to a spectacular state of denial;[25] (8) Christian ranchers have been sued in civil court for refusing to host gay weddings on their farms.[26] In the wake of *Obergefell*, the transgender teen suicide rate is out of control. Politicians who push for gay rights and transgender rights are encouraging citizens to open the door to a lifestyle and ideology that could lead to suicide and suffering. The Obergefell decision encourages our citizens to open the door to an unhealthy decision that fails to check out with the givenness of our nature.

59. The Plaintiffs file a lawsuit without at the same time asking the Court to find the very law that they are authoring for the state and federal legislature. They have learned their lesson on that. The first piece of legislation that has already been birthed from this action is a resolution that declares that all self-asserted sex-based identity narratives that are questionable moral, legal, and real are to be classified as "non-secular" and part of the religion of Secular Humanism, Atheism, Moral Relativism, and Expressive Individualism and the second is act to be entitled "The Marriage and Constitution Restoration Act," which redefines marriage in a manner that accords with the Constitution.[27] Plaintiff Sevier and Gunter have already secured sponsors to carry this bill. By 2019 a majority of States and the Federal Congress will carry the act.

60. Plaintiff Sevier filed a lawsuit against Congressman Alan Lowenthal, Susan Davis, Donald S. Beyer, and Earl Blumenauer, See *Sevier v. Lowenthal*, 17-cv-0570 (D.C. 2017). Gunter, Kohl, and Grace Harley have moved to intervene as Plaintiffs in that action. In response to the lawsuit Congressman Davis and Lowenthal took to the media and falsely stated:

---

[25] https://www.lifesitenews.com/blogs/if-gays-are-so-tolerant-why-are-they-disrupting-an-ex-gay-conference
[26] http://www.theblaze.com/news/2014/08/21/judge-fines-christian-farm-owners-13000-for-refusing-to-host-gay-wedding/

[27] With all due respect, the Plaintiffs never file a lawsuit without writing the very law that they are litigating at the same time.

"I fly the Pride Flag outside my office in support of every LGBTQ individual—those in my district, those in our nation, and those around the world," Congressman Lowenthal said. "It is a symbol of both how far we have come on equality for all Americans and, as these incidents illustrate, how far we still have to go. It is a symbol of love, of peace, and diversity. I will fight this hateful attempt to silence equality and justice. We have come too far to allow the voices of bigotry and hate to win." [28]

61. Congresswoman Susan Davis took to the media and maliciously published:

As the proud representative of the heart of LGBTQ San Diego, the rainbow flag in front of my DC office is a source of pride for me and my constituents," she explained. "It is a symbol of our commitment to full equality. It is especially offensive to see this type of hateful behaviour right after our city celebrated Pride with a record high turnout," she added. "It's disheartening that in this day and age this is still an issue. Be assured that hateful lawsuits are not going to stop me from celebrating our nation's diversity. If anything, this lawsuit is a reminder of the need for us to work even harder for full equality for all Americans.

Congresswoman Susan Davis and Congressman Lowenthal's statements were "of and

concerning" Plaintiff Sevier. The statements were shallow, inept, hateful, dishonest, and

maliciously published. The Congressmen used their offices to publish statements that were

designed to cause people to avoid and shun him and put him in a disfavorable light and this did

occur. Congressmen violated the Congressional Code of Conduct and constituted libel per se.

## STATEMENT OF THE EVIDENCE, STATEMENT OF GENERAL BACKGROUND FACTS, PROPOSED LEGISLATIVE FINDINGS FOR THE SENATE SPECIAL INVESTIGATIONS AND STATE LEGISLATIVE BODIES

62. WHEREAS, when a person says that "love is love" or "love wins" in support of legally

recognized gay marriage what they really mean is that they are perfectly "ok" with government

assets being used to socially ostracize, marginalize, and oppress anyone who dares to think that

gay marriage is obscene, immoral, and subversive to human flourishing; *Masterpiece Cakeshop*

*ltd. v. Colorado Civil Rights Commission,* 16-111 (S.Ct. 2016); *Miller v. Davis,* No.15-5880

(6thCir.2016);

---

[28] http://www.joemygod.com/2017/07/20/man-sued-marry-laptop-sues-us-house-democrats-pride-flags-outside-offices/

63. It is axiomatic that " (1) people who are intolerant of intolerant people are intolerant; (2) people who are judgmental of judgmental people are judgmental; and (3) people who are dogmatic about not being dogmatic are dogmatic;"

64. Just as there is no proof of "rape gene," there is no proof of a "gay gene" either, and therefore, homosexuality is a matter of religion and faith;

65. No one can necessarily prove or disprove that they were "born the wrong gender;"

66. Man-man, woman-woman, man-animal, man-object, and man-multiperson marriages are controversial, unneutral, and non-secular; (*Brenner v. Scott*, 2014 WL 1652418 (2014))

67. All self-asserted sex-based identity narratives that do not check out with self-evident truth and are predicted on a series of unproven faith-based assumptions and naked assertions that are implicitly religious; (DE _ Quinlan ¶¶ 1-37; DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo; ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34. See Amicus Brief of Garden State Families.)

68. The bright line rule in *State v. Holm,* 137 P.3d 726, 734 (Utah 2006) perfectly balances the Freedom Of Expression Clause with the Establishment Clause by permitting self-identified homosexuals, polygamists, objectophiles, unicorns, wizards, pixies, pixies, furries, and zoophiles to have wedding ceremonies based on their beliefs about sex, marriage, and morality as a matter of free expression, while prohibiting the government from legally recognizing, endorsing, and respecting any of those parody marriages under the Establishment Clause as applied to the States by the Fourteenth Amendment;

69. In the wake of *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) either all self-identified sex-based identity narratives warrant equal protection or due process or the holding is a sham for purposes of the Establishment Clause for being non-secular under prong one of *Lemon*; ( *Lemon v. Kurtzman*, 403 U.S. 602 (1971))

70. In the wake of *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) all clerks in all 50 states are providing marriage licenses and the state and federal government are subsequently providing special benefits and protections to self-identified homosexuals based on their self-asserted sex-based identity narrative but are refusing to give those same benefits to self-identified zoophiles, objectophiles, and polygamists for reasons that can only be described as "arbitrary" from every angle;

71. Polygamy, zoophilia, objectophilia, and homosexuality are different denominational sects within the same church of moral relativism who deserve equal treatment under the law for better or worse; (DE _ Quinlan ¶¶ 1-37;  DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20;  DE _Dr. Cretella  ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶  1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo;  ¶¶ 1-21;  Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski  ¶¶ 1-34. See Amicus Brief of Garden State Families)

72. Courts have held that "atheism is a religion for purposes of the Establishment Clause," *Wells v. City and Cnty. of Denver,* 257 F.3d 1132 (2001), and the Supreme Court held in *Torcaso v. Watkins,* 367 U.S. 488 (1961) that "among religions in this country, which do not teach what would generally be considered a belief in the existence of God, are Buddhism, Toaism, Ethical Culture, Secular Humanism, and others;"[29]

---

[29] See also *Washington Ethical Society v. District of Columbia*, 101 U.S.App.D.C. 371, 249F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313

73. The trajectory of the First Amendment in light of insurmountable evidence shows that self-asserted sex-based identity narratives that do not check out with self-evident truth are part of the religion of atheism or Secular Humanism and are unrecognizable for purposes of the First Amendment Establishment Clause;

74. Homosexuality is a religious ideology that is part of the religion of Secular Humanism according to the testimony of ex-gays who lived the lifestyle for decades before totally leaving it behind, since it is a series of unproven faith based assumptions and naked assertions that can only be taken on faith; (DE _ Quinlan ¶¶ 1-37; DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo; ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34). See Amicus Brief of Garden State Families.

75. The fact that ex-gays exist demonstrates that trying to shoehorn "gay rights" into the Equal Protection Clause based on immutability is an act of Constitutional malpractice, political malpractice, and intellectual dishonesty stemming from the false belief that the ends justify the means; Id.

76. Man-man, woman-woman, person-object, person-animal, multi-person marriage have never been part of American Tradition and, therefore, the attempt to shoehorn "gay rights' into a Substantive Due Process narrative is an act of Constitutional malpractice and actionable fraud that should subject evolutionist judges to prosecution by the Department of of Justice under 18 U.S.C. § 2381 for treason and impeachment under the United States Judicial Code of Conduct, JCUS-APR 73 and Judicial Improvements Act of 2002, and Art. I, § 3, cl. 6 and 7;

---

(2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v. U.S*, 1970398 U.S. 333 (U.S. Cal. June 15)

77. Legally recognized gay marriage by the State and federal government violates all three prongs of the *Lemon* test and the Courts must enjoin upon the showing of the failure of just one prong;

78. Legally recognized gay marriage is a "non-secular sham" for purposes of the Establishment Clause that constitutes an indefensible weapon, a license to crush non-observers, and a permit to introdrinate minors in public schools under a dogma that remains categorically obscene and questionably legal;

79. The Majority in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) was absolutely correct in finding that the Constitution is not silent as to how all 50 states must legally define marriage;

80. The Dissent in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) was dead wrong in arguing that the individual states should be allowed to legally define marriage for themselves, since the Constitution is not silent as to how the states must all legally define marriage;

81. The Majority in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) was dead wrong in finding that the Fourteenth Amendment Equal Protection and Substantive Due Process Clauses told all fifty States how to legally define marriage;

82. The First Amendment Establishment Clause is the correct Constitutional prescription that, at most, permits all 50 states - regardless of whether they are blue or red states - to only legally define marriage between "one man and one woman," since "man-woman" marriage is the only secular form and all parody forms of marriage are equally "non-secular" for purpose of the Establishment Clause;

83. Man-woman marriage arose out of the "the nature of things" and did not arise out of a desire to acquire political power and to use government as a tool to show the irresponsible gospel of

moral relativism down the throats of our citizens. See G. Quale, A History of Marriage Systems
2 (1988); cf. M. Cicero, De Officiis 57 (W. Miller transl. 1913). *Obergefell* at 5 (Roberts
Dissenting).

84.  The dictionary is a secular text and "in his first American dictionary, Noah Webster defined
marriage as "the legal union of a man and woman for life," which served the purposes of
"preventing the promiscuous intercourse of the sexes, . . . promoting domestic felicity, and . . .
securing the maintenance and education of children." 1 An American Dictionary of the English
Language (1828). Id.

85.  Legally recognized man-woman marriage accomplishes its legal purpose and does not
promote any religion any more than the Bill Of Rights does;

86.  The United States is not a "pure Democracy;" the United States is a "Constitutional
Republic," and the First Amendment Preemption applies to blue states that voted to legally
recognize gay marriage; *Obergefell* at 5 (Roberts Dissenting)

87.  What really happened in *Obergefell* was that the fake tolerant homosexuals imperialistically
argued that "nobody's version of morality as a basis for law mattered except for theirs;"

88.  Cases are not litigated in a vacuum, and they have real world consequence that impact the
quality of freedom - especially confusing and harming minors;

89.  The moral relativist on the bench replaced a moral code that is predicated on self-evident
truth that the Nation was founded on with a their personal "private moral code" which is
predicated on pride and does not check out with "the way things are" and "the way we are,"
which has facilitated moral superiority complexes that cause harm;

90. To suggest that "doctrine as a basis for law does not matter" is itself a doctrine that suggest that "it matters the most" and to say that "there is no absolute truth" is an "absolute that claims to be true;"

91. "Without faith," there is "no basis for morality," and "without morality," there is "no basis for law;"

92. All "religion" amounts to is a set of unproven answers to the greater questions, like "why are we here" and "what should we should be doing as humans;"

93. The Establishment Clause does not only guard against the government enshrining "institutionalized religions" but it also guards against the government from respecting doctrines advocated by "non-institutionalized religions;"

94. It takes a huge amount of religious faith to believe that "a man" can actually marry "a man" and make "him" "his wife," just as it takes a lot of faith to believe that a man can really marry his object of affection and make it his wife, as Judge Hinkle in *Brenner v. Scott*, 2014 WL 1652418 (2014) found when he attacked the legal basis for "man-object" marriage in response to Plaintiff Sevier's rule 24 motion to intervene; (See Exhibits)

95. A man and woman, in a marriage, are different biologically but are inherently equal, possessing corresponding sexual parts that when coalesced have the prospective procreative potential to create human life itself with an unbroken ancestral chain making that specific relationship factually and legally distinct from all other prospective parody forms of marriage and the only "secular," "neutral," "non-controversial," and "self-evident" form of marriage for purposes of the Establishment Clause;

96. All individuals have the First Amendment Freedom Of Expression right to self-identify as anything that they want to; This includes the fundamental right to self-assert a sex-based identity narrative that takes faith to believe it is real;

97. Man-object, man-animal, man-man, and woman-woman marriages all have the same non-existent procreation potential equally but are being treated differently under the law for arbitrary reasons at present;

98. There are millions of Americans who believe that to support a parody marriage is itself an act of incredible immorality, and they will never convert to the narrow and exclusive religion of moral relativism no matter how much coercion the government imposes on behalf of the LGBTQ church, despite the invalid collusion with moral relativists on the bench which continues to make the Judiciary look untrustworthy and intellectually dishonest;

99. The States have a compelling interest in upholding community standards of decency. *Paris Adult Theatre I v. Slaton*, 413 US 49, at 63, 69 (1973);

100. Man-man, woman-woman, man-object, man-animal, and man-multiperson marriages all amount to obscenity in action and the promotion of obscenity;

101. The Governor and Attorney General are charged with enforcing obscenity codes, not promoting obscenity, which is itself a crime;

102. Community standards of decency do not "evolve" but societies can become more sexually addicted and ultimately desensitized, developing for the worse;[30] (See declarations to come)

---

[30] In the words of Perry Farrell Jane's Addiction's front man - "Nothing's Shocking"

103. Societies do not always evolve for the better and a the living Constitution approach is an absolute threat to American Democracy and must be treated as such by the Congress and Executive branches;

104. In reference to the Eighth Amendment, Chief Justice Warren's elegant axiom that "the Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society" is completely contradicted by the Supreme Court's position that "to simply adjust the definition of obscenity to social realities" has always failed to be persuasive before the Courts of the United States in *Ginsberg v. New York*, 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), *Mishkin v. State of New York*, 383 U.S. 502, 509, 86 S.Ct. 958, 16 L.Ed.2d 56, and *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 271 N.Y.S.2d 947, 951, 218 N.E.2d 668, 671 (1966);

105. Justice Holmes said that "the life of the law has not been logic, it has been experience" but Justice Holmes was wrong: if the Courts are "incapable of logical reasoning," they are "incapable" of being respected;

106. For the state and federal government to declare all forms of parody marriage "obscene" and "morally repugnant" is Constitutionally permissible;

107. No one is getting arrested or losing their business because the state issues marriage licenses to man-woman couples;

108. Man-woman marriage is the only secular, neutral, and non-controversial form that the States can legally recognize without failing the *Lemon* Test;[31]

---

[31] As Chief Justice Roberts pointed out, "man-woman" marriage is the only secular dictionary definition that is natural, neutral, and non-controversial:  Traditional marriage arose out of the "the nature of things" and did not arise out of a desire to acquire political power and to use government as a tool to show the irresponsible gospel of moral relativism down the throats of our citizens. (Roberts dissent page 5). See G.

109. Man-woman marriage, between adults, is not questionably legal, real, and moral;

110. For any government official, like the Defendants, to pretend that "self-asserted sexual orientation rights" are "civil rights," like "race-based are "civil rights," whereas "race-based rights" are actually predicated on "immutability," only to not really meaning it, constitutes an act of actionable fraud and racial animus in kind that manages to be both sexually and racially exploitative. Therefore, the Defendants are guilty of actual "bigotry" and not the phony kind as maliciously advocated by "Justice Kennedy types" in a childish effort to silence objectors to his personalize religious worldviews that are irrational, dangerous, and faith-based; (See *United States v. Windsor*, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013) and *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015))

111. The Plaintiffs are defending the integrity of the Constitution, the rule of law, and the race-based civil rights movement advanced by Dr. Martin Luther King Jr., not the Defendants who are threatening race-based civil rights for self-serving political reasons in exchange for political capital in a manner that is completely fraudulent and sexually exploitative;

112. The Plaintiffs and others have standing to proceed under their First Amendment Claims as a taxpayer, regardless of how any state or federal official feels about the plausibility of their self-asserted sex-based identity narrative which is only relevant if sexual orientation rights are civil rights - which they are not; *Engel v. Vitale,* 370 U.S 421, 430 (1962); *Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004); *Newdow v. Congress*, 292 F.3d 597, 607, n. 5 (9th Cir. 2002)

---

Quale, A History of Marriage Systems 2 (1988); cf. M. Cicero, De Officiis 57 (W. Miller transl. 1913). *Obergefell* at 5 (Roberts Dissent). Roberts in his dissent in *Obergefell* also stated: "In his first American dictionary, Noah Webster defined marriage as "the legal union of a man and woman for life," which served the purposes of "preventing the promiscuous intercourse of the sexes, . . . promoting domestic felicity, and . . . securing the maintenance and education of children." 1 An American Dictionary of the English Language (1828). Id.

113. The codification of the fake gay civil rights movement through the courts has constituted the greatest act of judicial malpractice, since the inception of American Jurisprudence, but this Court (and others) can go back and get it right, removing these matters out of the "civil rights box" and into the "Establishment Clause box," where they always belonged;

106. Stare Decisis does not always apply in cases that are built on fraud, intellectual dishonesty and that are on the wrong side of reality and transcultural law (see *Dred Scott v. Sandford,* 60 U.S. 393 (1857));

114. The Plaintiffs do not have to show actual coercion to proceed under the Establishment Clause, but the Plaintiffs have personally been subjected to horrific persecution by the LGBTQ church and its supporters;

115. These matters involve heightened concerns because the LGBTQ church is infiltrating public schools on a great commission to indoctrinate and evangelize minors to their religious worldview on sex that is self-evidently immoral, faith-based, obscene, self-serving, sexually exploitative, depersonalizing, dehumanizing, desensitizing, and subversive to human flourishing;

116. Men and women are equal but different: a man's greatest need in a relationship is "respect" and a woman's greatest need is "unconditional love" and the government is eroding freedom by persisting in a spectacular state of denial. Men see the world through blue sunglasses and women see the world through pink sunglasses; the government needs to grow up and deal with the truth instead of inventing fictions that erode freedom and proliferate confusion that leads to sexual exploitation that inflicts harm to minors and endangers the public's health;

109. Whatever or whoever a person has sex with, they bond with in accordance with the straightforward science of oxytocin, dopamine, serotonin, beta-fosb, and classical conditioning,

and a government that cares for its people will pass laws that encourage its citizens to channel

their sexual energy in manner that accords with self-evident transcultural truth in accordance

with the givenness of our nature;[32]

## CAUSES OF ACTION

## I. ENJOINING THE STATE FROM LEGALLY RECOGNIZING ANY PARODY MARRIAGE

## A. FIRST AMENDMENT ESTABLISHMENT CLAUSE "*LEMON* TEST AND COERCION TEST"

117. The First Amendment to the United States Constitution, as applied to the States through the

Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment

of religion." U.S. CONST. amend. I. This provision, among other things, "prohibits government

from appearing to take a position on questions of religious belief or from 'making adherence to a

religion relevant in any way to a person's standing in the political community.'" *County of*

*Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687

(1984)(O'Connor, J., concurring)). The government must "remain secular" and must "'not favor

religious belief over disbelief.'" Id. at 610.[33]

---

[32] The LGBTQ church and planned parenthood are advocates for internet pornography and child pornography being distributed to minors because it proliferates promiscuity, normalizes false permission giving beliefs about sex, erodes consent, and cultivates sympathy for the homosexual lifestyle;

[33] *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 593-94 (1989). To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). Government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Agostini v. Felton*, 521 U.S. 203, 218 (1997). All that is needed to enjoin the state from issuing marriage licenses to self-identified homosexuals to show that gay marriage policy violates at least one prong of the *Lemon* tests. Gay marriage fails all three. In addition to this so-called *Lemon* test, "[t]he Supreme Court has . . . advanced two other approaches by which an Establishment Clause violation can be detected." *Doe ex rel. Doe v. Elmbrook Sch*. Dist., 687 F.3d 840, 849 (7th Cir. 2012)(en banc), cert. denied, 134 S. Ct. 2283 (2014). One approach—termed the "endorsement test"—has

118. The Establishment Clause was never designed to just single out "institutionalized religions," like Christianity and Judaism, which tends to parallel transcultural self-evident truth that serves as the master narrative of the Constitution itself. The Establishment Clause also was designed - if not more so - to prohibit the government from legally codifying the truth claims floated by "non-institutionalized religions," to include the truth claims asserted by the religion of postmodern western moral relativism, expressive individualism, and Secular Humanism. After all, the religion of moral relativism, Secular Humanism, and evangelical atheism has been the catalyst for most of the worst atrocities since the inception of humanity.

119. Homsexuality, transgenderism, zoophilia, objectophilia, polygamy are all part of the same religious ideology, only they are in different sects. Homosexuality orthodoxy is the largest denomination of a religion that involves the dogma of sexual orientation.

120. Homsexuality, transgenderism, zoophilia, objectophilia, polygamy are self-asserted sex-based identity narratives that are predicated on unproven faith based assumptions and naked assertions that are implicitly religious which invokes the Establishment Clause, as having exclusive jurisdiction. The government is barred from respecting the dogma floated by these faith based groups.

121. The state's legal recognition of gay marriage takes a prospective non-reality and establishes it as irrefutable truth in order to make individuals who are engaging in a homosexual lifestyle

---

its roots in Justice O'Connor's concurrence in *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring), and was subsequently adopted by the entire *Court in County of Allegheny*, 492 U.S. at 592-93. Under this test, courts: "ask[] whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. When [a court] find[s] that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is favored or preferred, the Establishment Clause has been violated." *Freedom From Religion Foundation v. City of Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000)(internal quotation and citation omitted) (emphasis in original). Some Circuit have observed that the endorsement test is "a legitimate part of *Lemon*'s second prong." *Elmbrook*, 687 F.3d at 850.

feel less inadequate and ashamed about their conduct and to garner support for the Democratic

Party and their exploitative and toxic platform of identity politics in exchange for political power

in the cultivation of an indefensible weapon to be used against non-observers.

122. The codification of sexual identity narratives and identity politics and postmodern

relativism has a chilling effect on speech that violates all three prongs of the *Lemon* test.[34]

123. To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test,

pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing,

endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at

592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). Government action "violates the

Establishment Clause if it fails to satisfy any of these prongs." *Edwards v.Aguillard*, 482

U.S.578,583(1987); *Agostini v.Felton*,521 U.S.203, 218 (1997).

124. Legally recognized gay marriage violates the *Lemon* test by a landslide. The codification of

sexual identity narratives and identity politics and postmodern relativism has a "chilling effect"

on the Plaintiffs' speech and freedom of expression that violates the coercion test - both indirect

and direct coercion.[35] The Plaintiffs have been subjected to widespread pressure, libel, and

harassment for asserting their rights even if it makes the fake gay civil rights plight appear to be

removed from reality, invalid, frivolous, and implausible. People of other religions, like

Christians living in Wyoming, have been subjected to persecution from homosexuals for refusing

to think about marriage, sex, and morality, like they do.

125. The state knows or should have known that by legally recognizing gay marriage, it would

---

[34] *Lynch v. Donnelly,* 465 U.S. 668, 68794 (1984).

[35] *Lee v. Weisman*, 505 U.S. 577 (1992); *School District v. Doe*, 530 U.S. 290 (2000); *County of Allegheny v. ACLU*, 492 U.S. 573 (1989).

subject Christians and others - to include the Plaintiffs - to religious persecution for not subscribing to or supporting and enabling the homosexual worldview. The Plaintiffs and others have standing to proceed under this claim as taxpayers. Their self-asserted sex-based identity narrative does not matter when it comes to seeking an injunction under this cause.

126. The First Amendment Establishment Clause has exclusive jurisdiction over all self-asserted sex-based identity narratives. The bright line rule of *State v. Holm*, 137 P.3d 726, 734 (Utah 2006) should apply to all non-secular marriages to include man-man, woman-woman, man-object, man-animal, and man-multiperson marriages.

127. The codification of legally recognized gay marriage is a non-secular sham for purposes of the First Amendment Establishment Clause.

128. The fact that all government officials who pretended that gay rights are civil rights are lying - alone - shows that gay marriage is a non-secular sham for purposes of the First Amendment. The fact that there has not been a land rush on gay marriage in the wake of *Obergefell* shows that it is a non-secular sham for purposes of the First Amendment.

129. The fact that that legally recognized gay marriage constitutes an indefensible weapon in the hands of moral relativists that no non-observer can defend against proves that gay marriage is a non-secular sham for purposes of the First Amendment.

130. The goal of legally codifying a non-secular form of marriage, i.e. gay marriage, was to promote tolerance, dignity, and unity, instead it has accomplished the very opposite because it's enshrinement into law is a non-secular sham for purposes of the First Amendment.[36]

---

[36] Marriage licenses issued by the Clerk's office to self-identified homosexuals have constituted a license to harangue and oppress the Plaintiffs and anyone who finds homosexuality to be obscene, immoral, and subversive to human flourishing. Legally recognized gay marriage is an indefensible weapon in the hands of moral relativist who affiliate with the homosexual denomination.

131. The fact that homosexuality was basically illegal until *Lawrence v. Texas*, 539 U.S. at 579 overturned *Bowers v. Hardwick*, 478 U.S. 186 (1986) shows that legally recognize gay marriage is a non-secular sham for purposes of the First Amendment.

132. The fact that homosexuality remains defined as "obscene" by the obscenity codes and that it is a material threat to community standards of decency proves that gay marriage is a non-secular sham for purposes of the First Amendment.

133. Under this claim, the Plaintiffs do not have to show actual coercion imposed on them, but the Plaintiffs here have been subjected to ruthless persecution by the LGBTQ gestapo for refusing to respect to their self-serving ideology.

134. Legally recognized gay marriage has given the LGBTQ church to infilrate public schools with the intent of indoctrinating minors to their worldview that is categorically obscene and questionably legal. The Plaintiffs and others do not want their tax pay dollars going towards the LGBTQ church.

135. Just the Defendants may be too intellectually blind to see that homosexuality is a series of unproven faith based assumptions that is at the very least implicitly religious - if not just a red herring that tries to justify immoral sexual conduct - does not mean that it is not part of the religion of Secular Humanism.

136. Acting under the Color of law, Defendant Soto unethically misused her office at the Judicial Ethics commission to harangue, harass, and harm the Honorable Judge Neely by intentionally and maliciously accusing her of unethical conduct.

_____

137. Defendant Soto's efforts to use the Judicial Ethics Commission to promote homosexual orthodoxy that flows out of the religion of Secular Humanism violated the Establishment Clause for failing the prongs of the *Lemon* Test.

138. As Wyoming taxpayers and as lobbyist who impact Wyoming's general fund, the Plaintiffs are in a persistent state of a fear of reprisal for refusing to convert to the moronic, illogical, asinine, dehumanizing, destructive, damaging, depersonalizing, obscene, immoral, religious worldview promoted by the Defendants.

## B. FIRST AMENDMENT ESTABLISHMENT CLAUSE TREATS DIFFERENT SECTS OF THE SAME RELIGION WITH DISPROPORTIONAL FAVOR: DISCRIMINATION OF "RELIGION AND RELIGION"

139. By issuing marriage licenses and giving transgender bathroom rights to homosexuals but not zoophiles, polygamists, and objectophiles, the State is discriminating against the Plaintiffs and others under the First Amendment Establishment Clause, which is applicable to the states under the Fourteenth amendment, for discriminating against "religion and religion."

140. The government lacks a narrowly tailored and compelling interest to treat homosexual denomination with disproportional favor in relationship to the zoophile, polygamist, and objectophile sects.[37] All self-asserted sex-based identity narratives are different denominational sects within the overall church of Western postmodern relativism and expressive individualism.

141. The Court must either force the state to give the Plaintiffs the same rights, benefits, and treatment as homosexuals "for better or worse," under the law, or alternatively, the Court must enjoin the State from giving rights, benefits, and privileges to individuals, just because they

---

[37] *McCreary Cnty, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

self-identify as homosexual, polygamist, zoophile, and objectophile. Either way, the status quo is unjust and unconstitutional.

142. The Plaintiffs were injured by the fact that individuals who are homosexuals and who marry based on that identity get to have the "state's imprimatur"[38] on their marriage licenses and ceremonies, whereas the Plaintiffs do not merely because they are in a less popular and different sect of the same ideology that the Democrats have written off. The Plaintiffs are arbitrarily denied all kinds of benefits by the state because they are merely in a minor sect in the church of moral relativism.

143. There is absolutely nothing secular about self-asserted sex-based identity narratives that are not predicated on neutral and self-evident truth.

144. The Plaintiffs have been injured by the fact that they are not allowed to exercise their existing right, individual right, and fundamental right to marriage that homosexuals are permitted merely because self-identified homosexuals have a more popular ideology worldview about sex and marriage and have the support of the liberal media and Hollywood elite.

145. The Plaintiffs demands that the Court either (1) enjoin the state from giving and rights and benefits to individuals based on their sex-based self-asserted identity and religious ideology or (2) enjoin the State from withholding rights and benefits from the Plaintiffs merely because he is in a different sect other than homosexual.

## C. RES IPSA LOQUITUR (The Thing Speaks For Itself)

146. The Defendants (individually and collectively) have a "duty" to act "reasonably."
The states have a compelling interest to uphold community standards of decency.[39]

---

[38] *Obergefell* at 10 (Thomas Dissenting).

[39] *Paris Adult Theatre I v. Slaton*, 413 US 49, at 63, 69 (1973)

147. Obscenity is unprotected harmful speech.[40]

148. Homosexual, polygamy, and objectophilia lifestyle are equally obscene.[41]

149. Community Standards of decency do not evolve, and if they did, it would violation the standard. Standards do not move or they are not standards.

150. There is something inherently wrong with the state promoting obscenity and furthering the LGBTQ ideology that is not just faith based by is questionably moral and questionably legal.

151. The fake gay civil rights movement has naturally lead to the transgender bathroom public health crisis and the LGBTQ groups infiltrating elementary schools to indoctrinate children to a sexualized worldview that does not even check out with the human design.

152. The homosexual lobby is supporting human trafficking and child exploitation.

153. Evangelical LGBTQ gospel narratives objectively promote transferrable intellectual darkness that is objectively sexually, intellectually, emotionally, and racially exploitative, while being depersonalizing, dehumanizing, desensitizing, and damaging from the perspective of a reasonable observer.

## II. ALTERNATIVE CLAIMS FOR INJUNCTIVE RELIEF FORCING THE STATE TO LEGALLY RECOGNIZE ALL FORMS OF PARODY MARRIAGE

---

[40]"Obscenity is not within the area of protected speech or press." *Court v. State*, 51 Wis. 2d 683, 188 N.W.2d 475 (1971) vacated, 413 U.S. 911, 93 S. Ct. 3032, 37 L. Ed. 2d 1023 (1973) and abrogated by *State v. Petrone*, 161 Wis. 2d 530, 468 N.W.2d 676 (1991);;;; *State v. Weidner*, 2000 WI 52, 235 Wis. 2d 306, 611 N.W.2d 684 (2000);;;; *Ebert v. Maryland State Bd. of Censors*, 19 Md. App. 300, 313 A.2d 536 (1973). Obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase "clear and present danger" in its application to protected speech. *Roth v. United States*, 354 U.S. 476 (1957);;;; *United States v. Gendron*, S24 :08CR244RWS (FRB), 2009 WL 5909127 (E.D. Mo. Sept. 16, 2009) report and recommendation adopted, S2 4:08CR 244 RWS, 2010 WL 682315 (E.D. Mo. Feb. 23, 2010);;;; *Chapin v. Town of Southampton*, 4 57 F. Supp. 1170 (E.D.N.Y. 1978);;;; *Sovereign News Co. v. Falke*, 448 F. Supp. 306 (N.D. Ohio 1977);;;; *City of Portland v. Jacobsky*, 496 A.2d 646 (Me. 1985).

[41] *Manuel Enterprises Inc. v. Day*, 370 U.S. 478 (1962)

## A. **SUBSTANTIVE DUE PROCESS**

154. If "gay rights" are "civil rights," then the Plaintiffs want the same substantive due process and equal protection rights afforded to the same-sex litigants in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015). The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const Amend XIV, § 1. Individuals are protected by the Due Process Clause from arbitrary government intrusion into life, liberty and property.

155. The Plaintiffs seek the same substantive due process and equal protection rights afforded to the same-sex litigants by the United States Supreme Court in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) in a straightforward manner.

156. The Clerk's arbitrary exclusion policy (especially after the decision in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), violate fundamental liberties that are protected by the Due Process Clause of the Fourteenth Amendment, both on its face and as applied to the Plaintiffs and others with different-sexual orientations who self-identify as something other than "gay" and "straight."

157. Homosexuality, transgenderism, objectophilia, zoophilia, and polygamy are all equally not a part of American tradition. To give favor to just one sect is Constitutionally unsound under substantive due process analysis.

158. If *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) is good law, the freedom to marry is one of the fundamental liberties protected by the Due Process Clause of the Fourteenth Amendment. The current policies advanced by the Governor and Attorney General following *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015), and the Marriage Discrimination Statutes violate this

fundamental right protected by the Due Process Clause because it prevents the Plaintiffs and

others from marrying the persons, creatures, and things based on their personal and individual

choice and from having their marriages entered into in other states and countries from being

recognized in this State; and the choice of marriage is sheltered by the Fourteenth Amendment

from this State's unwarranted usurpation of that choice, if and only if the legal recognition of

man-man and woman-woman marriage is to remain legally recognizable.

159. The Clerk's arbitrary marriage exclusion policy infringe on fundamental liberties protected

by the Due Process Clause by discriminating against people in the non-obvious classes of sexual

orientation (like the Plaintiffs), denying all of them the opportunity to marry civilly, to have their

civil marriage in another jurisdiction legally recognized, and to enter into or maintain the same

officially sanctioned family relationship with their preferred spouse as opposite-sex and

same-sex individuals are currently permitted. For example, by denying those individuals the

same "marriage" designation afforded to opposite-sex and same-sex individuals who married,

this State is stigmatizing beastialist, objectophiles, and polygamists, as well as their children and

families, and denying them the same dignity, respect, and stature afforded officially recognized

opposite-sex and same-sex family relationships.

160. Yet under the current definition of marriage where the First Amendment has been

discarded, the marriage discrimination denies those in the different-sex class the legal protections

afforded by Wyoming law to opposite-sex and same-sex married individuals on a completely

arbitrary basis which amounts to a bare desire to harm a politically unpopular group.

161. Because the Plaintiffs and others seek to exercise their fundamental right to marry or to

have an out of state marriage legally recognized, their claim that the Marriage Discrimination

policies and statutes violated their Due Process rights are subject to strict scrutiny. Further, it is irrelevant that the Wyoming voters voted to keep the Government from legally recognizing parody marriages. Election outcomes do not determine fundamental rights protected by the Fourteenth Amendment nor the First Amendment.

162. The Clerk's arbitrary marriage exclusion policy and any marriage discrimination statute are unconstitutional under the Due Process Clause because they are not narrowly tailored to a compelling government interest, as applied to all variations of sexual orientation, not just the majority and true minority.

163. As a result, the Court, pursuant to 28 U.S.C. § 2201, enter a declaratory judgment stating that the Clerk's discrimination policy and any other Wyoming law that bars different-sex marriage, including the Marriage Discrimination Statutes and Clerk's policies, violate the Due Process Clause of the Fourteenth Amendment, and should enter a permanent injunction enjoining enforcement or application that those laws and any other Wyoming laws that once barred same sex-marriage and now continues to bar different-sex marriages of all variety without a legal bases, and compelling Defendants to legally recognize the Plaintiffs' out of state marriages or to issue a new marriage license.

## B. EQUAL PROTECTION RIGHTS VIOLATION

164. The Plaintiffs repeat and incorporate by reference all of the above allegations of this Complaint as though fully set forth herein. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV ,§ 1. The Fourteenth Amendment's equal protection guarantee embodies the constitutional ideal that "all persons similarly situated should be treated alike." *City of Cleburne*

*v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The laws in dispute once discriminated against same-sex individuals now continues to discriminate against the Plaintiffs and others without any valid basis whatsoever, especially if gay marriage is actually legally valid.

165. The Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies violate the Equal Protection Clause of the Fourteenth Amendment, both on their face and as applied to the Plaintiffs and others.

166. For purposes of the Equal Protection Clause, the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies should be subject to heightened scrutiny because individuals, beyond just gay and straight, are the type of minority strict scrutiny was designed to protect in the first place - that is only if sexual orientation is actually a basis for suspect class status. Sexual orientation is a factor that "generally provides no sensible ground for differential treatment," *Cleburne,* 473 U.S. at 440-41, and sexual orientation meets all four factors requiring heightened scrutiny for a classification: (1) other-oriented people have suffered a significant history of discrimination in this country: (2) sexual orientation generally bears no relation to ability to perform or contribute to society - this is true beyond gay and straight; (3) discrimination against other-oriented people is allegedly based on an immutable or distinguishing characteristic that defines them as a group; and (4) not withstanding a measure of recent progress, other-oriented people are minorities with limited power to protect themselves from adverse outcomes in the political process, as demonstrated by Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies, the Marriage Discrimination Statutes, and the Clerk's arbitrary marriage exclusion policy.

167. Under the heightened scrutiny standard, Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies in their post *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) altered form violate the Equal Protection Clause because they are not "substantially" related to an important governmental purpose. There are no distinctions among lesbians, gay men, objectophiles, beasitalists, polygamists, and heterosexuals that amount to undeniable and real differences that the government might need to take into account in legislating. The real purpose behind the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies is animus if and only if these matters are actually civil rights ones.

168. Even if the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies are not analyzed under the heightened scrutiny standard, they still violate the Equal Protection Clause because the classification drawn by the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies between opposite-sex, same-sex, and different-sex individuals is not rationally related to a legitimate state interest. A state does not have a legitimate interest in disadvantaging an unpopular minority group under the sexual orientation class merely because the group is unpopular, or the private views that different-sex individuals hold are morally inferior to same-sex and opposite-sex individuals or are inferior because there is something psychiatrically wrong and inept with individuals who want to marry something other than a member of the same or opposite sex.

169. In fact, the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies harm the state interest in equality because it requires that men and women be treated differently only based on discredited and antiquated notions of gender.[42]

---

[42] Of course, man-man marriage discriminates against women on the basis of gender by telling them that they are not good enough to be a wife and mother. And woman-woman marriage discriminates against

170. The Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies policy violate the Equal Protection Clause in their post *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) amended form because they discriminate against objectophiles, beastialists, and polyamists by arbitrarily denying them a right to marry the item or items of their choice based on their feelings and identity narrative, whereas those who self-identify as homosexual and heterosexual may do so freely and receive legal recognition and government benefits. These laws also continue to disadvantage suspect classes in preventing only objectophiles, beastialists, and polygamists, not heterosexuals, from marrying, if and only if gay marriage is actually legally valid. The Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies also violate the Equal Protection Clause because they onced discriminated against gay men and lesbians legally married in another state but continue to discriminate against different-sex individuals who married in another jurisdiction by denying them the official sanction of their marriage in the State of Wyoming and the rights and benefits that flow from marriage. Whereas those who self-identify as heterosexual and homosexual men and women legally married in another state have their marriage officially sanctioned by the State of Wyoming, and receive, by operation of law the rights and benefits that flow from marriage, the true minority of sexual orientation has been arbitrarily denied these rights. And this wrongful denial disadvantages a suspect class in preventing only man-object, man-animal, and man-multiperson individuals, not

---

men by telling them that they are not good enough to be a father and husband. Man-object marriage does the same but at least the object is gender neutral. And man-object marriage is more discriminator on the basis of gender than legalized man-man and woman-woman marriage is. At least the polygamists married is not as discriminatory against men and women, and at least there is actual procreative potential and a more plausible bases to suggest that polygamy is part of American tradition and history.

heterosexuals and homosexuals, from having out-of-state marriages recognized in this State and in-state marriages authorized.

171. Following *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) and *United States v. Windso*r,133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013), the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies restrict civil marriage to individuals of the opposite sex and same-sex, while those who self-identify as different-sex are unable to marry the persons, animals, and objects of their choice or have their different-sex marriage in another jurisdiction legally recognized in this State. Thus, this State law treats similarly-situated people differently by providing civil marriage to same-sex and opposite-sex individuals, but not to different-sex individuals who remain discriminated against without a valid justifiable basis. As a consequence, different-sex individuals are not provided the tangible benefits and privileges of marriage. Even if these benefits and privileges were through some other mechanism besides civil marriage, it still would be unequal because the designation "marriage," enjoys a long history and uniform recognition. Like the gays of old, different-sex individuals are therefore unequal in the eyes of the law, and their families are denied the same respect and legal rights as officially sanctioned families of opposite sex and of same sex individuals. By purposefully denying civil marriage to different-sex individuals, State's ban on other-oriented marriage continues to discriminate on the basis of sexual orientation against the real minority.

172. The disadvantage the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies marriage denial policy in their amended form upon different-sex individuals is the result of disapproval or animus against a politically unpopular group. The Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies impose a

special disability upon those persons alone and deprive them of specific legal protections afforded to opposite-sex and same-sex married couples without any legal justification whatsoever. Accordingly, the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies violate the Equal Protection Clause of the Fourteenth Amendment in their altered form because they used to single out individuals who self-identify under the culturally created labels of gay and lesbians but continue to single out the remaining non-obvious classes of sexual orientation, which continues to unjustifiably impose a disfavored legal status, thereby creating a category of "third-class citizens," not merely "second class citizens" that those who self-identify as homosexual claim to have. *United States v. Windsor*, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013); *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012).

## C. VIOLATION OF 42 U.S.C. § 1983

173. The Plaintiffs repeat and incorporate by reference all of the above allegations of this Complaint as though fully set forth herein. Insofar as they are enforcing the terms of the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies Defendants, acting under color of state law, are depriving and will continue to deprive the Plaintiffs and other different-sex individuals of numerous rights secured by the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983 for reasons that are completely arbitrary - if and only if gay marriage is also to remain legally cognizable. The State's denial of marriage rights to polygamists, zoophiles, and objectophiles is totally arbitrary if homosexuals can enjoy those rights lawfully.

174. As a result, the Court, pursuant to 28 U.S.C. § 2201, should enter a declaratory judgment stating that the law in their amended form and any other law in this State that onced barred

same-sex marriage but continues to bar the other non-obvious classes of sexual orientation marriages, violate 42 U.S.C. § 1983, and should enter a permanent injunction enjoining enforcement or application of the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies that bars different-sex marriage, and to compel Defendants to legally recognize the marriage of all different-sex individuals who relocate to this State.

175. Alternatively, pursuant to 28 U.S.C. § 2201 the Court should enter a declaratory judgment stating that the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies should be completely revived to their original form enjoining the enforcement of the Supreme Court's decision in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) under 42 U.S.C. § 1983 for (1) violating the first amendment and (2) because sexual orientation is not really a basis for suspect classification like race is. It is unfair and discriminatory against the Plaintiffs for the Government to allow those who self-identify as homosexual to marry but not those who self-identify as objectophiles and polygamists to do so. There is no rational basis to say that one is ok but the other is not. It communicates to the Plaintiffs that their religious beliefs about marriage are inferior to those who have bought into the gay ideology.

176.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court:

A. Enter a declaratory judgment that all forms of marriage other than "man-woman" marriage are "non-secular" as a part of the religion of Secular Humanism, evangelical atheism, western postmodern moral relativism, and expressive individualism;

B. Enter a declaratory judgment and issue a preliminary and permanent injunction against the state because the legal codification of any form of parody marriage - to include gay marriage - violates the First Amendment Establishment Clause under the *Lemon* test for (1) lacking a secular purpose, (2) creating an indefensible legal weapon against non-observers, and (3) for the excessive entanglement of government with the religion of Secular Humanism;

C. Issue an injunction and a declaration that resolves that legally recognize gay marriage and the enforcement of statutes that advance gay rights as civil rights puts religion over non-religion in a manner that is unconstitutional;

D. Issue a declaration that all forms of parody marriage are part of the religion of Secular Humanism; (DE _ Quinlan ¶¶ 1-37; DE _ Pastor Cothran ¶¶ 1-50; DE _ Dr. King ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-20; DE _ Goodspeed ¶¶ 1-20; DE _ Grace Harley ¶¶ 1-25; DE 9 Kohl ¶¶ 1-12; DE_ Pastor Cuozzo; ¶¶ 1-21; Pastor Farr ¶¶ 1-33; DE 24 Pastor Cairns ¶¶ 1-30; and DE_ Pastor Penkoski ¶¶ 1-34. See Amicus Brief of Garden State Families)

E. Issue a preliminary and permanent injunction enjoining the State from legally recognizing any form of marriage other than man-woman marriage and from enforcing any statute that concerns transgender rights and gay rights and that treats sexual orientation as if it is a matter of civil rights;

F. Enter a Declaratory Judgment that polygamy, zoophilia, objectophilia, and homosexuality are different denominational sects within the the church of postmodern western moral relativism, expressive individualism, and Secular Humanism;

G. Issue a preliminary and permanent injunction, enjoining the Defendants from issuing marriage licenses to self-identified homosexuals and from enforcing statutes that suggest that sexual orientation is a civil rights matter for discrimination on the basis of religion and religion;

H. Resolve whether the coercion test is part of prong three of the *Lemon* test;

I. Enter a Declaratory Judgment that man-woman marriage is the only secular form of marriage, and thereby, the State can legally recognized it since it is not a non-secular sham;

I. Enter a Declaratory Judgment and issue a preliminary and permanent injunction that reflects that man-man, woman-woman, man-object, man-animal, and man-multiperson marriages are all equally obscene and threatening to community standards of decency in step with transcultural universal law and common sense;

J. Enter a preliminary and permanent injunction that enjoins the state from legally recognizing gay marriage and from enforcing statutes that treat sexual orientation as a civil right for constituting government condoned promotion of obscenity;

K. Enter a Declaration that *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) is overturned for being an egotistic judicial putsch that is a threat to American Democracy cultivated by Black Robed Supremacists in collusion with the LGBTQ lobby and the Democratic Party;

L. Enter a Declaration that "love is love" is circular reasoning and that "love" without "truth" is just "shallow sentimentality;"

M. Issue a preliminary and permanent injunction that prevents the LGBTQ church from entering into public schools and indoctrinating minors to their religious ideological worldview.

N. Issue a declaration that all forms of parody marriage are not secular;

O. Issue a declaration that the gay pride rainbow colored flag is the paramount religious symbol of the LGBTQ church, which is part of the religion of Secular Humanism;

P. Issue a declaration that all parody marriages are all equally not part of American heritage and tradition.

Q. Issue a declaration that allows all self-identified homosexuals, polygamists, and objectophiles to have wedding ceremonies but that the state cannot legally respect or recognize them as actual marriage in step with the Bright Line Rule in order to balance the Freedom Of Expression Clause with the Establishment Clause;

R. Issue a declaration that tolerance is a two way street and that people who are intolerant of intolerant people are intolerant; that people who are judgmental of judgmental people are judgmental; that people who are dogmatic about not being dogmatic are dogmatic;

S. Enjoin the Commission on Judicial Conduct and Ethics from treating homosexuality, parody marriages, and sexual orientation as if it is the basis for civil rights; Require the Commission on Judicial Conduct and Ethics to issue an apology, correction, and retraction concerning the censure of the Honorable Judge Neely;

ALTERNATIVE RELIEF,

T. Enter a declaratory judgment that the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies violate the Due Process, Equal Protection, Freedom of Association, Full Faith and Credit, Supremacy, and/or other clauses of the United States Constitution as it relates to barring objectophile and polygamy marriage requests or recognizing man-object and polygamy marriage requests to the same extent that it once barred and man-man and woman-woman marriage requests and marriage recognition;

U. Enter a declaratory judgment that the Clerk violated Plaintiffs' Equal Protection and Substantive Due Process rights afforded under Fourteenth Amendment in keeping with the holding in *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015) by denying the Plaintiffs their existing, individual, and fundamental right to marry based on their personal choice;

V. Enter a declaratory judgment that the Marriage Discrimination Statutes and the Clerk's arbitrary discrimination policies violate the Due Process, Equal Protection, Freedom of Association, Full Faith and Credit, Supremacy, and/or other clauses of the United States Constitution as applied to man-multi-person and man-object requests or recognition to the same extent that they barred same-sex marriage requests and recognition;

W. Enter an order directing Defendants to recognize, respect, and endorse marriage request and marriages beyond man-man, woman-woman, and man-woman entered into outside of this State;

X. Enter a Declaration that all statutes that treat sexual orientation as a civil right serve to also protect self-identified polygamists and objectophiles, not just self-identified homosexuals;

Y. Award costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988;

Z. Enter all further relief to which Plaintiffs may be justly entitled.

Respectfully Submitted,

/s/Chris Sevier Esq./

SPECIAL FORCES OF LIBERTY
BPR#026577
(615) 500 4411
ghostwarsmusic@gmail.com
9 Music Square South
Nashville, TN 37203
420 w 42
New York, NY
1LT 13th ECF Echo Delta
ROL Alpha Bravo Foxtrot

/s/Robin Goodspeed/
(307) 433-4585
Robing2016@reagan.com
4509 East 13th St
Cheyenne WY, 82001
307 433 4585

Robin Goodspeed

/s/John Gunter Jr./
SPECIAL FORCES OF LIBERTY
215 Bulter Court Apt.
Chapel Hill, NC 27514
techlawjohn123@gmail.com
(801) 654 5973
SMG Kilo Yankee

John Gunter, Founder of Clean Services Foundation

/s/Whitney Kolh/
SPECIAL FORCES OF LIBERTY
215 Bulter Court Apt.
Chapel Hill, NC 27514
techlawjohn123@gmail.com
(801) 654 5973
SMG Kilo Yankee

Whitney Kohl

/s/Joan Grace Harley./
SPECIAL FORCES OF LIBERTY
215 Bulter Court Apt.
Chapel Hill, NC 27514
joanpolygamyloveislove@gmail.com
(801) 654 5973
SMG Kilo Yankee



advertisement


Watch Now    ▶ 1. Click "Watch Now"
              ⬇ 2. Run and Install
              ⊘ 3. Open new Tab    — My News Wire

**NBC NEWS**    SECTIONS ⌄    NIGHTLY NEWS   MEET THE PRESS   DATELINE    🔍

NEWS › U.S. NEWS    WORLD   INVESTIGATIONS   CRIME & COURTS   LATINO   NBCBLK

NEWS AUG 17 2016, 7:01 PM ET

# Wyoming Judge Faces Removal for Refusing Same-Sex Marriages

by PETE WILLIAMS

SHARE     

A Wyoming judge urged the state's Supreme Court Wednesday to let her remain on the bench despite her publicly stated refusal to perform same-sex marriage ceremonies, citing religious objections.

The state's judicial ethics commission recommended that Ruth Neely be relieved of her position as a magistrate in the small northwestern Wyoming town of Pinedale, after she told the local newspaper that she would "not be able to do" marriage ceremonies for gay couples.


Ruth Neely 📷 Town of Pinedale

"When law and religion conflict, choices have to be made," she told the Pinedale Roundup.

In a letter to the state's judicial ethics advisory committee, she wrote, "Homosexuality is a named sin in the Bible, as are drunkenness, thievery, lying, and the like. I can no more officiate at a same-sex wedding than I can buy beer for the alcoholic."

**Related: Alabama Chief Justice Defends Anti-Gay Marriage Memo**

Her lawyer told the court that she's being unconstitutionally punished for her religious views.

But the state judicial conduct board found that she violated ethics rules requiring judges to follow the law, avoid the appearance of impropriety, and perform duties fairly, without bias or prejudice.

advertisement    ▷ ✕


AIG Direct

**TERM LIFE INSURANCE**
GET **$500,000** IN TERM LIFE COVERAGE

RATES START AT
**$15.48/month**
MALE AGE 35


VIEW YOUR RATE >>>

**FROM THE WEB**    Sponsored Links

**8 Benefits of Internet Faxing**
eFax

**All the reasons why VR came to a crawl this year.**
DoubIX VR Sites

by Taboola

**MORE FROM NBC NEWS**

**A brief history of the atomic bomb**

**A classified U.S. spy satellite**

by Taboola

advertisement    ▷


BECAUSE LEFTOVERS LINGER
febreze

"Judges do not enjoy the same freedom to proselytize their religious beliefs as ordinary citizens," the commission said, finding that her public statements amount to a conclusion that "adherence to the law is optional."

Because she violated ethics rules, the commission said, she should not be allowed to remain in her other job as a municipal court judge in Pinedale.

**Related: Kentucky Clerk Kim Davis, Who Refused to Issue Marriage Licenses to Gays, Seeks to End Case**

Urging the justices to allow Neely to remain on the bench, her lawyer said the commission "has adopted an extreme position. It claims that because Judge Neely's religious beliefs prevent her from solemnizing same-sex marriage, she cannot be a judge in Wyoming, even in a position that does not have authority to perform marriages."

She would tell any same-sex couple where they could find a magistrate to handle their wedding and would treat all gay and lesbian people in her courtroom fairly, her lawyer said.

Since the U.S. Supreme Court ruled last year that states cannot ban same-sex marriage, most local officials, including judges, have complied. While some county clerks refused to issue marriage licenses on religious grounds — most visibly, Kim Davis in Kentucky — clerks and judges have generally treated gay and lesbian couples no differently.

Only North Carolina and Utah have laws in effect that permit local officials to opt out, on religious grounds, of involvement with same-sex weddings. Judicial ethics commissions in Oregon and Washington have voted to sanction judges for refusing to officiate at same-sex marriages. In Louisiana, Nebraska, Ohio, Pennsylvania, and Wisconsin, state commissions have issued advisory opinions saying a judge would violate ethics rules for such a position.

The Wyoming Supreme Court said it would issue a written ruling later on Ruth Neely's appeal. For now, her authority to act as a local magistrate has been suspended, though she is still serving as the Pinedale town judge.

advertisement

How Vitamin D Affects Rheumatoid Arthritis Health Central

If Students Aren't Learning 3D Experiences Now, They Could B... Microsoft

7 Yoga Poses You Should Do First Thing In The Morning Work + Money

What Tiger Woods' Ex-Wife Looks Like Now Left Us With No Words Hyperactivz

There Are 7 Types of Irish Last Names - Which One Is Yours? Ancestry

advertisement



**Run a 9 Minute Mile?**



Over 40 and Can Still Run a 9 Minute Mile? See how much you can save on life insurance.

 PETE WILLIAMS

**TOPICS** NEWS, CRIME & COURTS, U.S. NEWS

**FIRST PUBLISHED** AUG 17 2016, 2:17 PM ET

↓ **NEXT STORY** Before the Games, gay Olympian Adam Rippon spars with Mike Pence

**More to Explore**                    Sponsored Links by Taboola

**12 Weird Viral Products Everyone Will Buy In 2018**
Household Saving Tips

**This $22 Tech Stock Is Set to Soar By 2020**
Banyan Hill Publishing

**Automate Small Business Expense Management with Neat Software. Try Free for 30 Days.**
Neat

**6 Key Characteristics of Leading CFOs**
Concur Resources

**$5 Billion Industry to Grow Huge (Will Power Everything by 2020)**
Banyan Hill Publishing

**"Check Engine" Light On? Do This Before The Auto Shop**
FIXD

**SPONSORED CONTENT**          **MORE FROM NBC NEWS**

This $22 Tech Stock is Set to ... Banyan Hill Publishing

Shoppers Are Getting Unbelievable De... Tophatter

Create Flawless Work Emails by Dow... Grammarly

The HR Leader's Guide for New Policy Motus

Free Real Estate Event in the San Fr... Fortune Builders

Hospital on children found shackled: 'They ...

Toxic masculinity in boys is fueling an epidemi...

Aunt and uncle of kids held captive in 'house ...

NBC News - Breaking News & Top Stories

Skater Ashley Wagner 'furious' after failing to ...

Promoted Links by Taboola

NBC OUT JAN 19 2018, 5:58 PM ET

# Before the Games, gay Olympian Adam Rippon spars with Mike Pence

by JOHN PAUL BRAMMER

SHARE   [f]  [t]  [✉]  [🖨]

Figure skater Adam Rippon, who this month made
history as the first openly gay athlete to win a spot on
the U.S. Winter Olympics team, is no fan of Vice
President Mike Pence, and he's not afraid to let the
world know.



Adam Rippon stands on the medal podium for the Men's
Championship during the 2018 Prudential U.S. Figure Skating
Championships on Jan. 6, 2018 in San Jose, California. 📷 Matthew
Stockman / Getty Images file

In an interview with USA Today this week, Rippon
blasted the White House's selection of Pence to lead
the 2018 U.S. Olympic delegation to Pyeongchang,
South Korea, next month, objecting to Pence's
record on LGBTQ rights.

"You mean Mike Pence, the same Mike Pence that
funded gay conversion therapy?" Rippon said during
the interview. "I'm not buying it."

So-called conversion therapy is a contentious
practice condemned by the medical establishment
that seeks to change a person's sexual orientation or
gender identity.

Rippon, who came out publicly in October 2015,
went on to say that he would decline to meet Pence
in the traditional meet-and-greet between the
delegation and the athletes ahead of the opening
ceremony.

"I would absolutely not go out of my way to meet somebody who I felt has gone out of their way to not only show that they aren't a friend of a gay person but that they think that they're sick," Rippon told USA Today, though he did leave open the possibility of having a conversation with Pence after the figure skating competition.



U.S. Vice President, Mike Pence addresses business leaders at The InterContinental on April 22, 2017 in Sydney. 📷 Brendon Thorne / Getty Images file

A spokesperson for Pence shot back at Rippon's conversion therapy claims in a statement sent to NBC News.

"The accusation is totally false with no basis in fact," Alyssa Farah, Pence's press secretary, stated. "But despite these misinformed claims, the Vice President will be enthusiastically supporting all the U.S. athletes competing next month in Pyeongchang."

Pence has been roundly criticized by LGBTQ advocates for his socially conservative views and his 2015 signing of the controversial Religious Freedom Restoration Act (RFRA) while governor of Indiana. His views on conversion therapy, however, are murky.

Though Pence has denied support for the practice, a statement on an archived version of his 2000 congressional campaign website has been widely interpreted as supportive of conversion therapy.

Under the headline "Strengthening the American Family" and just below his stated opposition to same-sex marriage and anti-discrimination laws protecting "homosexuals," Pence's platform advocates that resources "be directed toward those institutions which provide assistance to those seeking to change their sexual behavior."

The official Republican Platform, on which Donald Trump and Mike Pence ran in 2016, has also been interpreted by a number of LGBTQ organizations and news outlets as giving a nod to the practice of conversion therapy for minors.

"We support the ability of all organizations to provide, purchase, or enroll in healthcare coverage consistent with their religious, moral, or ethical convictions without discrimination or penalty," the GOP platform states. "We support the right of parents to determine the proper medical treatment and therapy for their minor children."

In a July 2016 interview with The Associated Press, Reince Priebus, then the chairman of the Republican Party, denied this passage was an expression of support for conversion therapy.

Nine states and the District of Columbia have banned conversion therapy for minors, and dozens of cities and counties across the U.S. have passed local legislation prohibiting the discredited practice.

FOLLOW **NBC OUT** ON **TWITTER**, **FACEBOOK** AND **INSTAGRAM**

JOHN PAUL BRAMMER  🐦

**TOPICS** NBC OUT

**FIRST PUBLISHED** JAN 19 2018, 5:58 PM ET

↓ **NEXT STORY** Trump HHS reverses Obama protections for medical providers


**People who switch save an average of $620 on car insurance.**
Sponsored | Progressive


**How Older Men Get Tighter Looking Skin [do this daily]**
Sponsored | The Modern Man Today


**Discover Why quip Was Named In TIME's Best Inventions of**
Sponsored | quip


**"Darkest Hour" Dishonors Winston Churchill's Memory**


**The Mormon Advantage**


**Obama Email Alias to Clinton Is Why FBI Didn't Prosecute**

Sponsored Links by





# Remove Ads

Enable ad blocking in two clicks.

Ad Remover

# A New, Ideological Litmus Test for Christian Judges


**Missed Somethin**
VISIT THE NR ARTICLE ARCHIVE

by BILL DUNCAN *March 15, 2017 4:00 AM*

The Wyoming Supreme Court set a dangerous precedent by censuring a judge for

saying she would not perform same-sex
marriages.

I n December 2014, a reporter at a local Wyoming paper,
the *Pinedale Roundup*, called the town's municipal judge,
Ruth Neely, to ask if she was "excited" to be able to
perform same-sex marriages. (Two months earlier, the
state had decided not to defend its same-sex marriage ban after it
was struck down by a federal judge.) In the ensuing conversation
and later ones, Judge Neely explained that she'd never been asked
to perform a same-sex marriage and mentioned her religious
belief that marriage is the union of a husband and wife. She also
made clear that her beliefs would not prevent any same-sex
couple in the area from getting married. (They have not, in fact,
done so, either: To this day, no one has asked her to perform a
same-sex wedding.)

Ominously, the reporter later called Judge Neely and offered not
to run the story if she would "state a willingness to perform
same-sex marriages." This odd reaction to the judge's response to
a hypothetical question was a portent of further trouble.



That trouble came after the
story was published, when it
was sent to the executive
director of the Wyoming
Commission on Judicial
Conduct and Ethics. The
Commission started an
investigation of Judge Neely
and eventually charged her
with four ethical violations a few weeks later. A panel of the
Commission determined that she was guilty, and recommended
that the Wyoming Supreme Court remove her from the bench

On March 7, the Wyoming Supreme Court issued its opinion in
the case. In a 3-2 decision, the majority rejected the
recommendation to remove Judge Neely — since she had, to this
point, only expressed her beliefs — and instead chose to publicly
censure her for violating three ethics rules. Specifically, the
majority determined that she had undermined confidence in the
judiciary by not acting fairly and impartially and by manifesting
bias against the state's citizens based on their sexual orientation.
The majority also said: "She must either commit to performing

## WHY IS *Quicken Loans* URGING AMERICA TO SWITCH TO A 15-YEAR FIXED?

If you owe less than $625,500, you may be shocked by how much Quicken Loans can reduce your monthly mortgage payment. Tr this radically simple mortgage experience and see if you can lock a crazy low rate that w never rise.

### SELECT YOUR MORTGAGE BALANCE:

$50k-$100k     $100k-$1

$150k-$200k     $200k-$2

$250k+

NMLS #3030

## PHOTO ESSAY

TOP SHOTS

## TRENDING

ON NATIONAL REVIEW

marriages regardless of the couple's sexual orientation, or cease performing all marriage ceremonies."

Two justices "vigorously" dissented. They argued that the judiciary should not add ideological criteria to the qualifications for judges established by the legislature. They also criticized the



**The Voice of**

≣ SECTIONS

b **HOME**

ᵛ **THE CORNER**

h **BENCH MEMOS**

p **MORNING JOLT**

jᵘ **THE G-FILE**

tᵉ **MAGAZINE**

p **PHOTO ESSAYS**

ᵛ **PODCASTS**

**ALL ARTICLES**

**SEARCH**

**DONATE**

ℕ **E-MAILS & ALERTS**

ℕ **SUBSCRIBE PRINT**

h **SUBSCRIBE DIGITAL**

o **STORE**

d **ADVERTISING**

n **ABOUT**

b **CONTACT**

n **PRIVACY**

n **NR INSTITUTE**

of a robust principle — 'free exercise' — to a minimal 'free belief.'"    Q

The majority's decision in Judge Neely's case is similar to ethics decisions offered in a handful of other states. Some are even more onerous. The Ohio Supreme Court has said that:

> A judge who takes the position that he or she will discontinue performing all marriages, in order to avoid marrying same-sex couples based on his or her personal, moral, or religious beliefs, may be interpreted as manifesting an improper bias or prejudice toward a particular class. The judge's decision also may raise reasonable questions about his or her impartiality in legal proceedings where sexual orientation is at issue and consequently would require disqualification.

As the Wyoming dissent clearly shows, these kinds of rules

create a *de facto* ideological, and often religious, test for qualification as a judge. A test totally extraneous to real concerns about bias and impartiality.

Judge Neely's plight is instructive. While it is certainly positive that she did not lose her job, she has now been labeled as biased and her discretionary authority to determine which marriages she performs will be micromanaged by the judiciary — all because she shared her beliefs in response to a hypothetical question from a reporter.

To stave off a hypothetical violation of constitutional rights, the court has sanctioned an *actual* violation of constitutional rights. And that should worry all Americans, regardless of their views on same-sex marriage.

*— Bill Duncan is a senior fellow at the Sutherland Institute, which filed a brief in support of Judge Neely.*

## SPONSORED CONTENT

Recommended by



**Hedgesville, West Virginia: This Brilliant Startup Is Disrupting a**
*EverQuote*



**5 Things You Need to Know Before Retiring**
*Fisher Investments*



**Your Billing Process Is Ripping You Off—Read How**
*DocuSign*



**Want A Gorgeous Head of Hair Again? Don't Use This Popular Product**
*Vital Updates*



**Solution to shutdown was 'inches away,' McConnell says**
*Washington Post*



**Hedgesville: Need a DUI Defense Attorney To Fight For You?**
*Yahoo! Search*



**Sanders to reporter: 'The premise of your question is completely ridiculous'**
*Washington Post*



**Handmade Boots That Won't Break The Bank By Tecovas**
*try.tecovas.com*

## MORE STORIES



**Samantha Power Regrets**



**Collusion 3.0: Russia and the NRA**



**Hang Tough, Republicans**



**Shutdown Showdown**



***12 Strong's* Moral Clarity about the War on Terror Is Sorely Needed**



***Friends* Declared Highly Problematic**

## Professor: Small Chairs in Preschools Are Sexist, 'Problematic,' and 'Disempowering'

**8 Comments**

Sort by   **Newest**



Add a comment...



**James Gitsas** · Retired... at United States Air Force

One More Time! We govern this Nation by our Constitution - Not the Holy Bible or the Holy Koran... You may Teach and you may Preach, but you may NOT Infringe upon the Rights of fellow citizens... If you are a Judge your ruling must be constitent with the Constitution of the United States of America... You must "marry" same-sex couples - or get off of the "Bench!" PERIOD!

Like · Reply · 44w



> **Bob Balliet** · CSUS Sacramento
> No judge is 'required' to officiate at ANY wedding. They just say they're not available and they do not have to give a reason.
>
> Like · Reply ·   1 · 44w



**David Marshall** · Author at Jesus is No Myth: The Fingerprints of God on the Gospels

The only thing now is to make a clean sweep of these bastards. Here in WA, they're going after grandmothers for selling flowers without exercising proper Goodthink.

Like · Reply · 44w



**Dean Henry** · University of Toledo College of Law

The quote attributed to "the Ohio Supreme Court" is not from any Ohio Supreme Court opinion or case. The quoted language appears in a nonbinding advisory opinion of the Ohio Supreme Court Board of Professional Conduct issued nearly two years ago following the U.S. Supreme Court decision in Obergefell v. Hodges.

The Advisory Opinion is a "informal, nonbinding opinion[s] in response to prospective or hypothetical questions regarding the application of..." rules governing the ethical conduct of attorneys and judges in Ohio.

Like · Reply ·   1 · 44w



> **Marc Luxenberg** · University of Southern California
> You would think an honest author with a strongly supported position would have noted that fact.
>
> Like · Reply · 44w

**Zack Yezek**

We all know the direction this is headed societally & legally: "You are totally free to agree with the 'Progressive' position & beliefs on any given issue". Disagreement is so beyond the pale that it is the obvious product of a diseased or hate-filled mind, and the principle of free speech doesn't cover expressions of "hateful", "offensive", etc. opinions & facts.

The Soviet Constitution contained provisions for Free Speech too; it also never seemed to cover criticism of the Communist Party.

Like · Reply ·   3 · 44w

**Steven Doggly**

I don't understand how a civil marriage violates one's religion? It's a contract.

Like · Reply · 1 · 44w



**Maria Anderson Huston**

Legality does not confer morality.

While gay marriage may be legal, it does not mean that there are those whose religious convictions will find it to be immoral. A citizen should not be forced to violate their sincerely held religious beliefs.

Like · Reply · 44w

**Steven Doggly**

Maria Anderson Huston That's like saying someone else eating a donut ruins your diet. Nonsense.

Like · Reply · 44w



**David Henderson** · Lakewood, Colorado

I agree that legality is not morality. A civil marriage does not have a morality; it is neither moral nor immoral.

Like · Reply · 43w



**Edwin Buck**

Now that is a bunch of BS. These liberal judges make unconstitutional rulings all the time, and no one seems to be worried. It's only the CHRISTIAN JUDGES that are in a microscope. Why is that? SUPREME COURT of the USA makes unconstitutional rulings all the time, and they are never held acccountable.

Like · Reply · 1 · 44w



**Terry Berry**

Judges hold secular positions that serve the public, which includes more than just Christians. To use their position to push Christian laws is unethical. I've never understood why Christians can't find worth in holding themselves to their ideals without insisting everyone else follow too even if they don't believe. Why would Jesus value that? Action without faith won't save anyone.

As for this particular case, I don't have enough details to form an opinion. If she were the only civil servent capable of performing marriages for 50 miles, it would be an issue of access. In which case finding a civil servent who could and would do the marriages should be sufficient.

All of the same sex couples I know just want a happy event without dragging in an unwilling participant.

Like · Reply · 2 · 44w



**Marc Luxenberg** · University of Southern California

Leroy Colson I think you mean it "forces" government employees to administer the law equally.

Like · Reply · 44w



**David Henderson** · Lakewood, Colorado

If it were true that "only the CHRISTIAN JUDGES" were under a microscope, maybe that would be because Jewish judges, Muslim judges, atheist judges, and judges of other religions are following the law. But I think most Christian judges are actually comfortable following the law, so it's really only those judges who don't that are "under a microscope".

Like · Reply · 43w



**Michael Berry**

Judges can perform marriages not because they are judges, but because they can adminster oaths. The same is true of notary publics. An notary is authorized to preform marriages. Now the ability to perform marriages is totaly discretionary. It is not part of their jobs.

What the court seems to be saying is that it is no longer discretionary and that if you can you must.

Like · Reply · 2 · 44w



**Marc Luxenberg** · University of Southern California

That function is discretionary only if exercising that discretion is not arbitrary. The courts have said that discriminating here is arbitrary.

Like · Reply · 44w



**Michael Intregitorul Dediu** · Works at Asymco

Moral dilemma: do you follow the Supreme Court decision or not?

Like · Reply · 44w



**Russ Davis**

Which one? The one diseased with deranged, lawless, bigoted, fascist Kennedy's chronological snobbery in delusions of godhood that in its illiteracy, especially but not only Biblically ignorantly and mindlessly protends greater knowledge than the vastly

only biblically, ignorantly and mindlessly pretends greater knowledge than the vastly more educated Founders, or its predecessors that knew that the whole "gay"/"homosex-" scam is a fraud, seen in "The gay invention" at touchstonemag.com. Tell a lie often enough and fools will buy any stupid thing, like two men can be married, or that there's such a thing as sexual "orientation" either in reality or legally vs the fact that it's just irrational antiChristian bigotry on the part of those deranged and corrupted by $ sex & power who should be jailed or executed as our vastly wiser and more knowlegeable Founders knew, unlike today's bigoted, lawless, fascist fools with morals worse than the Nazis like the WY 8 perverts.

Like · Reply · 44w



**Aaron Riggs** · Denver, Iowa

Russell Davis You do realize that you look like a rambling homophobe and don't further the point is trying to make right?

Like · Reply ·   3 · 44w



**Dennis Campbell**

Aaron Riggs -- Actually, he makes sense. You do realize that you are clueless, do you not?

Like · Reply ·   1 · 44w

Facebook Comments Plugin

—— ABOUT ——    —— INSTITUTE ——    —— ADVERTISE ——    —— CONTACT ——    N R    —— FACEBOOK ——    —— TWITTER ——    —— GOOGLE+ ——    —— PRIVACY ——

1 21 2018

NEWS    SHOWS    VIDEO    CBSN    MORE



## Hawking's Bold Prediction

Stephen Hawking Predicts "Biggest Event in the History of Civilization"

The Motley Fool



AP / *March 8, 2017, 8:52 AM*

# Ruth Neely, Wyoming judge against same-sex marriage, censured



*31 Photos*

A same-sex-marriage supporter waves a pride flag while celebrating the U.S Supreme Court ruling regarding same-sex marriage on June 26 2015 in San Francisco California   **JUSTIN SULLIVAN/GETTY IMAGES**

✦ Share / 🐦 Tweet /    Reddit / 🅵 Flipboard / ⊜ Email

**CHEYENNE, Wyo.** -- A small-town judge who says her religious beliefs prevent her from presiding over same-sex marriages was publicly censured by the Wyoming Supreme Court on Tuesday.

But while the court said her conduct undermines the integrity of the judicial system, it does not warrant removal from the bench. In a 3-2 decision, Justice Kate Fox wrote that Judge Ruth Neely violated judicial conduct code but removing Neely would "unnecessarily circumscribe protected expression."

"Judge Neely shall either perform no marriage ceremonies or she shall perform marriage ceremonies regardless of the couple's sexual orientation," Fox wrote.

Neely has never been asked to perform a same-sex marriage, and Fox said that the case was not about same-sex marriage or the reasonableness of religious beliefs.

CBSN Live    WATCH







**PLAY
HOT
ARTISTS**   'SEA

OZUNA
SE PREPARÓ

consumable

++++
++          +

**here to treat what
mom's chicken
soup can't**

FIND A LOCATION

ME MedExpress
URGENT CARE

---

**Same-sex marriage**    *Latest*  |  *Highlights*

  Last hurdle to same-sex marriages falls in Australia

  Lawmaker uses same-sex marriage speech to pop the question

  Texas Supreme Court questions right of bene gay spouses

briefly in 2015 after refusing marriage licenses to gay and lesbian couples. The case against clerk Kim Davis, a conservative Christian, sparked a national debate over the religious freedom of civil servants versus the civil rights of same-sex couples. Davis ultimately agreed to alter the licenses to remove her name and title.



**A history of gay rights in America**

In Neely's case, the dissenting justices argued that Neely didn't violate any judicial conduct code. "Wyoming law does not require any judge or magistrate to perform any particular marriage, and couples seeking to be married have no right to insist on a particular official as the officiant of their wedding," Justice Keith Kautz wrote in the dissent that was joined by Justice Michael K. Davis.

Neely, who's not a lawyer, is a municipal judge in Pinedale, a town of about 2,000 residents, and a part-time circuit court magistrate in Sublette County, a rural county rich in outdoor recreation and oil and gas. The majority of her work as a magistrate is to perform marriages.

The Wyoming Commission on Judicial Conduct and Ethics had recommended that Neely be removed from her positions for violating the state code of judicial conduct. Neely had argued that removing her would violate her constitutional rights.

Because Neely is a part-time magistrate appointed by a local circuit court judge to handle particular court needs, the Supreme Court left it to the discretion of the circuit court judge whether Neely can "continue to serve the essential functions of that position."

The circuit court judge who oversees Pinedale was not available for comment Tuesday, according to his office.

Attorney James Campbell, who represented Neely, said in a statement that Neely looks forward to serving her community for years to come.

"By affirming that Judge Neely may remain in her judicial positions, the Wyoming Supreme Court has recognized that her honorable beliefs about marriage do not disqualify her from serving her community as a judge, which she has done with distinction for more than two decades," said Campbell, who is an attorney with the Alliance Defending Freedom, an Arizona-based religious advocacy law firm.

Patrick Nixon, an attorney for the Judicial Conduct and Ethics commission, did not immediately return a message seeking comment. Commission Executive Director Wendy Soto declined to comment on the case and what the censure means for Neely.

The Supreme Court opinion noted that judicial discipline serves multiple purposes, including discouraging further misconduct by the judge and reinforcing the perception that judicial ethics are important.

Jason Marsden, executive director of the Denver-based Matthew Shepard Foundation, which advocates for gay rights, said the foundation believes that any

**Office Depot Brand White Copy Paper, Letter Paper Size, 20 Lb, 500 Sheet...**

$34.99

Watch CBSN Live

Couple Arrested After Their 13 Children Found Shackled & Tortured In California

Roughly Half Of Women Consider Their Lives To Be Harder After Trump Took Office

Here Are Some Of The Top Stories Of The Weekend

The Annual Lumiere London Festival

Government Shuts Down During GOP Control Of Congress

Follow Us

Popular on CBS News

01 Government shuts down after Senate fails to reach a deal
985801 *views*

02 Tom Petty died of accidental drug overdose, family announces
277596 *views*

03 Delta imposes new rules for service dogs after "serious incidents"
255554 *views*

04 How the government shutdown will affect Americans
166568 *views*

05 Man fools officers with car made of snow, gets fake parking ticket
140079 *views*

From "60 Minutes"


Kabul under siege while America's longest war rages on


The American scientist who's seen North Korea's nuclear secrets

public official must serve members of the public equally, regardless of personal beliefs.

"We would simply ask the circuit court to remain watchful to ensure that there is no discrimination from the bench for any of the citizens in her jurisdiction should she continue to serve," Marsden said.

The ethics commission investigated Neely after she told a reporter in 2014 that she wouldn't preside over same-sex marriages. Her lawyers said no same-sex couples had asked her to perform their marriage before she made the comments to the local newspaper. The U.S. Supreme Court ruled in 2015 that same-sex couples nationwide may marry.



**Supreme Court says "I Do"**

*© 2017 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.*

⨍ Share / 🐦 Tweet / Reddit / 🏳 Flipboard / ✉ Email

Sponsored Links by Taboola

**Bitcoin - Ignore the crash, and do this immediately**
Bonner and Partners Subscription

**An app that gets complete beginners speaking Spanish in 3 weeks**
Babbel

**Office Depot Brand Copy Print Paper, Letter Size Paper, 20 Lb, 500 Sheets Per Ream, Case Of 10 Reams**
$49.99 - officedepot.com

**How To Fix Dark Spots**
Gundry MD

**There Are 10 Types of Irish Last Names - Which One Is Yours?**
Ancestry

**Martinsburg: This Meal Service is Cheaper Than Your Local Store**
Home Chef

**12 Weird Viral Products Everyone Will Buy In 2018**
Household Saving Tips

**The Highest Paying Cash Back Card Has Just Hit The Market**
Credit.com

Surgeon arrested after hospital receives alarming report

Inside the minds of the Turpins, whose 13 children were found shackled and starving

Sponsored Links

**U.S. Cardiologist Warns: Throw Out Your Probiotics Immediately**

 Is Portland still Portlandia?

 RT's editor-in-chief on election meddling, being labeled Russian propaganda

 Predicting crime in Chicago

 Combat veterans coming home with CTE

 "60 Minutes" Presents: Making a Difference

 Delivered From Evil

 Japan's Babe Ruth

 Whisky Island



**Hawking's Bold Prediction**

Stephen Hawking Predicts "Biggest Event in the History of Civilization"
The Marketwatch  ⟩



VIDEO
**Goat Yoga**

Most Shared on CBS News

 Government shuts down after Senate fails to reach a deal

 New California declares "independence" from rest of state

WND EXCLUSIVE

# DID SUPREME COURT CANCEL JUDGES' FREE-SPEECH RIGHTS?

'Countless jurists ... at risk of discipline' for 'respectful expressions of reasonable beliefs'

Published: 08/04/2017 at 9:12 PM



**BOB UNRUH (HTTP://WWW.WND.COM/AUTHOR/RUNRUH/)**  About | Email (mailto:runruh@wnd.com) | Archive (http://www.wnd.com/author/runruh/?archive=true)

Subscribe to feed (http://www.wnd.com/author/runruh/feed/)



Judge Ruth Neely

rights/print/) Print

A small-town magistrate who lost her job after explaining to a reporter that her Lutheran faith would not allow her to perform a same-sex wedding is petitioning the U.S. Supreme Court

Ruth Neely is appealing a Wyoming Supreme Court decision against her that if allowed to stand, "poses a broad threat to judges' expressive freedom, reaching far beyond the circumstances of this case," contends the petition submitted by her legal team, the Alliance Defending Freedom. (http://www.adfmedia.org/files/NeelyCertPetition.pdf)

Neely was publicly censured by the Wyoming Commission on Judicial Conduct and Ethics and forced out of her job as a magistrate for explaining to reporter Ned Donovan of the Pinedale, Wyoming, newspaper that her faith precluded her from performing same-sex ceremonies

rights/print/)A A

Donovan told an editor that he wanted to get Neely "sacked," according to the complaint.

Neely's comment to the reporter was brought to the attention of Wendy Soto, the executive director of the ethics commission and a former board member of the LGBT advocacy group Wyoming Equality.

*"Outlasting the Gay Revolution" spells out eight principles to help Americans with conservative moral values counter attacks on our freedoms of religion, speech and conscience by homosexual activists (http://superstore.wnd.com/books/autographed/Outlasting-the-Gay-Revolution)*

Without anyone having issued a complaint, Soto initiated a disciplinary process without Neely's knowledge that ultimately resulted in her censure and removal from her position as magistrate.

The U.S. Supreme Court should overturn that result, ADF argues, for the danger the precedent poses.

The brief states: "Consider a state-court judge who says that he opposes the death penalty and would need to recuse himself from cases involving that issue. Or suppose that a juvenile-court judge discloses that his religious beliefs require him to step aside in proceedings in which minors seek permission to undergo abortions without parental consent. What if a judge indicates that she was

Supreme Court's logic, all those judges would be exposed to discipline for manifesting bias or a lack of impartiality."

It also points out that Wyoming judges may express many "nonreligious reasons for refusing wedding requests (e.g. because they do not know the marrying couple, would rather attend a football game, or just 'don't feel like' performing a wedding). But judges cannot decline a wedding request if they express the religious reason that Judge Neely invoked.

The brief says "such stifling of religious speech – which encourages judges to closet their beliefs or lie about their motives – confirms that this court should review whether the Wyoming Supreme Court violated Judge Neely's free-speech rights."

Among other constitutional problems with the Wyoming ruling is viewpoint censorship, the petition asserts.

"The state has admitted that its speech-censoring rules – by targeting expression that state officials consider to be biased or partial ... discriminate based on content. This case, however, goes beyond mere content discrimination and actually involves discrimination based on viewpoint. Had Judge Neely said that her religious beliefs favor same-sex marriages and that she could not wait to perform those ceremonies, she would have face no punishment," the brief explains.

The First Amendment, it argues, "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'"

"Finally, the Wyoming Supreme Court's decision implicates not only Judge Neely's freedom to speak, but also her freedom to decline to express messages that violate her conscience. The court below mandated that Judge Neely commit to personally officiating same-sex weddings in order to retain her role as a marriage-solemnizing magistrate. Yet agreeing to do that would have forced her to speak message at odds with her faith."

"Although the state has a system of individualized exemptions that permits magistrates to decline marriages for nearly any secular reason, the Wyoming Supreme Court held that Judge Neely could not refer same-sex-marriage reuqests (if she ever received any) to other magistrates for the religious reason she expressed. According to that court, the First Amendment provides no accommodation for a potential religious conflict (1) that has never actually arisen, (2) that the court below admitted is 'not likely' to occur ... and (3) for a function that others could easily cover."



**How To Shut An Atheist Up in 15 Seconds Flat**

Promoted Content

The bias of the Wyoming process further was demonstrated, the complaint says, when the commission sought to bring further charges against Neely because the defense counsel she obtained shared her beliefs.

The commission "alleged that Judge Neely violated additional code provisions – including one that prohibits affiliation with an 'organization that practices invidious discrimination' ... by retaining as counsel a faith-based legal organization that shares her religious beliefs about marriage. The commission insisted that because of her choice of counsel, she could not remain in ... her judicial positions."

"No one should be punished simply for expressing a belief about marriage that is 'based on decent and honorable religious ... premises' and is held 'in good faith by reasonable and sincere people,'" said ADF Senior Counsel David Cortman, quoting the U.S. Supreme Court's marriage decision, Obergefell v. Hodges, which four justices criticized as being unconnected to the Constitution.

"The state allows magistrates to decline wedding requests for countless secular reasons – because they refuse to perform weddings for strangers, because they simply don't feel like marrying the couple, or because they prefer to watch a football game," he said. "But the state forbids Judge Neely from saying that she would need to decline some wedding requests for a religious reason. This unconstitutionally targets religion for disfavored treatment, and that's why we're asking the U.S. Supreme Court to hear this case."

Neely has served as the municipal judge in Pinedale, Wyoming. In that role, in a part-time capacity, she had no authority to solemnize marriages. She also served as a part-time circuit court magistrate in Sublette County for approximately 15 years. In that role, she was authorized to solemnize marriages but had discretion to decline wedding requests for nearly any reason.

The Wyoming commission's position in the case "threatens to punish not just Neely, but also any other judge who expresses conscience-based conflicts involving any issue," ADF said.

WND reported last March (http://wnd.com/2017/03/justices-warn-of-new-religious-test-over-same-sex-marriage/) when the state court's decision was vigorously opposed by two justices, Michael Davis and Keith Kautz.

The dissenting judges pointed out that Neely broke no law and violated no part of the judicial code of ethics by stating she personally could not perform a same-sex "wedding."

Davis and Kautz warned that the decision creates a new "religious test" for judges.

"The effect of the majority opinion is concerning for the people of Wyoming. It likely results in a religious test for who may be a judge, at any level, in our state."

The judges said there is "only a single statute granting judges and others the authority to perform marriages in Wyoming."

"Apparently from that statutory authority the majority concludes that a circuit court magistrate who is willing to perform any marriages must perform all same sex marriages when requested," they wrote.

"To avoid ethics charges like these, judges then must pass a religious test indicating that they have no religious beliefs that would prevent them from performing same sex marriages, or be precluded from performing any marriages."

*"Outlasting the Gay Revolution" spells out eight principles to help Americans with conservative moral values counter attacks on our freedoms of religion, speech and conscience by homosexual activists (http://superstore.wnd.com/books/autographed/Outlasting-the-Gay-Revolution)*

---

# YOU MAY LIKE

(http://www.wnd.com/20
Ads by Revcontent

supreme-

court-

cancel-

judges-

**Remember Her? You Will when You See Her Before Plastic Surgery**
InspoTap
(//trends.revcontent.com/click.php?
d=9cPqtQZzfn53QRWtBNmr3iAgif8OmkVDoC7pUr4cJyxrVqMGgdgEMOgJW3BDhyJmsPeaC4TxgY06gcJvNwL

**You Could Become a PCH Multi-Millionaire on 2/23!**
Publishers Clearing House
(//trends.revcontent.com/click.php?
d=5Yo2f0ux0yyfaMRPJJor67ea5ICctd25Fo42kmpMHBGKXWk5t

**1 Cup Of This (Before Bed) Will Get Rid Of Nail Fungus**
Clear Nail Solution
(//trends.revcontent.com/click.php?
speech-
(http://www.wnd.com/20

supreme-

court-

**You Could Win $5k a Week "Forever" - Guaranteed for Award on 2/23**
Publishers Clearing House
(//trends.revcontent.com/click.php?
d=Z3C9coo5k5K%2FNFirWMK6HFStd

**19 Discounts Seniors Didn't Know They Could Get (#10 Has Cable Companies**
Life'd
(//trends.revcontent.com/click.php?

**Final Photo: What Happens Next is Tragic and Heartbreaking**
Triviabases
cancel-
judges-
free-
(//trends.revcontent.com/click.php?
speech-

rights/print/A A

**Chiropractors Baffled:**    **If You Have Sleep Apnea It's**    **Barbi Benton Is 67 Years**

Simple Stretch Eases Years
of Back Pain
Health Hack Tips

(Learn More)
Sleeptreatmentgroup

Standondaily

(//trends.revcontent.com/click.php?
d=nv%2BVZlgmu2dHo8JkD7B89I9Jw...

(//trends.revcontent.com/click.php?

(//trends.revcontent.com/click.php?
d=%2BjYsKiU306GH6E6nwKZVjQdY

(//trends.revcontent.com/click.php?
d=%2BjYsKiU306GH6E6nwKZVjQdY

Ads by Revcontent

# FROM THE WEB

How Netflix is Losing Millions of Users Cause of This Simple Device
(//trends.revcontent.com/click.php?
d=IO0H5lYy6SuDqXmyUd9JcleFRB4U1kmAE5TUHg9NYzEwN4%2FKUYRyGT?
Modern Gizmo

19 Discounts Seniors Didn't Know They Could Get (#10 Has Cable Companies
Angry) (//trends.revcontent.com/click.php?
d=Bkfr51XTj7vmupPpcdmuU4lXpfKlezPV1ciEgjhblJdfeyMFBWIWEl%2Fspk65l
Life'd

Jamie Lee Curtis Finally Reveals Secrets About Her Transgender Transformtaion
(//trends.revcontent.com/click.php?
d=%2Fj%2F8cB1AkpgmBoKO2vgUIx%2B42iQHYxaGqVAw5624YEMArp%2B3S
MommyThing

Hillary Clinton's IQ Score is So Low That It Will Make You Laugh Out Loud
(//trends.revcontent.com/click.php?
d=CAYYW6lBuKpu0hw80KDQVnqo4vzlLnT6SnBMcVEPlRtvHp4l6hVTgLP5d1g
Refinance Gold

Top 7 Must Have Edc & Survival Essentials
(//trends.revcontent.com/click.php?
d=etzQsiXYkQ0yAMOljscFUVpnz%2BNTloHTZW%2FQUr%2BMiEP%2BxW9Cil
American Survivalist Magazine

Allah takes over church in heart of U.S. Bible Belt
(//trends.revcontent.com/click.php?
d=i1OHm4wbFyTwTRTuUz8kk7WHuA6Mzc9Y6dy2VvBOS9mKdLtS7ZGiriKzUm

Bombshell: Donna Brazile warned off private eye on Seth Rich murder
(//trends.revcontent.com/click.php?
d=wfBujNvA1A0iqe%2Fd1%2F343Wx3BmhZj4wCFJRi1nv6RnsFrK1W72nPdilL

Dead DNC staffer suddenly back to haunt Democrats
(//trends.revcontent.com/click.php?
d=LB2ewb1wkNDbOpMisyV5cftp%2FBHgbalR%2BtKTPswWBCbMom10y8Oql

Comedian Kathy Griffin holds bloody head of 'decapitated Trump'
(//trends.revcontent.com/click.php?
d=4m0WM5V4a2PZXcs1AFYAl7oX6AWAKDdzw31cUYW6nSk15Ks4lyuz7cB05S

Idaho girl's refugee sex attackers walk free?
(//trends.revcontent.com/click.php?
d=d1BA8Oga7f5OlEHKvNFNi5t02DygTCK4PCRXR39jhfiECQnH8am0zSHDmtl\

**Note:** Read our discussion guidelines (/discussion-guidelines/) before commenting.

Sponsored

48 Comments    WND

● Login

♡ Recommend 3 Share Sort by Newest

Join the discussion...

LOG IN WITH

W SIGN IN TO WND

OR SIGN UP WITH DISQUS ?

Name

Email

Password

By signing up, you agree to the Disqus Basic Rules, Terms of Service, and Privacy Policy.

→

**ShemSilber2** · 5 months ago

Why should anyone be censured for not participating in what CANNOT exist, same-sex "marriage"? The Master Yahusha (Lord Jesus), per John 1:1-18; Colossians 1:13-17; Hebrews 1:1-3, made them male and female, or as a bumper sticker expressed it, Adam and EVE and not Adam and STEVE. He states in Leviticus 18:22 and 20:13 that homosexual activity is forbidden and is worthy of death to the participants. Through the Apostle Paul, He says that there won't be any effeminacy or homosexuality in His Kingdom (1Corinthians 6:9-11), and it also says there, "...and such WERE some of you, but you are WASHED..." for Paul had counseled them and led them to the Master, and by Him they had their sins washed and left behind. They left their homosexuality in the past, through the power of the Holy Spirit that the Master Yahusha gave them, so that they COULD be in the Kingdom.

Do we think that we will escape the Master's judgment any more than Sodom and Gomorrah did? But no, the judgment will be much more severe against us, because we have their example, whether we believe that example or not.

Blessings from the Master Yahusha on all those who turn to Him and leave their sins in the past, amein.

1 ^ v · Reply · Share ›

**southdfw** · 5 months ago

Guess Wyoming is doing anything they can to boost their population, chasing the (false) rainbow now?

4 ^ v · Reply · Share ›

**ERSmith** → southdfw · 5 months ago

Given that such cannot reproduce naturally, that plan won't work in the long run.

3 ^ v · Reply · Share ›

**JenniferP** · 5 months ago

The piece referring to her choice of representation caught my eye. So are they considering disbarring certain attorneys in their state for being religiously affiliated? How does that affect their understanding of the law as written? I'm really getting tired of the discrimination against the religious and paler members of our nation!

8 ^ v · Reply · Share ›

This comment was deleted.

**fedupinmo** → Guest · 5 months ago

Pedophilia, rape, and murder of non-Muslims all contain a similar element: a second person, who also has rights. A Muslim right to religion would not extend to their ability to do harm to someone else in violation of their own rights.

^ v · Reply · Share ›

**JenniferP** → Guest · 5 months ago

Freedom of religion was really about protestant vs catholic. The muslims were mostly attacking ships and stealing people in

surrounding land areas for slavery. The attribution of the idea to islam, buddhism, hinduism, etc, was not considered part of the original plan. Per the letters, speeches, etc. of the people who wrote our constitution and bill of rights. How do we stop the horrible things they are doing? Stop the inflow, first. Force the removal of the head coverings for women and require following our laws. Arrest and convict those who are performing terrorist acts and mutilating and killing girls.

∧　∨　·　Reply　·　Share ›

**I draw Mohammed!** · 5 months ago

Does that mean muslim judges can't express their religion....

5 ∧　∨　·　Reply　·　Share ›

**RLJPE** · 5 months ago

From the Wyoming Constitution:

Sec. 25. Religious liberty. Perfect toleration of
religious sentiment shall be secured, and no inhabitant of this state shall ever
be molested in person or property on account of his or her mode of religious
worship.

Sec. 18. Religious liberty. The free exercise and enjoyment of religious profession
and worship without discrimination or preference shall be forever guaranteed in this
state, and no person shall be rendered incompetent to hold any office of trust or
profit, or to serve as a witness or juror, because of his opinion on any matter of
religious belief

whatever; but the liberty of conscience hereby secured shall not be so construed
as to excuse acts of licentiousness or justify practices inconsistent with the
peace or safety of the state.

I guess that only a very few in Wyoming have actually read their Constitution. That
"no person shall be rendered incompetent to hold any office of trust or profit." is very
clear and easily understood, even by a progressive liberal Utopian.

6 ∧　∨　·　Reply　·　Share ›

**ltbl123** → RLJPE · 5 months ago

I commend you. Everyone talks about Constitutions but completely blows off
why these documents are the highest level of laws in our land. Why, because
they were put in place by all of the people to protect everyone of us from the
abuse of power by members of our own government.

The question you raise here and I find impossible to answer is not how only a
few may have read the Wyoming Constitution, but how is it possible that their
own Supreme Court charged with a primary mission of defending the
Wyoming Constitution's unambiguous protection Ms Neely's rights. can both
overrule its own Constitution and deny her the very rights protected in that
Constitution? This is high treason! These justices should be immediately
removed from office. They should then be put on trial for gross negligence in
violation of their oaths of office and sent to prison for denying Ms Neely's civil
rights and her livelihood. I think it is an outrage that an action as obvious and
egregious as this must wait to be adjudicated before the SCOTUS??? These
judges themselves have committed a criminal act against the petitioner why
aren't they in jail.?? If they disrobed themselves and raped her in court there
would be outrage, and perhaps an arrest? Yet... our soldiers that die on the
battlefields of the world in defense of freedom of conscience, faith, belief, and
speech (including Ms Neely's) their graves are being urinated on by these
rectums who hate everything our country stands for. When will we the people
wake up and demand that our government obey our Constitutions!!! When
will strip these despots from their robes and put freedom loving men and
women in their place???

2 ∧　∨　·　Reply　·　Share ›

**Rob Andrews** → ltbl123 · 5 months ago

What is needed is a new law that makes violating an American
Citizen's Constitutional Rights by action, inaction or by Ruling would
be a Capital Crime! ANY government official being Bureaucratic,
Congressional, Exexcutive or Judicial shall be given ONLY a jury Trial
and if guilty the MINIMUM sentence would be life in prison with no
possiblity of parole. The death sentence could be considered under
certain circumstances.

^ ∨ · Reply · Share ›

**RLJPE** ➜ ltbl123 · 5 months ago

Well said and thank you.

^ ∨ · Reply · Share ›

**rennyangel2** · 5 months ago

If Christians cannot follow their beliefs (a majority of the US), then Jews can be forced to produce Nazi propaganda, and Muslims draw cartoons of Muhammed.

5 ^   ∨ · Reply · Share ›

> **I draw Mohammed!** ➜ rennyangel2 · 5 months ago
>
> No!
>
> I draw Mohammed!
>
> 3 ^   ∨ · Reply · Share ›

>> **rennyangel2** ➜ I draw Mohammed! · 5 months ago
>>
>> Whichever
>>
>> 2 ^   ∨ · Reply · Share ›

> **I draw Mohammed!** ➜ rennyangel2 · 5 months ago
>
> No!
>
> I draw Mohammed!
>
> 1 ^   ∨ · Reply · Share ›

**Al-Franki "el-da dhimmi"** · 5 months ago

Whatever happened to the tough settlers and cowboys of Wyoming??

5 ^   ∨ · Reply · Share ›

> **ShemSilber2** ➜ Al-Franki "el-da dhimmi" · 5 months ago
>
> I wonder, Brother Frankie...have they ALL become sissies? OY, gevalt what a fix we're in!
>
> Even so come, Master Yahusha (Lord Jesus)! Help us now to navigate these Dark Ages and prepare us for the Age to Come by which you will throw the NWO in the garbage and give us real peace, joy, and productivity, amein!
>
> 1 ^   ∨ · Reply · Share ›

> **CrewMagnum** ➜ Al-Franki "el-da dhimmi" · 5 months ago
>
> They are being politically purged by the Bolsheviks.
>
> 4 ^   ∨ · Reply · Share ›

>> **Rob Andrews** ➜ CrewMagnum · 5 months ago
>>
>> The Fascist Alphabet perverts are trying to purge any Christians from government. Forcing their degenerate perversions on society by the barrel of a gun! This will only go so far before people decide to say NO!!
>>
>> 1 ^   ∨ · Reply · Share ›

> **alleyboy59** ➜ Al-Franki "el-da dhimmi" · 5 months ago
>
> broke back mountain.
>
> 7 ^   ∨ · Reply · Share ›

>> **I draw Mohammed!** ➜ alleyboy59 · 5 months ago
>>
>> Lmao
>>
>> 2 ^   ∨ · Reply · Share ›

**Harold Melton** · 5 months ago

Marriage is to establish a relationship the result of love..., not lust. Two men or two women cannot possibly love each other as does a man and woman.

6 ^   ∨ · Reply · Share ›

> **ltbl123** ➜ Harold Melton · 5 months ago
>
> He sure has a deep bench.
>
> ^ ∨ · Reply · Share ›

**Tommy100** · 5 months ago

We didn't have these issues before Obama. Obama hates America and wants to destroy it from within.

7 ∧　∨ · Reply · Share ›

> **ShemSilber2** ➜ Tommy100 · 5 months ago
>
> The problems were developing more slowly before Pharaoh Barry took a hand in it, and they would have gotten exponentially worse if Bonnie-Parker-&-Clyde-Barrow-on-steroids Clinton had gotten into the White House for their third term.
>
> Praises to Almighty Yahuwah for His mercy on us to give us the Trump-Pence team instead of what we really deserve. He truly gave us a break in response to our pleas for HELP, in Yahusha's (Jesus') Name, amein!
>
> 2 ∧　∨ · Reply · Share ›

> **ERSmith** ➜ Tommy100 · 5 months ago
>
> I recall the promise was to bring about fundamental change.
>
> ∧　∨ · Reply · Share ›

> **Watson Forrest** ➜ Tommy100 · 5 months ago
>
> I expected nothing less from the "negro". And sadly I was correct. That "thing" disgraced all good blacks and most people are too stupid to see it.
>
> 6 ∧　∨ · Reply · Share ›

> > **CWD** ➜ Watson Forrest · 5 months ago
> >
> > I must disagree with you only in part. "That "thing" disgraced all good blacks and most people are too stupid to see it." I believe that it's a relatively "small group that don't see it". But that small group is usually loud and violent thus, They tend to scare many good people into thinking ( and rightfully so) that they the idiot's will violently burn, destroy and attack good law abiding citizens and their property. That is where the line is. so it's just the bad people that should be punished severely.
> >
> > 4 ∧　∨ · Reply · Share ›

> > > **Watson Forrest** ➜ CWD · 5 months ago
> > >
> > > I truly hope the group is small. But I fear it is larger than both of us think.
> > >
> > > 1 ∧　∨ · Reply · Share ›

**malthus jr the second** · 5 months ago

step by step they are criminalizing christianity, exactly like the red chinese.

6 ∧　∨ · Reply · Share ›

> **ltbl123** ➜ malthus jr the second · 5 months ago
>
> Its not just Christianity. Reason, common sense, morality, and the rule of law, along with all of our other freedoms. There is a reason what is included in the First Amendment of our Constitution comes FIRST. Because these are the most important freedoms we have. These are the freedoms men and women have died to obtain and to keep. The Second Amendment has one purpose to enforce the citizen's right to overthrow their government should government decide to violate the rights protected by the FIRST Amendment.
>
> 2 ∧　∨ · Reply · Share ›

> > **ERSmith** ➜ ltbl123 · 5 months ago
> >
> > When you leave the source of wisdom, there can be no other outcome.
> >
> > ∧　∨ · Reply · Share ›

**FWiedner** · 5 months ago

Countless jurists and legal functionaries walk all over free-speech and every other constitutionally enumerated right of every American citizen every single day of the week. Now I'm supposed to get upset that one of these oppressors of humanity is getting a taste of life under their own boot?

Not.

**ShemSilber2** → FWiedner · 5 months ago

When the Master Yahusha (Lord Jesus) turns the tables in the proper direction, it will be proven that the LGBTQ-whatever subculture is the oppressor, trying to force its immoral and abominable practices on society in general. May the time be fulfilled SOON when EVERY knee bows and EVERY tongue confesses that the Master Yahusha is Yahuwah and that all His instructions to us and all His actions are above reproach, in that His design in forming us in the womb in the first place was so that He could give us time in the second place to choose between everlasting life in our Father's Kingdom or the default, which is to pay the price for our own sin rather than to accept the Master Yahusha's payment in His death to cover them and wash them clean.

If we accept His payment and His resurrection from the dead, He will prepare us for everlasting life in peace, joy and productivity. If we refuse, then we have chosen to die a fiery death in Gei-Hinnom, the lake of fire made for the devil and his fellow demons, who forsook the perfection with which the Master created them and chose to run things according to their rebellion. There is no resurrection from the second death, but it will be as if they never existed at all, when they COULD have had everlasting life, says the Master Yahusha, who has no pleasure in the death of the wicked, but that we should turn to Him to be imbued with immortality, amein.

∧  ∨ · Reply · Share ›

> **FWiedner** → ShemSilber2 · 5 months ago
>
> Blah, blah, blah...
>
> If you put a tooth under your pillow before you go to sleep, a little fairy will take it and leave you a quarter before you wake up.
>
> ∧  ∨ · Reply · Share ›

>> **ShemSilber2** → FWiedner · 5 months ago
>>
>> When the time comes that Isaiah 45:23, Romans 14:11 and Philippians 2:5-11 is fulfilled, and every knee bows and every tongue confesses that the Master Yahusha (whom Christians call 'Lord Jesus'), then you will know that among all the fairy tales that the devil invented to throw people off, there is truth. Until then, just go your merry ignoramus way. Have all the laughs you want until you hit the brick wall that stops you cold, in Yahusha's Name, amein.
>>
>> ∧  ∨ · Reply · Share ›

>> **FWiedner** → ShemSilber2 · 5 months ago
>>
>> Yawn. You... Are a kook.
>>
>> ∧  ∨ · Reply · Share ›

>> **ShemSilber2** → FWiedner · 5 months ago
>>
>> LOL! GUILTY as charged, and I wouldn't have it any other way. Remember to CRY OUT to the Master Yahusha for some serious help when you hit that brick wall. Cry out to Him with all your heart, repenting for all your castigation of your Redeemer, the Master Yahusha, amein!
>>
>> ∧  ∨ · Reply · Share ›

> **ltbl123** → FWiedner · 5 months ago
>
> Sad
>
> ∧  ∨ · Reply · Share ›

**Dave Neuendorf** · 5 months ago

If the Supreme Court doesn't fix this, maybe judges in the future should answer "no comment" to leading questions like "would you perform a same-sex marriage." In dealing with Satan-inspired opponents like this, Jesus said, "Behold, I send you forth as sheep in the midst of wolves: be ye therefore wise as serpents, and harmless as doves." (Matthew 10:16)

4 ∧  ∨ · Reply · Share ›

Well, I just E-mailed senator Enzi and Representative Liz Cheney.

∧ ∨ · Reply · Share ›

**OutlawJoseyWales** · 5 months ago

This is a no-brainer for the SCOTUS. Hopefully they will clear this matter up in short order at their next chance.

3 ∧ ∨ · Reply · Share ›

**Southernyankee** · 5 months ago

**It is cases like this one that are going to eventually sway public opinion, and the courts against forcing people to violate their religious beliefs in regard to same sex marriage, this is a clear violation of this woman's freedom of speech, and freedom to exercise her religious beliefs.**

6 ∧ ∨ · Reply · Share ›

> **Spectrum** ↱ Southernyankee · 5 months ago
>
> Same-sex "marriage", not marriage. Don't credit it with any respect.
>
> 2 ∧ ∨ · Reply · Share ›

**Ngorgh** · 5 months ago

Can no one see what is going on...? Wyoming only wants to get rid of the "Christian" Judges.
Since Judges are becoming the Law Writers of this new form of governance where Congress and the Senate are a none entity.
This is why when the democrats were in power they put so many liberal Judges on the bench. Now when they are not in power they just preform Gridlock and let the courts make law.

6 ∧ ∨ · Reply · Share ›

**eDeplorabisUnum** · 5 months ago

In Wyoming, they should have keel-hauled the queers before a few cactuses. Live up to the legend, er myth....

2 ∧ ∨ · Reply · Share ›

**FreetheBirds** · 5 months ago

The headline is deceptive. The Wyoming Supreme Court canceled judges' free speech rights sometime in the past, but as far as I can tell from the story, SCOTUS has done nothing yet.

1 ∧ ∨ · Reply · Share ›

**SAMADAMSISBACK** · 5 months ago

The same can be argued for judges with bias against the first amendment too!

3 ∧ ∨ · Reply · Share ›

✉ Subscribe   ⊙ Add Disqus to your siteAdd DisqusAdd   🔒 Privacy



TRIAL (HTTP://SUPERSTORE.WND.COM/WND-WEEKLY-FREE-SAMPLE) / MONTHLY (HTTP://SUPERSTORE.WND.COM/WND-WEEKLY-MONTH-TO-MONTH) / ANNUAL (HTTP://SUPERSTORE.WND.COM/WND-WEEKLY-1-YEAR-SUBSCRIPTION)



SUBSCRIBE (HTTP://SUPERSTORE.WND.COM/WHISTLEBLOWER-MAGAZINE) / GIFT (HTTP://SUPERSTORE.WND.COM/WHISTLEBLOWER-MAGAZINE-GIFT) / RENEW (HTTP://SUPERSTORE.WND.COM/WHISTLEBLOWER-MAGAZINE-RENEWAL)

**SECTIONS**

WND TV
(HTTP://WWW.WND.COM/
TV/)

COMMENTARY
(HTTP://WWW.WND.COM/

POLITICS
(HTTP://WWW.WND.COM/
PAGE/POLITICS/)

U.S.
(HTTP://WWW.WND.COM/
PAGE/US/)

WORLD
(HTTP://WWW.WND.COM/
PAGE/WORLD/)

FAITH
(HTTP://WWW.WND.COM/
PAGE/FAITH/)

HEALTH
(HTTP://WWW.WND.COM/
PAGE/HEALTH/)

EDUCATION
(HTTP://WWW.WND.COM/
PAGE/EDUCATION/)

MONEY
(HTTP://WWW.WND.COM/

DIVERSIONS
(HTTP://WWW.WND.COM/

**FEATURES**

AMERICAN MINUTE
(HTTP://WWW.WND.COM/
MINUTE/)

CARTOONS
(HTTP://WWW.WND.COM/

REVIEWS
(HTTP://WWW.WND.COM/

EMAIL TO THE EDITOR
(HTTP://WWW.WND.COM/
TO-THE-EDITOR/)

PETITIONS
(HTTP://WWW.WND.COM/

JOKE OF THE DAY
(HTTP://WWW.WND.COM/

**RESOURCES**

ABOUT WND (/ABOUT-
WND/)

ADVERTISING
(HTTP://WWW.WND.COM/
WITH-WND/)

COMMENTATOR LINEUP
(HTTP://WWW.WND.COM/

DONATE TO WND
(HTTP://SUPERSTORE.WN
SUBSCRIPTION)

NEWS ALERTS
(HTTP://WWW.WND.COM/S
UP-FOR-WNDS-FREE-
EMAIL-ALERTS/)

G2 BULLETIN
(HTTP://G2BULLETIN.WND

WND SUPERSTORE
(HTTP://SUPERSTORE.WN

WND BOOKS
(HTTP://WNDBOOKS.WND

WHISTLEBLOWER
(HTTP://SUPERSTORE.WN

WND WEEKLY
(HTTP://SUPERSTORE.WN

WHO READS US
(HTTP://WWW.WND.COM/
READS-US/)

WHO'S WHO AT WND
(HTTP://WWW.WND.COM/
WHO-AT-WND/)

WND HISTORY (/ON-THIS-
DAY-IN-WND-HISTORY/)

WND SCOOPS
(HTTP://WWW.WND.COM/
SCOOPS-YOU-READ-IT-
HERE-FIRST/)

MOBILE WND
(HTTP://MOBILE.WND.CO

**CONTACT WND**

- Advertising Inquiries
  (/contact-wnd/?
  subject=advertising)
- Corrections (/contact-wnd/?
  subject=corrections)
- Email to the Editor (/contact-
  wnd/?subject=email)
- News Tips (/contact-wnd/?
  subject=tips)
- Testimonials (/contact-wnd/?
  subject=testimonial)
- Questions (/contact-wnd/?
  subject=questions)

© Copyright 1997-2018. All Rights Reserved. WND.com.   Terms of Use (/terms-of-use/)   Privacy Policy (/privacy-policy/)   Mobile Site

(http://mobile.wnd.com/)

(///privacy.truste.com/privacy-seal/WorldNetDaily-com.-Inc-/validation?rid=924b6c21-beda-42ba-889c-47e0ec5cd339)

## IN THE SUPREME COURT
## STATE OF WYOMING

### OCTOBER TERM, A.D. 2015

An Inquiry Concerning the Honorable Ruth
Neely, Municipal Court Judge and Circuit
Court Magistrate, Ninth Judicial District,
Pinedale, Sublette County, Wyoming

No. J-16-0001

Judge Ruth Neely
    Petitioner,

v.

Wyoming Commission on Judicial Conduct
and Ethics
    Respondent.

## AMICUS BRIEF OF THE BECKET FUND FOR RELIGIOUS LIBERTY
## IN SUPPORT OF THE HONORABLE RUTH NEELY'S PETITION
## OBJECTING TO THE COMMISSION'S RECOMMENDATION

Douglas W. Bailey
WSB#7-5102
BAILEY | STOCK | HARMON | COTTAM P.C.
221 E. 21st Street
P.O. Box 1557
Cheyenne, WY 82003
(307) 638-7745 Fax: (307) 638-7749
dwb@bsh-law.com

Local Counsel for Amici Curiae

Luke Goodrich*
Daniel Blomberg*
THE BECKET FUND FOR RELIGIOUS LIBERTY
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
lgoodrich@becketfund.org
dblomberg@becketfund.org
(202) 955-0095 Fax: (202) 955-0090

Counsel for Amicus Curiae
*Admission *pro hac vice* pending

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... iii

SUMMARY OF ARGUMENT ........................................................................................ 1

ARGUMENT .................................................................................................................. 3

I.  The Commission's recommendation to remove Judge Neely from
    judicial office violates Article 1, section 18 of the Wyoming Constitution ............. 3

    A. The text and history of Article 1, section 18 show that religious
       views on marriage do not render a judge incompetent to hold
       public office ....................................................................................................... 5

    B. The Commission's recommendation violates Article 1, section 18 ................ 10

II. The Commission's recommendation to remove Judge Neely from
    both of her judicial positions violates the Free Exercise Clause of
    the U.S. Constitution .............................................................................................. 14

    A. The Commission's recommendation impermissibly punishes
       Judge Neely for her religious beliefs ................................................................ 15

    B. The Commission's recommendation is not neutral because
       it targets Judge Neely's religious conduct ........................................................ 15

    C. The Commission's recommendation is not generally
       applicable because it favors nonreligious conduct ........................................... 19

    D. The Commission's recommendation fails strict scrutiny ................................. 21

        1. There is no compelling interest in requiring Judge
           Neely to perform wedding ceremonies that violate
           her faith ........................................................................................................ 22

        2. Removing Judge Neely is not the least restrictive means
           of furthering the Commission's stated interests ........................................... 27

            a. Wyoming has other ways of ensuring full access to
               marriage ceremonies without punishing Judge Neely ........................... 28

            b. There are numerous less restrictive ways of addressing
               concerns about perceived bias or partiality ........................................... 29

CONCLUSION ............................................................................................................. 30

ii

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) .................................................................................... 19

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3rd Cir. 2004) ...................................................................................... 19

*Braunfeld v. Brown,*
366 U.S. 599 (1961)..................................................................................................... 15

*Burwell v. Hobby Lobby,*
134 S. Ct. 2751 (2014)............................................................................................. 1, 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)............................................................................................. passim

*City of Boerne v. Flores,*
521 U.S. 507 (1997)..................................................................................................... 21

*Davila v. Gladden,*
777 F.3d 1198 (11th Cir. 2015) .................................................................................. 29

*Dworkin v. L.F.P., Inc.,*
839 P.2d 903 (Wyo. 1992)............................................................................................. 7

*Employment Div. v. Smith,*
494 U.S. 872 (1990)............................................................................................. passim

*Fraternal Order of Police Newark Lodge*
*No. 12 v. City of Newark,*
170 F.3d 35 (3rd Cir. 1999) ........................................................................... 20, 21, 22

*Frudden v. Pilling,*
742 F.3d 1199 (9th Cir. 2014) .................................................................................... 26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006)..................................................................................................... 23

*Good News Club v. Milford Central Sch.,*
533 U.S. 98 (2001)....................................................................................................... 25

*Heffernan v. City of Paterson,*
No. 14–1280, 2016 WL 1627953 (April 26, 2016) ...................................................... 27

iii

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ................................................................................. 27

*In re LePage*,
18 P.3d 1177 (Wyo. 2001) ........................................................................................... 5

*In re Roberts' Estate*,
133 P.2d 492 (Wyo. 1943) .................................................................................... 26, 28

*Kaahumanu v. Hawaii*,
682 F.3d 789 (9th Cir. 2012) ..................................................................................... 26

*McDaniel v. Paty*,
435 U.S. 618 (1978) .................................................................................................... 16

*Miller v. City of Laramie*,
880 P.2d 594 (Wyo. 1994) ................................................................................... 22, 23

*Miller v. Davis*,
123 F. Supp. 3d 924 (E.D. Ky. 2015) ........................................................................ 28

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015) ......................................................................................... passim

*Rep. Party of Minn. v. White*,
416 F.3d 738 (8th Cir. 2005) ..................................................................................... 27

*Rep. Party of Minn. v. White*,
536 U.S. 765 (2002) ............................................................................................. 22, 25

*Sherbert v. Verner*,
374 U.S. 398 (1963) ............................................................................................. 15, 23

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................................................................................................... 23

*State v. Hershberger*,
462 N.W.2d 393 (Minn. 1990) ................................................................................. 6, 7

*State v. Jefferis*,
178 P. 909 (Wyo. 1919) ............................................................................................. 10

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) .................................................................................................... 22

iv

*Torcaso v. Watkins*,
  367 U.S. 488 (1961) ................................................................................................ 15

*U.S. v. Playboy Ent'mt Grp., Inc.*,
  529 U.S. 803 (2000) ................................................................................................ 27

*Vasquez v. State*,
  990 P.2d 476 (Wyo. 1999) ......................................................................................... 5

*W. Va. St. Bd. of Ed. v. Barnette*,
  319 U.S. 624 (1943) .................................................................................................. 2

*Walters v. State ex rel. Wyo. Dep't of Transp.*,
  300 P.3d 879 (Wyo. 2013) ......................................................................................... 7

*Washakie Cnty. Sch. Dist. No. One v. Herschler*,
  606 P.2d 310 (Wyo. 1980) ....................................................................................... 22

*Williams-Yulee v. Florida Bar*,
  135 S. Ct. 1656 (2015) ............................................................................................ 21

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ................................................................................................ 26

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ................................................................................... 27

## Statutes and Constitutions

N.C. Gen. Stat. § 51-5.5 ............................................................................................ 29

U.S. Const. amend. I ............................................................................................ 6, 15

U.S. Const. art. VI ...................................................................................................... 6

Wyo. Const. art. 21, § 25 ............................................................................................ 4

Wyo. Const. art. 7, § 12 .............................................................................................. 4

Wyo. Const. art. 1, § 18 ...................................................................................... passim

Wyo. Const. Preamble ................................................................................................ 4

Wyo. Stat. § 5-9-213 ................................................................................................ 11

Wyo. Stat. § 20-1-106 ................................................................................... 11, 26, 28

## Rules

Preamble, Wyo. Code of Judicial Conduct ........................................................................ 10

Rule 8, Wyo. Rules Governing
the Commission on Judicial Conduct and Ethics............................................................. 30

Rule 18, Wyo. Rules Governing
the Commission on Judicial Conduct and Ethics............................................................. 30

Rule 8.2, Wyo. Rules of Professional Conduct ................................................................ 25

## Other Authorities

Andrew Koppelman,
*Gay Rights, Religious Accommodations, and the Purposes
of Antidiscrimination Law*, 88 S. Cal. L. Rev. 619 (2015) ............................................. 31

Cal. Comm. on Jud. Ethics Adv. Op.
(Nov. 12, 2015), http://www.judicialethics
opinions.ca.gov/sites/default/files/CJEO%20Oral%20
Advice%20Summary%202015-014.pdf ....................................................................... 24

Douglas Laycock,
*Religious Liberty and the Culture Wars*,
2014 U. Ill. L. Rev. 839 (2014)..................................................................................... 30

*Essays on the Constitution of the United States,
Published During Its Discussion by the People 1797—1788*
(Paul L. Ford ed., 1892) ............................................................................................ 6, 8

*Journal and Debates of the Constitutional Convention
of the State of Wyoming*
(The Daily Sun, Book and Job Printing 1893)......................................................passim

Oral Argument Transcript, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015),
http://www.supremecourt.gov/oral_arguments/
argument_transcripts/14-556q1_7l48.pdf ................................................................... 26

*Pamphlets on the Constitution of the United States,
Published During Its Discussion by the People, 1787—1788*
(Paul L. Ford ed., 1888) ......................................................................................... 8, 14

Pinedale Online News,
*Candidate Questions & Answers on KPIN* (Apr. 30, 2006),

http://www.pinedaleonline.com/news/2006/04/
CandidateQuestionsAn.htm ........................................................................................ 24

Robert B. Keiter & Tim Newcomb,
*The Wyoming State Constitution* (2011) ..................................................................... 8, 9

Robert B. Keiter and Tim Newcomb,
*The Wyoming State Constitution, A Reference Guide* (1993) ......................................... 5

## SUMMARY OF ARGUMENT

After over twenty years of undisputedly sterling service, Judge Ruth Neely faces the loss of her judicial offices simply because she publicly expressed a "decent and honorable religious" belief about marriage which is shared by many state and federal judges across the country. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). Contrary to U.S. Supreme Court guidance on this issue, the Wyoming Commission on Judicial Conduct and Ethics has declared that Judge Neely's beliefs are so "repugnant" that any judge who publicly expresses them "cannot remain in office." That blatant hostility to traditional religious beliefs about marriage violates both the United States and Wyoming Constitutions.

Sex, marriage, and religion are deeply important issues about which Americans hold a variety of beliefs. The freedom to form one's own beliefs about these issues—and to express those beliefs—is protected by the U.S. Constitution as central to each citizen's own dignity and self-definition. *Obergefell*, 135 S. Ct. at 2593. For religious citizens, as Justice Kennedy recently explained, living according to their religion "is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts." *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2785 (2014) (Kennedy, J., concurring). This freedom includes not just the right to privately hold religious beliefs, but also the right to express them—*i.e.*, to "establish one's religious . . . self-definition in the political, civic, and economic life of our larger community." *Id.*

The Supreme Court's *Obergefell* decision illustrates this principle. The Court recognized that marriage is a "transcendent" issue about which individuals should remain

1

free to make their own decisions, without government coercion. *Obergefell*, 135 S. Ct. at 2594, 2599-2604. The Court fully understood that, for millions of Americans, a marriage is also a fundamentally *religious* event—one that "is sacred" and forms "a keystone of our social order." *Id.* at 2594, 2601. The Court saw no problem with people and institutions holding the "decent and honorable religious or philosophical" belief that marriage is limited to opposite-sex unions and recognized that this belief is held "in good faith by reasonable and sincere people." *Id.* at 2602, 2594. Instead, it emphasized that the constitutional problem arises when the State itself makes citizens into "outlaw[s]" or "outcast[s]" for pursuing a less popular view of marriage. *Id.* at 2600.

The same pluralism that animates *Obergefell* is commanded by decades of First Amendment doctrine and by the terms of Wyoming's constitution. *See W. Va. St. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943); Wyo. Const. art. 1, § 18. The Commission is no more permitted to punish Judge Neely for living according to her view of marriage in Wyoming than Ohio was free to punish Mr. Obergefell for living according to his view of marriage in Ohio. Or, as one recently-married same-sex couple in Pinedale put it, "it would be obscene and offensive to discipline Judge Neely for her statement . . . about her religious beliefs regarding marriage." C.R. 902.

The Commission offers two reasons to depart from this principle. First, it argues that Judge Neely and those judges who share her beliefs suffer from an "inability to apply and follow the law," which is what "renders [them] incompetent to perform as a judge." Order at 6. But the law does not even authorize, much less require, Pinedale municipal judges to perform marriage ceremonies. Nor does the law require Sublette County magistrates to

2

perform marriage ceremonies; it merely allows them the discretion to do so and allows them to cite many reasons—including schedule, relationship, and convenience—for declining to perform particular ones. This poses no barrier to same-sex marriages because there are plenty of other individuals in Pinedale who will perform them. There is no evidence that anyone in Pinedale who has wanted a marriage of any type has failed to receive it promptly, courteously, and professionally.

Second, the Commission argues that banning Judge Neely and those with similar beliefs from the bench is necessary to avoid the perception of bias. But in two decades of serving as a judge, no one has ever complained that Judge Neely was biased. The only evidence is to the contrary: Judge Neely has been an exemplary judge who treats LGBT citizens, like all other citizens, with impartiality and fairness both inside and outside her courtroom. Further, Wyoming already has a means for addressing possible or perceived bias: recusal. Yet the Commission instead chooses a far more drastic, disproportionate punishment: complete removal from any judicial position, regardless of whether that position is authorized to perform marriages. Such overreach evinces the targeted and discriminatory nature of the Commission's actions.

If this Court were to sanction the Commission's extreme position, it would purge the Wyoming judiciary of people who hold and exercise "decent and honorable religious" beliefs about marriage. That is both unnecessary and unconstitutional.

3

## ARGUMENT

## I.     The Commission's recommendation to remove Judge Neely from judicial office violates Article 1, section 18 of the Wyoming Constitution.

The Wyoming Constitution places unusually strong emphasis on religious liberty, both in its language and in its structure. The Constitution's preamble identifies religious liberty as an animating reason for establishing the Constitution in the first place. *See* Wyo. Const. preamble. Its main free exercise guarantee is not only very strong, it is also placed in the Declaration of Rights and must thus be construed liberally to protect individual liberty. *Id.* art. 1, § 18. Yet another free exercise guarantee broadly protects religious liberty in public schools. *Id.* art. 7, § 12. And the Constitution's final article once more re-affirms the right to religious liberty and places that guarantee among just a few others that can be repealed only with the express consent of the U.S. Congress. *Id.* art. 21, § 25. Simply put, Wyoming's constitution ensures religion receives the broadest possible protection from government encroachment.

That strong and repeatedly reinforced commitment to religious liberty in the text of the Constitution is reinforced by the history of the text's enactment. Indeed, the framers of the Constitution actually considered a closely analogous but *even harder* question than the one presented here: whether Wyomingites must be banned from public office for holding and expressing deeply unpopular religious views in favor of polygamous marriage. And the framers came down on the side of protecting religious liberty. This combination of text and history—particularly of Article 1, section 18—confirm that the Commission's recommendation cannot stand.

4

### A. The text and history of Article 1, section 18 show that religious views on marriage do not render a judge incompetent to hold public office.

Article 1, section 18 of the Wyoming Constitution provides a robust, specific guarantee of religious liberty by stating that Wyoming citizens cannot be removed from public office because of their religious beliefs. And because that guarantee is located in the Declaration of Rights section of the constitution, it must be construed liberally to protect individual liberty. *Vasquez v. State*, 990 P.2d 476, 485 (Wyo. 1999) (quoting Robert B. Keiter and Tim Newcomb, *The Wyoming State Constitution, A Reference Guide* 11-12 (1993)).

Section 18 provides:

> The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.

Wyo. Const. art. 1, § 18. This section begins generally, "forever guarantee[ing]" the "free exercise" of "religious profession and worship." Within this broad right, it defines a specific protection: any person can hold "any office of trust" regardless of "his opinion on any matter of religious belief whatever." Several aspects of this language are important.

First, by protecting "free exercise," the language protects not just religious *beliefs*, but the *exercise* of those beliefs through action and abstention. *In re LePage*, 18 P.3d 1177, 1181 (Wyo. 2001) (stating that Section 18 protects "the free exercise of religion" from "governmental interference"); *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) ("exercise of religion" includes "the performance of (or abstention from) physical acts").

5

Second, unlike the federal free exercise clause, which "simply attempts to restrain governmental action," Wyoming's language "is of a distinctively stronger character" and "expressly grants affirmative rights" to the free exercise of religion. *State v. Hershberger,* 462 N.W.2d 393, 397 (Minn. 1990) (construing similarly strong language in the Minnesota constitution). The federal constitution restricts government from "prohibiting" religious exercise, U.S. Const. amend. I; Wyoming "forever guarantees" religious exercise. Wyo. Const. art. 1, § 18.

Third, the protection for service in public office in Section 18 is significantly more explicit than the guarantees in state and federal counterparts. While those constitutions ban "religious Test[s]" for public office, *see, e.g.,* U.S. Const. art. VI, Wyoming prohibited *any* government action that rendered *any* person incompetent from holding "*any* office of trust or profit" based on "*any* matter of religious belief *whatever.*" Thus, Wyoming citizens are protected not just from the narrow test oaths often imposed at the time of the founding— such as questions about whether they are "presbyterians, episcopalians, baptists, or quakers"—but from any type of disqualification from office based on religion. *See Essays on the Constitution of the United States, Published During Its Discussion by the People 1797—1788* at 169 (Paul L. Ford ed., 1892) (reprinting essay by Oliver Ellsworth, later Chief Justice of the U.S. Supreme Court) (hereinafter *Essays on the Constitution*).

Finally, Wyoming's broad guarantees of religious freedom are limited only in that they cannot justify "acts of licentiousness" or a threat to "the peace or safety of the state." But even that limitation helps illuminate the breadth of the guarantees. If the framers had only meant to cover belief and expression, there would have been no need to place a limit on

6

only a particular specified set of "acts." And by specifying which "permissible countervailing interests of the government" may "outweigh religious liberty," the Wyoming Constitution forecloses the argument that *other* interests might also outweigh religious liberty. *Hershberger*, 462 N.W.2d at 397 (construing identical language); *Walters v. State ex rel. Wyo. Dep't of Transp.*, 300 P.3d 879, 884 (Wyo. 2013) (it is a "fundamental rule" that the "doctrine of *expressio unius est exclusio alterius* requires us to construe a statute 'that enumerates the subjects or things on which it is to operate . . . as excluding from its effect all those not expressly mentioned.'" (internal citation omitted)).

The history of Article 1, section 18 confirms its broad scope. *See Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 910 (Wyo. 1992) (the "history" and "proceedings of our state constitutional convention" are "a valuable aid in interpreting the scope of a provision of the state constitution"). Before adopting its broad free exercise language, the Wyoming Constitutional convention considered much weaker language, which limited the protection of religious freedom to "matters of religious sentiment, belief, and worship," and which protected public officeholders solely from being forced to meet "religious qualification[s]." *Journal and Debates of the Constitutional Convention of the State of Wyoming* 168 (The Daily Sun, Book and Job Printing 1893) (hereinafter *Journal*). The convention's decision to reject that language is illuminating.

First, by protecting "free exercise" and "liberty of conscience" instead of mere "sentiment, belief, and worship," the convention again showed that it wasn't protecting merely thoughts and words, but religiously motivated conduct. Second, by rejecting language that would have forbidden only "religious qualification[s]" for public office, the

7

convention showed that it wanted to do more than merely ban test oaths. Federal and state provisions banning such oaths had a similar general aim as Wyoming—preventing government officials from "incapacitat[ing] more than three-fourths of the American citizens for any publick office" and "degrad[ing]" the excluded groups "from the rank of freemen," *Essays on the Constitution* at 169; and allowing "[t]he people [to] employ any wise or good citizen in the execution of the various duties of the government." *Pamphlets on the Constitution of the United States, Published During Its Discussion by the People, 1787—1788* at 146 (Paul L. Ford ed., 1888) (hereinafter *Pamphlets on the Constitution*). But Wyoming could hardly have been clearer that it wanted to do more—it wanted to remove every impediment to public office based on "*any* matter of religious belief *whatever*."

Two related convention debates concerning the scope of Section 18 are particularly revealing. First, the convention considered an amendment "aimed at the state's Mormon population," which would have limited Section 18's broad protections by "prohibit[ing] anyone who entered into or believed in polygamy from . . . holding public office." Robert B. Keiter & Tim Newcomb, *The Wyoming State Constitution* 69 (2011). The text of the amendment banned from "any civil office" anyone who "is a bigamist or polygamist, or is a believer in or enters into what is known as plural or celestial marriage." *Journal* at 837. When the language was offered at the convention, the proponents successfully moved to suspend the rules and immediately consider the language. *Id.* at 837.

Two delegates then rose in opposition to the amendment. Before addressing the substance of his objection, the first delegate noted that he did "not think it . . . right or just"

8

that the language was "offered now at this last day without any notice" and that while he expected that proponents of the language had a "pocketful of speeches prepared upon this question," he did not. *Id.* at 838. Shifting to the substance, he then argued that "the language of this section will have a bad effect upon a good many good citizens of Wyoming." *Id.* Further, he explained, the nature of their beliefs "make[] little difference" "if they are good, law abiding citizens," and he believed that it was clear that "while [Wyoming] may be populated with a good many of this class of people who believe this way, they have proved themselves to be law abiding citizens and peaceful citizens." *Id.* He also argued that the language inappropriately "point[ed] directly at one class of individuals" and showed "a lack of confidence"—a "weakness"—that "we are not going to be able to cope with these people in Wyoming" even though they "[n]ever caused any trouble in our territory." *Id.* He urged the convention to "do what is right" and reject the language. *Id.*

The second delegate emphasized that the language targeted Mormons, and he opposed it "not because I have any personal sympathy with the[ir] religious convictions," but because "I don't believe in selecting one class of crime, or in singling out a special religious sect in the territory." *Id.* at 839. The delegates then voted to rescind their prior vote to consider the language. *Id.* at 839-40. Afterwards, a proponent of the language admitted that the intended target was indeed Mormons, and that "[t]he percentage of Mormons is less than one percent of the population of Wyoming." *Id.* at 842.

This history shows that the broad protections of Section 18 were meant to powerfully insulate minority religious views on marriage that were contentious, unpopular, and contrary to established public policy. *The Wyoming State Constitution* 69 (2011) (rejecting

9

the amendment was a "[s]ignificant" move, since failing to do so "would have diminished the principle of religious tolerance").

The second related debate, this time over whether to subject jurors to a religious test to ensure their honesty, reinforces the same point. The convention rejected religious tests for jurors because the State "should take the man for what we know him to be without any reference to what he professes to believe." *Journal* at 720-21. Imposing a religious test would inappropriately counter the Constitution's desired "breadth and freedom from all prejudice." *Id.* at 720.

This debate helps illustrate why the convention was willing to keep public office open to individuals who held and expressed such a disfavored religious view of marriage as polygamy. In the mind of the framers, the important question was not what a person believed and expressed about marriage—or what the community thought about those beliefs—but rather simply whether the person could do the job.

### B. The Commission's recommendation violates Article 1, section 18.

The Commission's recommendation violates both the text and spirit of Section 18. The "office of judge" is an "office of trust or profit" within the meaning of the Constitution, and the Commission does not argue otherwise. *See State v. Jefferis*, 178 P. 909, 915 (Wyo. 1919); *see also* Preamble, Wyo. Code of Judicial Conduct ("the judicial office [i]s a public trust"); Order at 6 (assuming judicial office qualifies as an "office of trust"). The Commission also ruled that Judge Neely is "incompetent to hold . . . office" because of her expression of her "opinion on . . . [a] matter of religious belief." Wyo. Const. art. 1, § 18. Both its final order and its theory of prosecution condemned Judge Neely for "express[ing]

10

. . . her inability to perform same sex marriages," which it admitted was her "opinion regarding same-sex marriage" and was based on "her honestly held religious belief." Order at 5. Thus, the Commission's recommendation strikes at the heart of Section 18.

The Commission tries to dissemble on this point and say its action is about her "inability to apply and follow the law" and not her religious "opinion on same-sex marriage." Order at 6. But that fails for three reasons. First, the Commission's dodge fails on its own terms: there is no evidence before this Court that Judge Neely has ever failed to apply or follow the law. No law requires her to perform marriage ceremonies. The Commission conceded at oral argument that a magistrate or circuit judge does *not* have a "duty to perform marriages" and that the power is "discretionary." C.R. Vol. 7, Part 1 at 42; *accord id.* ("I don't think that a magistrate or a circuit judge, just because someone comes into the office and asks them to do a marriage, has to do the marriage."). And the relevant statute which enables magistrates to choose to perform a marriage ceremony applies equally to, among others, "every licensed or ordained minister of the gospel, bishop, priest [and] rabbi." Wyo. Stat. § 20-1-106(a). Surely the Commission does not mean to suggest that this same statute likewise creates an obligation on clergy to personally perform wedding ceremonies for everyone who walks into their church, parish, synagogue, or mosque. Moreover, to the extent that Judge Neely does perform marriages, she does so voluntarily. Judge Neely receives no salary as a part-time magistrate and has never been paid by the State to perform marriages as a magistrate. C.R. 502-04; Wyo. Stat. § 5-9-213 (setting terms of payment for part-time magistrates). Rather, the only State payments for her service as a magistrate have been for activities such as holding a bail hearing or providing a warrant. *Id.*

11

Second, the Commission clearly admitted that it *does* hold Judge Neely's religious opinion about marriage in contempt. Most obviously, it concluded that expressing her religious belief about marriage "manifested a bias" that is "antithetical to the important role of judges in our democracy." Order at 5. The Commission likewise emphasized that "Judge Neely's inability to perform same sex marriages was not based upon her schedule, but on her religious beliefs." Order at 2. If Judge Neely's decision *had* been schedule-based (or based on any number of other criteria, such as geography, familiarity, friendship, or kinship), then she would not have been punished. C.R. 361-62, 372, 438, 465. Indeed, unlike Judge Neely—a part-time magistrate who is not paid by the State to do weddings and who was only asked about same-sex weddings as a hypothetical—her supervisor, full-time Circuit Court Judge Curt Haws, declined an *actual* request to officiate a same-sex wedding in the regular course of his paid judicial service. C.R. 372. He declined because of a scheduling conflict, and he is not facing punishment. *Id.* Thus, the Commission does not believe that declining to perform same-sex weddings for "scheduling" purposes is "antithetical" to a judge's role. Instead, it is precisely because Judge Neely said she would respectfully decline *based on her religious belief* that the Commission seeks to punish her. And, in fact, Commission representatives have repeatedly attacked Judge Neely's beliefs as "repugnant," "cast[ing] the Wyoming judiciary" into "disrepute," and as "tarnish[ing]" the reputation of the State. C.R. Vol. 7, Part 1 at 52, 73; C.R. 57.

Finally, Judge Neely has *two* relevant sincere religious opinions at issue: first, about the nature of marriage, and second, about her inability to personally perform marriages which violate that first belief. And it is precisely because of those two beliefs that the Commission

12

found her incompetent to perform as a judge. Order at 4 (condemning "announcing her position against same sex marriage and her decision not to perform said marriages"). Indeed, the Commission did not introduce evidence that Judge Neely was unable to do the basic functions of her job, such as adjudicate ordinance violations or hold bail hearings. Nor did it introduce actual evidence of bias or partiality by Judge Neely. In fact, a member of the Commission's Adjudicatory Panel conceded that, with the exception of her stated religious belief, "Judge Neely has served the community well" and that "there's been no evidence that she's done anything except be a well-recognized and respected judge in the community[.]" C.R. Vol. 7, Part 1 at 32. And the record shows that LGBT citizens in Pinedale have full confidence in Judge Neely's ability to adjudicate their cases regardless of her beliefs on marriage. C.R. 901 ("I consider [Judge Neely] to be a conscientious, fair, and impartial person. I have no doubt that she will continue to treat all individuals respectfully and fairly inside and outside her courtroom"); *see also* C.R. 884-902 (affidavits of Pinedale citizens affirming Judge Neely's impartiality).

Thus, the Commission has missed the lesson, and violated the rule, of Section 18. Instead of "tak[ing] the [Judge] for what we know h[er] to be without any reference to what [s]he professes to believe," *Journal* at 720-721, the Commission is disregarding her undisputedly sterling service record and punishing her for holding and expressing her opinions on a "matter of religious belief." Wyo. Const. art. 1, § 18.

Nor can punishing Judge Neely be excused on the ground that expressing her religious beliefs was an "act[] of licentiousness" or "inconsistent with the peace and safety of the state." *Id.* As the U.S. Supreme Court explained in *Obergefell*, her beliefs are "decent and

13

honorable," are held "in good faith by reasonable and sincere people," and are entitled to protection. 135 S. Ct. at 2602, 2594. That the Commission disagrees with them does not make them either "licentious" or a threat to "peace and safety."

It is not hard to see what is going on here. The Commission strongly disagrees with Judge Neely's religious beliefs about marriage. It considers such beliefs about marriage to be "the equivalent of thinking that "black students" must attend "segregated schools," and it thinks such beliefs must be consigned to "churches" and "coffee shops." C.R. Vol. 7, Part 1 at 36, 44. It is attempting to remove her from judicial office because of those beliefs. That is a textbook violation of Section 18.

The better course is the one the Wyoming framers adopted. Instead of marriage-viewpoint litmus tests on public service, which will have a "bad effect upon a good many good citizens of Wyoming" and "singl[e] out a special religious [belief]" for punishment, public office should be open to any "wise or good citizen" who can do the job. *Journal* at 838-839; *Pamphlets on the Constitution* at 146. Here, Judge Neely is not only capable of doing her job, but has been doing it very well for decades. C.R. 884-902. Her religious beliefs on marriage should not disqualify her from adjudicating traffic tickets.

## II. The Commission's recommendation to remove Judge Neely from both of her judicial positions violates the Free Exercise Clause of the U.S. Constitution.

The Commission's recommendation also violates the federal Free Exercise Clause because it targets her religious beliefs, is not neutral or generally applicable, and fails strict scrutiny.

14

## A. The Commission's recommendation impermissibly punishes Judge Neely for her religious beliefs.

The Free Exercise Clause, which was made applicable to the States by the Fourteenth Amendment, forbids any law "prohibiting the free exercise [of religion]." U.S. Const. amend. I. At a bare minimum, this means that the government cannot penalize "religious *beliefs* as such." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). Any attempt to "punish the expression of religious doctrines" or "impose special disabilities on the basis of religious views" is categorically forbidden, *Smith*, 494 U.S. at 877—meaning that the government does not even get to try to justify its actions under strict scrutiny. *See, e.g., Torcaso v. Watkins*, 367 U.S. 488 (1961) (not applying strict scrutiny); *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("The freedom to hold religious beliefs and opinions is absolute.").

As explained above, punishing religious belief is precisely what the Commission has attempted to do here. Judge Neely is not required by her job to perform same-sex marriages and has never even been asked to do so. Instead, she is being punished for stating "her honestly held religious belief" and her "opinion regarding same-sex marriage." Order at 2, 5. Nor is it any answer to say that she is being punished for the "act" of stating her belief to others; the Free Exercise Clause categorically protects *both* "the *act* of declaring a belief in religion" and "the act of discussing that belief with others." *McDaniel v. Paty*, 435 U.S. 618, 635 (1978) (Brennan, J., concurring).

## B. The Commission's recommendation is not neutral because it targets Judge Neely's religious conduct.

Even assuming the Commission was regulating only Judge Neely's *conduct*—not her beliefs—the Commission still violated the Free Exercise Clause. Under the Free Exercise

15

Clause, restrictions on religious conduct are subject to strict scrutiny unless they are both "neutral" and "generally applicable." *Smith*, 494 U.S. at 880. Here, the proposed punishment of Judge Neely is neither.

A government action is not "neutral" if its "object or purpose" is to "restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Smith*, 494 U.S. at 877 (government unconstitutionally restricts free exercise where it "sought to ban . . . acts or abstentions [from acting] only when they are engaged in for religious reasons, or only because of the religious belief that they display."). Although the Commission claims that its action was "facially neutral", Order at 5, the Supreme Court has held that "[f]acial neutrality is not determinative." *Lukumi*, 508 U.S. at 534. Rather, the Free Exercise Clause also forbids "covert suppression" of religion and "subtle departures from neutrality." *Id.*

Here, there is nothing "subtle" about the Commission's effort to punish Judge Neely because her conduct is religiously motivated. If Judge Neely had declined to perform a same-sex wedding for any number of *other* motivations—for example, because she wanted to perform marriages only for her friends and family, only at certain times or locations, or only when it didn't conflict with her "fishing," "football game[s]," or getting her "hair done"—or even because she "just d[id]n't feel like it"—that would be permissible. C.R. 361-62, 372, 438, 465. But because she expressed her religious motivation, the Commission seeks to punish her.

The Commission's own words confirm its intent to target Judge Neely's religious motivation. It specifically faulted her for "giv[ing] precedence to her *religious beliefs*."

16

C.R. 55 (emphasis added). It said that her beliefs constituted "a *discriminatory attitude* toward the LGBT community" that made her incapable of acting "impartially." *Id.* at 58 (emphasis added). It gratuitously invoked her religious denomination, stating that the Code "makes no exception for members of the Missouri Synod of the Lutheran church." *Id.* at 54. And it intimated that "*her opinions* [on marriage] were not judicially appropriate." *Id.* at 56.

The Commission's prosecutor—who acts on behalf of the Commission—went even further. He condemned Judge Neely's religious beliefs as "every bit as repugnant as I found the Mormon Church's position on black people." C.R. Vol. 7, Part 1 at 73-74. He impugned the sincerity of her "quote, sincere religious conviction." C.R. Vol. 7, Part 2, at 7. And he recommended sanctioning her $40,000 because of what he called her "holy war." C.R. Vol. 7, Part 2 at 7, 38.

The Commission's choice of the most draconian punishment available further confirms that its action was not religiously neutral. As the Supreme Court has said, "gratuitous restrictions" on religious conduct suggest that the government "seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Lukumi*, 508 U.S. at 538. The same is true of gratuitous punishment. Here, the Commission acknowledged that the law was unsettled. This was "a very big issue that has not really been decided." C.R. Vol. 7, Part 1 at 17. "[T]here were no formal Wyoming ethics opinions out there." C.R. Vol. 7, Part 2 at 14. And even looking to *other* jurisdictions, there were "no decided cases . . . on th[is] question[]." C.R. Vol. 7, Part 1 at 72, 76. Yet of all the possible sanctions it could have chosen for a judge facing a novel and uncertain

17

situation—warning, censure, recusal, *etc.*—it chose the harshest: removal from office. And not just removal from the volunteer magistrate position where Judge Neely might perform marriages, but removal from a municipal judgeship where she cannot perform any marriages. If the Commission simply wanted to deter Judge Neely and others from voicing their religious beliefs about marriage publicly, a warning or censure would suffice. But the use of the harshest punishment available suggests that the Commission did not merely want to keep Judge Neely quiet, but to punish her because the Commission disapproved of her religious beliefs.

Finally, to determine whether a government action is neutral, courts should examine "the specific series of events leading to" the action. *Lukumi*, 508 U.S. at 540 (opinion of Kennedy, J.). Here, those events show that the investigation of Judge Neely was hardly neutral. The investigation was initiated by the Executive Director of the Commission, Wendy Soto, who had also served on the Board of Wyoming Equality, a leading LGBT-rights organization. C.R. 31. When Ms. Soto overheard the Chair of the Wyoming Democratic Party describing a newspaper article about Judge Neely's religious beliefs, she asked the Chair to send her the article and encouraged her to file a complaint. *Id.* at 75-78. On the same day she received the article, Ms. Soto selected an Investigatory Panel and initiated an "own motion" proceeding against Judge Neely—a rare type of proceeding that Ms. Soto had never initiated against any other judge. *Id.* at 55-56. Most importantly, Ms. Soto admitted that she would not have initiated an investigation if Judge Neely had offered a nonreligious reason for declining to perform same-sex marriages, such as that she only married friends or family, only performed marriages within a particular geographic area,

18

or simply "didn't feel like" performing a marriage. C.R. 438. This confirms that Judge Neely never would have been investigated, much less punished, but for her religious motivation.

### C. The Commission's recommendation is not generally applicable because it favors nonreligious conduct.

The Commission's recommendation is also subject to strict scrutiny because it is not generally applicable. One way to show that a law is not generally applicable is to show that the government has discretion to make exceptions based on an "individualized governmental assessment of the reasons for the relevant conduct." *Smith*, 494 U.S. at 884. The reason for this rule is simple. When the government applies an "across-the-board" prohibition on all conduct, there is little risk that it is discriminating against religious conduct. *Id.* But when an open-ended law lets government officials grant exceptions on a case-by-case basis, there is a risk that the law will be "applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3rd Cir. 2004) (citing *Smith*). That risk justifies strict scrutiny. *Id.*

The Tenth Circuit's decision in *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) is instructive. There, a former student in a state university acting program sued the university under the Free Exercise Clause, alleging that it had pressured her to say certain curse words or "take God's name in vain" in violation of her religious beliefs. *Id.* at 1280. In response, the university claimed that it was simply enforcing a neutral curricular requirement that all acting students recite their scripts as written. The Tenth Circuit, however, ruled against the university. Noting that the university had made exceptions to its

19

curricular requirement in the past, the Court held that there was a material dispute of fact over whether the university "maintained a discretionary system of making individualized case-by-case determinations regarding who should receive exemptions from curricular requirements." *Id.* at 1299.

Here, the Executive Director of the Commission, Ms. Soto, admitted that she had discretion to make case-by-case decisions about whether to initiate investigations. She said that she could decline to report a magistrate who refused to remarry individuals who had repeatedly been divorced, or even a magistrate who refused to conduct *any* marriages until same-sex marriage was legalized. C.R. 439-40. She also admitted that she would not have initiated an investigation if Judge Neely had expressed an unwillingness to perform same-sex marriages for various nonreligious reasons (she didn't feel like it, didn't like marrying strangers, didn't like traveling, etc.). C.R. 438. In other words, the initiation of an investigation by the Commission "just depends on what the specific circumstances were, or what the information was." C.R. 443. This is a textbook example of an "individualized governmental assessment of the reasons for the relevant conduct," and it therefore requires strict scrutiny. *Smith*, 494 U.S. at 884.

The Commission's action is also subject to strict scrutiny because it represents a "value judgment in favor of secular motivations, but not religious motivations." *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3rd Cir. 1999). In *Lukumi*, for example, the city argued that its ban on animal slaughter was a generally applicable rule designed to promote public health and prevent animal cruelty. But the Supreme Court rejected that argument, noting that the ordinances exempted a wide variety

20

of conduct that also undermined the government's interest in public health and preventing animal cruelty, such as hunting, pest control, and euthanasia. 508 U.S. at 543-44. Similarly, in *Fraternal Order*, the Third Circuit struck down a police department policy that prohibited police officers from growing beards for religious reasons, but allowed beards for medical reasons, concluding that this represented an unconstitutional "value judgment in favor of secular motivations, but not religious motivations." *Fraternal Order*, 170 F.3d at 366.

The same is true here. According to the Commission, magistrates can decline to perform marriages for a variety of nonreligious reasons—such as a desire to marry only friends and family, only at certain times or locations, or only when it doesn't conflict with their "fishing," "football game[s]," or "hair" appointments. C.R. 361-62. Judge Neely's own supervisor declined to perform a same-sex marriage in Pinedale because he was doing a "performance" in Jackson, and he obviously faced no punishment. C.R. 372. The Commission even admitted that magistrates can decline to perform same-sex weddings simply because they "don't feel like it." C.R. 438 (Soto admission). Yet when Judge Neely says that she would decline based on her religious beliefs, she is punished. This is a quintessential example of a "value judgment in favor of secular motivations, but not religious motivations." *Fraternal Order*, 170 F.3d at 366; *see also Lukumi*, 508 U.S. at 543. Accordingly, strict scrutiny is required.

### D. The Commission's recommendation fails strict scrutiny.

Strict scrutiny is the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997); *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015)

21

(applying strict scrutiny to judicial ethics restrictions on a judicial candidate's speech); *Rep. Party of Minn. v. White*, 536 U.S. 765 (2002) (same). To pass this scrutiny, the Commission must prove that its recommendation to ban Judge Neely from judicial office is the "least restrictive means" of achieving a "compelling state interest." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *accord Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 333 (Wyo. 1980) (same). It cannot do so.

### 1. There is no compelling interest in requiring Judge Neely to perform wedding ceremonies that violate her faith.

As the unanimous U.S. Supreme Court explained, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal citation omitted); *Miller v. City of Laramie*, 880 P.2d 594, 597 (Wyo. 1994) (government has the "onerous burden of demonstrating clearly and precisely that the ordinance is, in fact, applied in a nondiscriminatory manner"). Here, there are three reasons the government does not have a compelling interest to force Judge Neely to violate her faith.

First, as shown above, Judge Neely is not required by law to perform *any* weddings, much less those that directly violate her faith. The law cannot treat as compelling what it does not even bother to require.

Second, as also shown above, the law does not have a compelling interest in privileging secular motivations over religious motivations. *Fraternal Order*, 170 F.3d at 366; *see also Lukumi*, 508 U.S. at 543. That is what the Commission seeks to do here. The Commission permits Judge Neely to tell same-sex couples, as Judge Haws did, that she will not do their

22

weddings because of scheduling conflicts. It likewise permits her to cite relational, geographical, or financial motivations. But it specifically bans her from relying on her religion. That "[]discriminatory manner" of enforcement is not even constitutional, much less compelling. *Miller*, 880 P.2d at 597.

Third, there is no compelling interest in requiring judges to adopt the government's views on marriage. The Commission argues that it has an interest in protecting same-sex couples from the perception of bias and partiality, and that this interest is implicated because of Judge Neely's beliefs on marriage and the public's awareness of that belief. Order at 5-6. But this fails for a number of reasons.

To begin with, it is too general. "[S]trict scrutiny" requires courts to "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006). This is a tall order, and the Commission failed to take the first necessary step: "offer[ing] evidence" *proving* that its interest was threatened by a judge who exercises her legal discretion to decline to perform certain marriages. *Id.* at 437.

Further, even if some found it offensive that Judge Neely said she would decline to personally perform a same-sex marriage and would refer inquiring same-sex couples to a different judge, there is no compelling interest in shielding individuals from offense. Rather, a "bedrock principle underlying the First Amendment" is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Sherbert*, 374 U.S. at 402

23

("Government may . . . [not] penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities"). That is particularly true here, where Judge Neely is expressing a "decent and honorable religious" belief held by "reasonable and sincere people" across Wyoming. *Obergefell*, 135 S. Ct. at 2594, 2602. The goal of non-offense would also directly threaten the ability of judges to participate in the religious communities that hold such "decent and honorable religious" beliefs. *But see* Cal. Comm. on Jud. Ethics Adv. Op. at 4 (Nov. 12, 2015), http://www.judicialethics opinions.ca.gov/sites/default/files/CJEO%20Oral%20Advice%20Summary%202015-014.pdf (a judge may belong to a religious organization that discriminates on the basis of sexual orientation if the "organization [is] dedicated to the preservation of religious values of legitimate common interest" to the organization).

Moreover, it's hard to square the Commission's recommendation against Judge Neely with the fact that judges are allowed to make numerous other statements that could just as easily offend other members of the community. For instance, the Commission never complained that one of Judge Neely's fellow part-time circuit magistrates, Judge Stephen Smith, concurrently served as Pinedale's elected mayor for eight years, ran for office in three elections, and announced his party affiliation and his position on political issues. C.R. 574; Pinedale Online News, *Candidate Questions & Answers on KPIN* (Apr. 30, 2006), http://www.pinedaleonline.com/news/2006/04/CandidateQuestionsAn.htm.

Nor does the Commission's view square with the vehement statements that members and representatives of the Commission have made against Judge Neely's religious beliefs. For instance, the Commission's disciplinary counsel, Patrick Dixon, repeatedly branded

24

those beliefs as "repugnant" and the equivalent of racism and bigotry against disabled people. C.R. Vol. 7, Part 1 at 73-74. He also attacked the "Missouri Synod of the Lutheran Church" and "Mormon Church" by name. *Id.* These are deeply offensive comments to many religious Wyoming citizens. Thus, under the Commission's position, Mr. Dixon himself could never serve in judicial office. *Cf.* Rule 8.2, Wyo. Rules of Professional Conduct at Cmt. 3 ("A lawyer who, in the course of representing a client, knowingly manifests by words or conduct, bias or prejudice based upon . . . religion . . . [commits misconduct] when such actions are prejudicial to the administration of justice").

Fortunately, the Commission's view is not the law. Officials cannot take sides on religious matters and wield government power to silence their opposition. *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 119 (2001) (rejecting "a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what" others perceive).

Of course, while a generalized interest in "impartiality" is not a "compelling state interest," there is compelling interest in preventing *actual* bias or partiality. *White*, 536 U.S. at 777. This arises when a judge is partial *toward specific parties*. *Id.* Here, the record before this Court shows Judge Neely is impartial and unbiased, and so the Commission has no interest in removing her. C.R. 898-901.

But although the State does *not* have a compelling interest in punishing Judge Neely, it *does* have a compelling interest in protecting her and others who share her beliefs by evaluating them based upon their abilities, not upon their religious beliefs. That interest is particularly compelling in the context of a marriage ceremony.

25

Wedding ceremonies themselves are inherently, and often religiously, expressive events. *Kaahumanu v. Hawaii*, 682 F.3d 789, 798-99 (9th Cir. 2012) ("The core of a wedding ceremony's 'particularized message' is easy to discern" and "convey[s] important messages about the couple, their beliefs, and their relationship to each other and to their community"). This Court has recognized marriage as "the most sacred of all contracts," one which has had "religious" components since at least "ancient Rome." *In re Roberts' Estate*, 133 P.2d 492, 493 (Wyo. 1943). Wyoming law recognizes that component's continued vitality today in the role that a "minister of the gospel, bishop, priest, or rabbi" plays in performing marriages "in accordance with" their faith. Wyo. Stat. § 20-1-106.

Thus, Wyoming rightly makes performing marriages discretionary. *Id.* Our nation does not even force people to bear governmental messages on their license plates or wear t-shirts bearing innocuous messages. *Wooley v. Maynard*, 430 U.S. 705, 717 (1977); *Frudden v. Pilling*, 742 F.3d 1199, 1206 (9th Cir. 2014). It likewise cannot force people to personally participate in others' marriage ceremonies. *Wooley*, 430 U.S. at 707-08, 715 (government cannot "force[] an individual" to express a "point of view" that deeply violates her "moral [and] religious . . . beliefs."); Oral Arg. Tr. at 26:9-15, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), http://www.supremecourt.gov/oral_arguments /argument_transcripts/14-556q1_7l48.pdf (Justice Kagan: "[T]here are many rabbis that will not conduct marriages between Jews and non-Jews, notwithstanding that we have a constitutional prohibition against religious discrimination. And those rabbis get all the powers and privileges of the State, even if they have that rule.").

26

Moreover, the Commission's recommendation "cannot help but to have a tremendous chilling effect on the exercise of First Amendment rights" by other current and future Wyoming judges. *Holloman v. Harland*, 370 F.3d 1252, 1269 (11th Cir. 2004); *see also Rep. Party of Minn. v. White*, 416 F.3d 738, 746 (8th Cir. 2005) (en banc) ("Wersal, fearful that other complaints might jeopardize his opportunity to practice law, withdrew from the race."); *Heffernan v. City of Paterson*, No. 14–1280, 2016 WL 1627953, at *5 (April 26, 2016) ("We also consider relevant the constitutional implications" of "discouraging [governmental] employees—both the employee discharged (or demoted) and his or her colleagues—from engaging in protected activities"). So there is a compelling interest at stake here, and it calls for rejecting the Commission's recommendation.

### 2. Removing Judge Neely is not the least restrictive means of furthering the Commission's stated interests.

Even if the Commission successfully proved that it had a compelling interest supporting its recommendation, it would have to further prove that banning Judge Neely from office is the least restrictive means of furthering that interest. This requirement is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. If a less restrictive alternative would serve the government's purpose, "the legislature *must* use that alternative." *U.S. v. Playboy Ent'mt Grp., Inc.*, 529 U.S. 803, 813 (2000) (emphasis added). To make this showing, the government must "prove" that no other approach will work, *Id.* at 816, 826, and "must" "refute . . . alternative schemes suggested by the plaintiff." *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014). The Commission has not done so.

27

### a. Wyoming has other ways of ensuring full access to marriage ceremonies without punishing Judge Neely.

The Commission repeatedly argued below that this case is similar to a case concerning a county clerk who refused to issue *any* licenses because of her objection to same-sex marriage. C.R. Vol. 7, Part 1 at 72, 76, *citing Miller v. Davis*, 123 F. Supp. 3d 924 (E.D. Ky. 2015); *but see id.* at 72 (admitting this "truly is a different case"). The analogy fails on a number of levels. The most obvious reason is that the clerk's refusal to provide licenses created, at some level, a barrier to marital access. Not so here.

Wyoming provides an expansive list of who can "perform the ceremony of marriage": "*every* district or circuit court judge, district court commissioner, supreme court justice, [and] magistrate," along with "*every* licensed or ordained minister of the gospel, bishop, priest or rabbi," *and* all "other qualified person[s] acting in accordance with the traditions . . . of *any* religion, denomination or religious society." Wyo. Stat. § 20-1-106. Even *invalid* officiants can solemnize a wedding "if the parties believe in good faith that they have been lawfully married." *In re Roberts' Estate*, 133 P.2d at 500.

And, in fact, "[p]lenty of people in Sublette County . . . are willing to perform marriage ceremonies for same-sex couples." C.R. 901. Since same-sex marriage was recognized in Wyoming, "[n]o one's been denied the opportunity" to get married. C.R. 372. There are several officials in the area who will perform a same-sex ceremony, and Judge Haws will even make special one-day magisterial appointments for citizens who want to perform a marriage for a family member or a friend. C.R. 353. Given that only two same-sex

weddings have been performed in Pinedale since 2014, there is considerably more supply than demand when it comes to officiants. C.R. 372.

### b. There are numerous less restrictive ways of addressing concerns about perceived bias or partiality.

To the extent the Commission is concerned about perceptions of bias or partiality, it can address that in numerous ways that do not require banning Judge Neely and those who share her beliefs from judicial office.

The easiest and most obvious solution is referral. The government could instruct magistrates with religious objections about personally performing certain marriages to handle marriage requests the same way they are already permitted to decline for secular reasons: politely and promptly refer the requesting party to another magistrate who can perform the marriage. Indeed, that magistrates are regularly permitted to decline to perform weddings for a variety of secular reasons shows that the government has less restrictive ways of providing for all applicants seeking a marriage ceremony. *Davila v. Gladden*, 777 F.3d 1198, 1207 (11th Cir. 2015) ("That the [government's] own policy contemplates exemptions . . . undercuts the Defendants' argument that a categorical prohibition on . . . religious objects is the least restrictive means of achieving their objectives").

Second, if the Commission somehow proved that such a referral system was unworkable only in the context of religious motivations, Wyoming could adopt North Carolina's approach: allow "[e]very magistrate" the "right to recuse from performing all lawful marriages" where required by "any sincerely held religious objection." N.C. Gen. Stat. § 51-5.5. Again, this recusal occurs behind-the-scenes and does not require informing

29

any inquiring party of a magistrate's religious objection. Notably, though, as explained above, such an all-or-nothing recusal system could not be targeted at religious recusals. If the State is willing to permit ad hoc recusal/referral based on non-religious motivations, it cannot penalize religious motivations. *Lukumi*, 508 U.S. at 538.

Finally, to the extent the Commission could prove a religiously neutral, compelling need to punish Judge Neely, it still had many far less drastic means of correction. The Commission could have issued a letter of correction; a private censure, reprimand, or admonishment; a monetary sanction; or some form of temporary discipline or interim suspension. *See* Rule 8(d) of the Rules Governing the Commission on Judicial Conduct and Ethics. If it wished to go further, it could have recommended that the Wyoming Supreme Court issue a longer-term suspension, a public censure, a reprimand, an admonishment, or retirement. *Id.* at Rule 18. While even these lesser punishments are unnecessary here, the Commission nonetheless chose the most severe punishment available: removal. On the novel facts before this Court, that is not just disproportionate, but vindictive. It is certainly not the least restrictive means of furthering any governmental interest, and it strongly suggests that the Commission was targeting Judge Neely because of her religious beliefs. *Lukumi*, 508 U.S. at 538.

## CONCLUSION

In our pluralistic society, the law should not be used to coerce ideological conformity. Rather, on deeply contested moral issues, the law should "create a society in which both sides can live their own values." Douglas Laycock, *Religious Liberty and the Culture Wars*,

30

2014 U. Ill. L. Rev. 839, 877 (2014). That is precisely how Wyoming has approached this issue since its founding as a State.

The U.S. Supreme Court's *Obergefell* decision affirms this approach for the issue of marriage. That is why *Obergefell* emphasized that the constitutional problem arose not from the multiplicity of good faith views about marriage, but from the enshrining of a single view into law which excluded those who did not accept it as "outlaw[s]" and "outcast[s]." 135 S. Ct. at 2600, 2602.

Dignity is a two-way street. It would be at least as wrong for a government to make Judge Neely and all who share her beliefs outcasts for living and expressing their understanding of marriage as it was to make Mr. Obergefell an outcast for living and expressing his. Andrew Koppelman, *Gay Rights, Religious Accommodations, and the Purposes of Antidiscrimination Law*, 88 S. Cal. L. Rev. 619, 629-30 (2015) (noting the severe "burden" on individuals whose "religious beliefs really forbid" them to personally participate in "same-sex weddings," since they are forced to "abandon" their job). And it would profoundly misunderstand *Obergefell* to mandate such a course.

If this Court faithfully applies the Wyoming Constitution, the First Amendment, and *Obergefell,* everyone can win: Same-sex couples can have full access to the legal institution of marriage, and religious individuals can remain in public office if they hold a traditional religious view of marriage. There is room enough in our pluralistic democracy for both sides to live according to their respective views of sex, marriage, and religion. It is not the government's role to punish either side for their views on these subjects.

For all these reasons, this Court should reject the Commission's recommendation.

31

Respectfully submitted this 10th day of May, 2016.

By: _____

Douglas W. Bailey
WSB#7-5102
BAILEY, STOCK, HARMON, COTTAM P.C.
221 E. 21st Street
P.O. Box 1557
Cheyenne, WY 82003
(307) 638-7745 Fax: (307) 638-7749
dwb@bsh-law.com

Luke Goodrich*
Daniel Blomberg*
THE BECKET FUND FOR RELIGIOUS
    LIBERTY
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
lgoodrich@becketfund.org
dblomberg@becketfund.org
(202) 955-0095 Fax: (202) 955-0090

Amici Curiae
*Admission *pro hac vice* pending

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2016, the original and six copies of the foregoing document were hand-delivered to the Wyoming Supreme Court and the foregoing document was served by mailing a copy of it via United States mail, first class, postage prepaid, to the following:

Patrick Dixon
Dixon & Dixon, LLP
104 South Wolcott, Suite 600
Casper, WY 82601
pdixn@aol.com
*Counsel for the Commission on Judicial Conduct and Ethics*

Tim Newcomb
P.O. Box 928
170 North Fifth
Laramie, WY 82073
newcomb@appellateconsultation.com
*Counsel for the Commission on Judicial Conduct and Ethics*

Wendy J. Soto
Commission on Judicial Conduct & Ethics
P.O. Box 2645
Cheyenne, WY 82003
wendy.soto@wyoboards.gov
*Executive Director of the Commission on Judicial Conduct and Ethics*

Peter J. Michael
Wyoming Attorney General
123 Capitol Building
Cheyenne, WY 82002
peter.michael@wyo.gov
*Attorney General for the State of Wyoming*

Douglas W. Bailey

33

# CP U.S.

## Former Gay Activist Talks About His Heterosexual Marriage, Being a Pastor and Upcoming Movie Starring James Franco

By Jessica Martinez , CP Reporter | May 15, 2014 9:07 AM

# Video Player

A former gay activist, who married a woman and left his previous lifestyle behind to commit his life to God, has shifted his outlook to serving people in need of change now that he is the pastor of a rural Wyoming church.

The Christian Post interviewed Michael Glatze and his wife, Rebekah, to catch up on what life has been like for the both of them after receiving backlash from the gay community for penning an opinion piece (http://www.wnd.com/2013/12/to-hateful-gays-please-respect-my-choices/) in December in which Michael addressed "angry homosexuals" who have criticized him for leaving his past.

Now, with a movie based on his life (http://www.huffingtonpost.com/2014/04/01/james-franco-ex-gay-role- n 5070472.html) set to begin production this summer starring James Franco, and serving alongside each other in ministry, the Galtzes remain busy while trying to deflect the criticism they oftentimes receive.

Below is an edited transcript of the Galtzes' interview with The Christian Post.

**CP: How did you two meet?**

**Rebekah:** We met at a Bible college out here in Wyoming during the first week, sometimes in the lunch line and we were also in class together. It was in 2011, and we started dating in November of that year and were together for almost two years before we got married.

**CP: What have you been up to after writing that opinion piece and getting married?**

**Michael:** I'm now a pastor of a small community church in Wyoming and our focus in life now is ministry, so our emphasis is on spreading the good news to reach people, inspire them and serve the community. In addition, marriage life has been awesome. I'm constantly thrilled, excited, humbled and grateful that after so long of wondering through many choices and places that weren't satisfying for me, I would eventually find and meet the woman that I was meant to be with. Here I am, almost 40 years old now and enjoying this aspect of my life that God really had wanted for me.

**Rebekah:** A lot has changed in my life in the past six months. I feel like our church is a reverse ministry because they have ministered more to me than I have to them, and it's been wonderful getting to know everybody. People would say to me, "Oh, you're going to be a pastor's wife!" And there is a stereotype for a pastor's wife, but I haven't felt any of that pressure. They just want me to be myself and do what I can do, I don't feel like a pastor's wife in that traditional sense and I have no complaints.

**CP: Do you continue to get backlash from the gay community regarding your published article?**

**Michael:** Yeah, a lot has happened since then. After we got married, prayed and talked about the ways in which I had personally handled some of these issues over the years, Rebekah and I came to the realization that we wanted to tell a different story in our approach to faith and Jesus. We have a really deep yearning to do that, and emphasize that we're not here to judge but to love everyone unconditionally. I do feel the need, in some cases, to apologize to some of my friends and former colleagues because what happens in their lives is between them and God. My ministry is not to condemn people or tell them how to live their life.

**Rebekah:** We've talked about everything, even the criticism, but I don't really pay that much attention. It does have an impact and it hurts to hear some things that are said, but at the same time we learn from everything that we go through.

**CP: What has changed, besides marriage, in your new life?**

**Michael:** I have a bit of a persona of being a firebrand and it's something I don't regret, but I'd like to move away and perhaps get beyond that. When I'm conversing with friends who actually know me, that's not the Michael Glatze that they know, but I guess it's because I've been so political in the past. We don't want our image to be these polarized political figures, we're really not interested in that at all.

**CP: Tell me about the movie being made about your life.**

**Michael:** The producer is Gus Van Sant, who did the movie "Milk," and the actor playing me is James Franco. Right after we got married, the director Justin Kelly called us to congratulate us. We had a good conversation with him and I think he realizes that we're not here trying to hurt anyone. We're not sure where the movie will go with my life story, but we'll pray that God will use it and we see it as a positive. James Franco has also told me that he isn't interested in demonizing my character, so we'll see. There's a lot more to come.

**CP: I noticed that you have a new blog, tell me about that.**

**Michael:** Our emphasis has really been on healing just because of the aspect of healing that God has shown me in my life on multiple levels. We've chosen to focus on that in our blog, which has been a ministry in itself as well, because we've been spending a lot of time together working on it.

**CP: I also noticed that you wrote about San Francisco, a city known for its large gay community, and how Christians have given you "warnings" about the city. Can you explain that a bit more?**

**Michael:** I don't want to be one of those people who holds themselves up and has a mentality where I'm closing my heart off to the needs to humanity. There are a lot of needs and that's what I was trying to get across. Sometimes, we have fear and feel the need to protect ourselves from whatever we see as dirty or frightening, and sometimes that fear equates to people saying, "You don't want to go to San Francisco, it's dirty there, they have unconditional acceptance of sexual diversity." But I love that city, my family lives there and I don't want to have that mentality.

For more on the Glatzes, visit their blog, Healing Springs. (http://michaeleglatze.blogspot.com/2014/05/im-not-comfortable-with-that.html)

**TRENDING TODAY**

Ads by Revcontent

**Bitcoin - Ignore The Crash, And Do This Immediately**
Underground Finance

**How to Shut an Atheist Up in 15 Seconds Flat**
Health Revelations

**Office Depot Brand Multiuse Paper, Letter Paper Size, 94 Brightness, 20 Lb, Whit...**
$23.99 - Office Depot US

**Melania's IQ Vs Michelle's IQ is
Pretty Unnerving**

OMG LANE

**Optometrist: Lenses Are Gone, This
Method Restores Vision Clarity**

Outback Vision Protocol

**Have A Tax Question? TurboTax Live
Is Here!**

TurboTax

# SOCIAL SECURITY ADMINISTRATION
## Application for a Social Security Card

### Applying for a Social Security Card is free!

## USE THIS APPLICATION TO:

- Apply for an original Social Security card
- Apply for a replacement Social Security card
- Change or correct information on your Social Security number record

**IMPORTANT:** You MUST provide a properly completed application and the required evidence before we can process your application. We can only accept original documents or documents certified by the custodian of the original record. Notarized copies or photocopies which have not been certified by the custodian of the record are not acceptable. We will return any documents submitted with your application. For assistance call us at 1-800-772-1213 or visit our website at www.socialsecurity.gov.

## Original Social Security Card
To apply for an original card, you must provide at least two documents to prove age, identity, and U.S. citizenship or current lawful, work-authorized immigration status. If you are not a U.S. citizen and do not have DHS work authorization, you must prove that you have a valid non-work reason for requesting a card. See page 2 for an explanation of acceptable documents.

NOTE: If you are age 12 or older and have never received a Social Security number, you must apply in person.

## Replacement Social Security Card
To apply for a replacement card, you must provide one document to prove your identity. If you were born outside the U.S., you must also provide documents to prove your U.S. citizenship or current, lawful, work-authorized status. See page 2 for an explanation of acceptable documents.

## Changing Information on Your Social Security Record
To change the information on your Social Security number record (i.e., a name or citizenship change, or corrected date of birth) you must provide documents to prove your identity, support the requested change, and establish the reason for the change. For example, you may provide a birth certificate to show your correct date of birth. A document supporting a name change must be recent and identify you by both your old and new names. If the name change event occurred over two years ago or if the name change document does not have enough information to prove your identity, you must also provide documents to prove your identity in your prior name and/or in some cases your new legal name. If you were born outside the U.S. you must provide a document to prove your U.S. citizenship or current lawful, work-authorized status. See page 2 for an explanation of acceptable documents.

### LIMITS ON REPLACEMENT SOCIAL SECURITY CARDS
Public Law 108-458 limits the number of replacement Social Security cards you may receive to 3 per calendar year and 10 in a lifetime. Cards issued to reflect changes to your legal name or changes to a work authorization legend do not count toward these limits. We may also grant exceptions to these limits if you provide evidence from an official source to establish that a Social Security card is required.

### IF YOU HAVE ANY QUESTIONS
If you have any questions about this form or about the evidence documents you must provide, please visit our website at www.socialsecurity.gov for additional information as well as locations of our offices and Social Security Card Centers. You may also call Social Security at 1-800-772-1213. You can also find your nearest office or Card Center in your local phone book.

## EVIDENCE DOCUMENTS

The following lists are examples of the types of documents you must provide with your application and are not all inclusive. Call us at 1-800-772-1213 if you cannot provide these documents.

**IMPORTANT** : If you are completing this application on behalf of someone else, you must provide evidence that shows your authority to sign the application as well as documents to prove your identity and the identity of the person for whom you are filing the application. We can only accept original documents or documents certified by the custodian of the original record. Notarized copies or photocopies which have not been certified by the custodian of the record are not acceptable.

# Evidence of Age

In general, you must provide your birth certificate. In some situations, we may accept another document that shows your age. Some of the other documents we may accept are:

- U.S. hospital record of your birth (created at the time of birth)
- Religious record established before age five showing your age or date of birth
- Passport
- Final Adoption Decree (the adoption decree must show that the birth information was taken from the original birth certificate)

# Evidence of Identity

You must provide current, unexpired evidence of identity in your legal name. Your legal name will be shown on the Social Security card. Generally, we prefer to see documents issued in the U.S. Documents you submit to establish identity must show your legal name AND provide biographical information (your date of birth, age, or parents' names) **and/or** physical information (photograph, or physical description - height, eye and hair color, etc.). If you send a photo identity document but do not appear in person, the document must show your biographical information (e.g., your date of birth, age, or parents' names). Generally, documents without an expiration date should have been issued within the past two years for adults and within the past four years for children.

As proof of your identity, you must provide a:

- U.S. driver's license; or
- U.S. State-issued non-driver identity card; or
- U.S. passport

If you do not have one of the documents above or cannot get a replacement within 10 work days, we may accept other documents that show your legal name and biographical information, such as a U.S. military identity card, Certificate of Naturalization, employee identity card, certified copy of medical record (clinic, doctor or hospital), health insurance card, Medicaid card, or school identity card/record. For young children, we may accept medical records (clinic, doctor, or hospital) maintained by the medical provider. We may also accept a final adoption decree, or a school identity card, or other school record maintained by the school.

If you are not a U.S. citizen, we must see your current U.S. immigration document(s) and your foreign passport with biographical information or photograph.

WE CANNOT ACCEPT A BIRTH CERTIFICATE, HOSPITAL SOUVENIR BIRTH CERTIFICATE, SOCIAL SECURITY CARD STUB OR A SOCIAL SECURITY RECORD as evidence of identity.

# Evidence of U.S. Citizenship

In general, you must provide your U.S. birth certificate or U.S. Passport. Other documents you may provide are a Consular Report of Birth, Certificate of Citizenship, or Certificate of Naturalization.

# Evidence of Immigration Status

You must provide a current unexpired document issued to you by the Department of Homeland Security (DHS) showing your immigration status, such as Form I-551, I-94, or I-766. If you are an international student or exchange visitor, you may need to provide additional documents, such as Form I-20, DS-2019, or a letter authorizing employment from your school and employer (F-1) or sponsor (J-1). We CANNOT accept a receipt showing you applied for the document. If you are not authorized to work in the U.S., we can issue you a Social Security card only if you need the number for a valid non-work reason. Your card will be marked to show you cannot work and if you do work, we will notify DHS. See page 3, item 5 for more information.

# HOW TO COMPLETE THIS APPLICATION

**Complete and sign this application LEGIBLY using ONLY black or blue ink on the attached or downloaded form using only 8 ½" x 11" (or A4 8.25" x 11.7") paper.**

**GENERAL:** Items on the form are self-explanatory or are discussed below. The numbers match the numbered items on the form. If you are completing this form for someone else, please complete the items as they apply to that person.

4.   Show the month, day, and full (4 digit) year of birth; for example, "1998" for year of birth.

5.   If you check "Legal Alien Not Allowed to Work" or "Other," you must provide a document from a U.S. Federal, State, or local government agency that explains why you need a Social Security number and that you meet all the requirements for the government benefit. NOTE: Most agencies do not require that you have a Social Security number. Contact us to see if your reason qualifies for a Social Security number.

6., 7. Providing race and ethnicity information is voluntary and is requested for informational and statistical purposes only. Your choice whether to answer or not does not affect decisions we make on your application. If you do provide this information, we will treat it very carefully.

9.B., 10.B. If you are applying for an original Social Security card for a child under age 18, you MUST show the parents' Social Security numbers unless the parent was never assigned a Social Security number.  If the number is not known and you cannot obtain it, check the "unknown" box.

13. If the date of birth you show in item 4 is different from the date of birth currently shown on your Social Security record, show the date of birth currently shown on your record in item 13 and provide evidence to support the date of birth shown in item 4.

16. Show an address where you can receive your card 7 to 14 days from now.

17. WHO CAN SIGN THE APPLICATION? If you are age 18 or older and are physically and mentally capable of reading and completing the application, you must sign in item 17. If you are under age 18, you may either sign yourself, or a parent or legal guardian may sign for you. If you are over age 18 and cannot sign on your own behalf, a legal guardian, parent, or close relative may generally sign for you. If you cannot sign your name, you should sign with an "X" mark and have two people sign as witnesses in the space beside the mark. Please do not alter your signature by including additional information on the signature line as this may invalidate your application. Call us if you have questions about who may sign your application.

# HOW TO SUBMIT THIS APPLICATION

In most cases, you can take or mail this signed application with your documents to any Social Security office. Any documents you mail to us will be returned to you. Go to https://secure.ssa.gov/apps6z/FOLO/fo001.jsp to find the Social Security office or Social Security Card Center that serves your area.

## PROTECT YOUR SOCIAL SECURITY NUMBER AND CARD

Protect your SSN card and number from loss and identity theft. DO NOT carry your SSN card with you. Keep it in a secure location and only take it with you when you must show the card; e.g., to obtain a new job, open a new bank account, or to obtain benefits from certain U.S. agencies. Use caution in giving out your Social Security number to others, particularly during phone, mail, email and Internet requests you did not initiate.

# PRIVACY ACT STATEMENT
## Collection and Use of Personal Information

Sections 205(c) and 702 of the Social Security Act, as amended, authorize us to collect this information. The information you provide will be used to assign you a Social Security number and issue a Social Security card.

The information you furnish on this form is voluntary. However, failure to provide the requested information may prevent us from issuing you a Social Security number and card.

We rarely use the information you supply for any purpose other than for issuing a Social Security number and card. However, we may use it for the administration and integrity of Social Security programs. We may also disclose information to another person or to another agency in accordance with approved routine uses, which include but are not limited to the following:

1. To enable a third party or an agency to assist Social Security in establishing rights to Social Security benefits and/or coverage;

2. To comply with Federal laws requiring the release of information from Social Security records (e.g., to the Government Accountability Office and Department of Veterans' Affairs);

3. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level; and

4. To facilitate statistical research, audit or investigative activities necessary to assure the integrity of Social Security programs.

We may also use the information you provide in computer matching programs. Matching programs compare our records with records kept by other Federal, State, or local government agencies. Information from these matching programs can be used to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of payments or delinquent debts under these programs.

Complete lists of routine uses for this information are available in System of Records Notice 60-0058 (Master Files of Social Security Number (SSN) Holders and SSN Applications). The Notice, additional information regarding this form, and information regarding our systems and programs, are available on-line at www.socialsecurity.gov or at any local Social Security office.

This information collection meets the requirements of 44 U.S.C. §3507, as amended by Section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 8.5 to 9.5 minutes to read the instructions, gather the facts, and answer the questions. You may send comments on our time estimate to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. **Send only comments relating to our time estimate to this address, not the completed form.**

No. 17-195

# In the Supreme Court of the United States

JUDGE RUTH NEELY,

*Petitioner,*

v.

WYOMING COMMISSION ON JUDICIAL
CONDUCT AND ETHICS,

*Respondent.*

**On Petition for a Writ of Certiorari to
the Supreme Court of Wyoming**

**RESPONDENT'S BRIEF IN OPPOSITION**

EUGENE R. FIDELL
*Yale Law School*
*Supreme Court Clinic*
*127 Wall Street*
*New Haven, CT 06511*
*(203) 432-4992*

PAUL W. HUGHES
*Counsel of Record*
MICHAEL B. KIMBERLY
CHARLES A. ROTHFELD
ANDREW J. PINCUS
*Mayer Brown LLP*
*1999 K Street, NW*
*Washington, DC 20006*
*(202) 263-3000*
*phughes@mayerbrown.com*

*Counsel for Respondent*

i

## QUESTION PRESENTED

Whether the Wyoming Supreme Court violated the Free Exercise Clause or Free Speech Clause when it censured a judge after she announced her refusal to impartially perform her duties in accordance with governing law.

ii

## TABLE OF CONTENTS

**Page**

Question Presented ...................................................... i

Table of Authorities.................................................. iii

Respondent's Brief in Opposition ............................... 1

Statement ..................................................................... 3

    A.  Wyoming judicial ethics canons. ...................... 3

    B.  Factual background. ......................................... 4

    C.  Proceedings below............................................ 5

Reasons for Denying the Petition ............................... 8

    A.  There is no conflict. ......................................... 8

    B.  This is a poor vehicle. ...................................... 9

    C.  The decision below is correct........................... 11

        1.  Because the Code is neutral and
           generally applicable, strict scrutiny
           does not apply........................................... 12

        2.  If strict scrutiny applies, the state
           court properly found it satisfied. .............. 20

    D.  The Court should not hold the petition
        pending *Masterpiece Cakeshop*. ..................... 25

Conclusion ................................................................ 26

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*The Anaconda* v. *Am. Sugar Refining Co.*,
   322 U.S. 42 (1944)................................................10

*Caperton* v. *A.T. Massey Coal Co.*,
   556 U.S. 868 (2009).......................................20, 21

*Church of the Lukumi Babalu Aye, Inc.* v.
   *City of Hialeah*,
   508 U.S. 520 (1993)...............................................14

*Employment Division, Department of Human
   Resources of Oregon* v. *Smith*,
   494 U.S. 872 (1990)..............................12, 13, 14, 16

*Garcetti* v. *Ceballos*,
   547 U.S. 410 (2006)........................................18, 19

*Guzzo* v. *Mead*,
   2014 WL 5317797 (D. Wyo. Oct. 17, 2014)............5

*Pickering* v. *Board of Education*,
   391 U.S. 563 (1968)...................................10, 11, 19

*Republican Party of Minnesota* v. *White*,
   536 U.S. 765 (2002).....................................*passim*

*Roberts* v. *Galen of Virginia, Inc.*,
   525 U.S. 249 (1999)...............................................10

*Rumsfeld* v. *Forum for Acad. & Institutional
   Rights, Inc.*,
   547 U.S. 47, 66 (2006).........................................17

*Williams-Yulee* v. *Florida Bar*,
   135 S. Ct. 1656 (2015).......................18, 20, 21, 22

*Wisconsin* v. *Yoder*,
   406 U.S. 205 (1972)...............................................13

iv

## TABLE OF AUTHORITIES—continued

**Page(s)**

### Constitutions & Statutes

Wyo. Code of Judicial Conduct R.

    Preamble .......................................................... 13, 21

    1.2 ............................................................ 3, 6, 20, 22

    2.2 .................................................................. *passim*

    2.3 .................................................................. *passim*

Wyo. Const. art. 6, § 20 .......................................... 4, 13

Wyo. Stat. § 20-1-106(a) .................................... 4, 14, 15

## RESPONDENT'S BRIEF IN OPPOSITION

The Wyoming Code of Judicial Conduct provides that a "judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice" including "based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation." Wyo. Code of Judicial Conduct ("Code") R. 2.3(b). Likewise, "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Code R. 2.2. This requires a judge to "apply the law without regard to whether the judge approves or disapproves of the law in question." Code R. 2.2, cmt. [2].

These are neutral rules of general applicability. And they are a cornerstone of an impartial judiciary.

Among petitioner Ruth Neely's judicial duties is the performance of marriages. Petitioner publicly announced that she will never perform a marriage ceremony for a same-sex couple.

The Wyoming Supreme Court held that this violated the Code's impartiality provisions, issued a public censure, and required petitioner to perform marriage ceremonies either impartially or not at all. The court did not remove petitioner from the bench, and she remains free to conduct all other judicial functions.

There is nothing surprising about this result. As the court below explained, if petitioner "had taken the position that her religion prevented her from conducting interracial marriages, a right which our society now generally accepts, there would be little controversy regarding her discipline." Pet. App. 42a n.12. Although "[i]t is quite likely that all judges dis-

2

agree with some aspect of the law for religious, personal, or moral reasons," "the judiciary plays a key role in preserving the principles of justice and the rule of the law * * * regardless of the judge's personal views." *Id.* at 21a.

In other words, the state may regulate a judge's public refusal to apply the law impartially. Review of this holding is not warranted.

To begin with, there is no conflict among the lower courts. As the Wyoming Supreme Court observed (Pet. App. 58a-59a) and petitioner appears to acknowledge (Pet. 21-22 & *n.4), every tribunal to reach the question has arrived at the same result.

This case, moreover, is a poor vehicle for review. The parties appear to have stipulated that strict scrutiny applies, which the state court accepted without careful consideration. Pet. App. 14a. But the free exercise claim in this case does not trigger strict scrutiny. Nor does any free speech claim. Here, to the extent that the state is regulating speech at all, it is the speech of a government employee about the performance of her official duties. The Court has long held that government employers have significant leeway to regulate the speech of their employees.

In any event, the Wyoming Supreme Court correctly held that strict scrutiny is satisfied here, even supposing that were the correct framework. As this Court has repeatedly recognized, states may assert a compelling interest in an impartial judiciary. And the Code's impartiality and anti-bias provisions are narrowly tailored.

The Court should deny the petition.

3

## STATEMENT

### A. Wyoming judicial ethics canons.

Wyoming has largely incorporated the ABA's Model Code of Judicial Conduct. The rules relevant here are adopted verbatim from the model code.

Rule 1.2, Promoting Confidence in the Judiciary, provides:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

Rule 2.2, Impartiality and Fairness, provides:

> A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.

Rule 2.3, Bias, Prejudice, and Harassment, provides in relevant part:

> (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

> (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socio-economic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

4

### B. Factual background.

Wyoming has vested the authority to perform marriage ceremonies with, among others, "magistrate" judges. Wyo. Stat. § 20-1-106(a).

Petitioner Neely was appointed a municipal court judge for the Town of Pinedale. Pet. App. 5a. In that capacity, she "hears all cases arising from the town's ordinances, such as traffic and parking violations, animal control, public intoxication, underage drinking, breach of peace, nuisances, and similar matters." *Ibid.*

Because municipal court judges are not authorized by state law to officiate marriages, Judge Haws appointed petitioner to the additional position of part-time circuit court magistrate. Pet. App. 5a. Petitioner acknowledges that the performance of marriage was the "sole purpose" of this appointment. *Id.* at 163a. And the celebration of marriage remains her "primary function" as a magistrate. *Id.* at 6a.

Petitioner has presided over more than 100 wedding ceremonies. Pet. App. 6a.

It is "undisputed" that the Wyoming Code of Judicial Conduct applies to petitioner and that she is "subject to the disciplinary authority" of the Wyoming Supreme Court. Pet. App. 5a. When she became a magistrate, petitioner took an oath to "support, obey and defend the constitution of the United States, and the constitution of the state of Wyoming" and to "discharge the duties of [her] office with fidelity." *Id.* at 7a (quoting Wyo. Const. art. 6, § 20.2).

In 2014, the United States District Court for the District of Wyoming found that the state's ban on same-sex marriage violated the "due process and

5

equal protection guarantees of the United States Constitution." *Guzzo* v. *Mead*, 2014 WL 5317797, at *1 (D. Wyo. Oct. 17, 2014).

On December 5, 2014, petitioner had a roughly ten-minute phone call with a reporter. Pet. App. 8a, 171a. The reporter ultimately published a story that quoted petitioner's explanation for refusing to perform marriage ceremonies for same-sex couples:

> I will not be able to do them. ... We have at least one magistrate who will do same-sex marriages, but I will not be able to.

> When law and religion conflict, choices have to be made. I have not yet been asked to perform a same-sex marriage.

*Id.* at 8a. Petitioner does not dispute the accuracy of these quotations. *Ibid.*

Petitioner subsequently wrote to the Wyoming Judicial Ethics Advisory Committee, explaining her belief that "homosexuality is a named sin," just like "drunkenness, thievery, lying, and the like." Pet. App. 9a. Petitioner stated that officiating the wedding of a same-sex couple would, in her view, be akin to her "buy[ing] beer for the alcoholic or aid[ing] in another person's deceit." *Ibid.*

Petitioner does not deny that she has publicly stated her policy of refusing to perform same-sex marriages. Pet. App. 8a. As a result, it is "not likely" that a same-sex couple will ask her to officiate at a wedding, "given her clear and public statement refusing to perform same-sex marriages." *Id.* at 57a.

### C. Proceedings below.

1. Respondent is the Wyoming Commission on Judicial Conduct and Ethics, which enforces the

6

Code. Its Investigatory Panel commenced an investigation into petitioner's conduct. Pet. App. 9a. Concluding that there "was probable cause to find a code violation," the Investigatory Panel referred the matter to the Adjudicatory Panel. *Id.* at 11a.

The Commission's Adjudicatory Panel found multiple violations of the Code. Pet. App. 11a. The full Commission adopted these findings of a violation, and it recommended that the Wyoming Supreme Court remove petitioner from her positions as a municipal court judge and part-time circuit court magistrate. *Ibid.*

2. The matter proceeded to the Wyoming Supreme Court. Explaining that the issue is petitioner's "conduct as a judge"—not her "religious beliefs" (Pet. App. 12a)—the court adopted respondent's recommendation in part.

The court held that petitioner's conduct violated several provisions of the Code.

The court found, first, that she violated Rule 1.2, because "the fact that she has unequivocally stated her refusal to perform marriages for same-sex couples" "creates the perception in reasonable minds that she lacks independence and impartiality." Pet. App. 56a. It matters not, the court held, that "solemnizing marriages is a discretionary function." *Id.* at 53a. "In essence, this is an argument that bias or prejudice is acceptable if the judicial function is discretionary," but "[o]ur society requires a fair and impartial judiciary no matter how the judicial function is classified." *Ibid.*

The court found, second, that petitioner's conduct violated Rule 2.2 because "[s]he has taken the position that she is willing" to perform marriages "for

7

one class of people (opposite-sex couples), but not for
another (same-sex couples), in spite of the fact that
the law provides both classes are entitled to be mar-
ried." Pet. App. 55a. This "is not fair and impartial
performance by any measure." *Ibid.* As Comment 2
to Rule 2.2 instructs, "a judge must interpret and
apply the law without regard to whether the judge
approves or disapproves of the law in question." *Id.*
at 56a.

Finally, the court found a violation of Rule 2.3.
Petitioner did not merely express her religious belief;
she "expressed her position that, in her performance
of her judicial function, the law would have to yield
to her religious beliefs." Pet. App. 57a. The issue is
not whether petitioner is in fact biased, but whether
"her conduct may reasonably be perceived as preju-
diced or biased." *Id.* at 58a. And her "refusal to con-
duct marriages on the basis of the couple's sexual
orientation can reasonably be perceived to be bi-
ased." *Ibid.*

In so holding, the court recognized that its con-
clusion was in harmony "with every other tribunal
that has considered the question." Pet. App. 58a.

The court rejected petitioner's assertions that
this application of the Code breached her First
Amendment rights. Pet. App. 12a-30a. It concluded
that her "refusal to perform marriage ceremonies for
same-sex couples, in spite of the law recognizing
their right to be married, implicates the compelling
state interest in maintaining the integrity, inde-
pendence, and impartiality of the judiciary." *Id.* at
30a.

The court issued a public censure and ordered
petitioner to either perform marriage ceremonies for

8

couples regardless of their sexual orientation or to perform no marriage ceremonies at all. Pet. App. 64a. "[M]indful of [its] goal to narrowly tailor the remedy," the court declined to order petitioner removed from her position as a municipal court judge. *Ibid.* As to her part-time magistrate position, the court "defer[red] to the circuit court judge who appointed [petitioner] to determine whether she can continue to serve the essential functions of that position." *Ibid.*

Two justices dissented. Pet. App. 64a-110a

## REASONS FOR DENYING THE PETITION

No feature of this case counsels in favor of further review. There is no conflict among the lower courts; indeed, petitioner acknowledges that every tribunal to consider the issue has reached the same result. This is a poor vehicle for review because the lower court assumed the application of strict scrutiny, but that assumption was wrong. Even if strict scrutiny did apply, it is satisfied in this case. Finally, the Court should not hold the petition pending its disposition of *Masterpiece Cakeshop*, No. 16-111.

### A. There is no conflict.

Petitioner does not identify any split of authority on the issues presented in this case. That is unsurprising, because, as the court below recognized, the decision in this case "is in line with every other tribunal that has considered the question." Pet. App. 58a-59a (citing cases).

Petitioner does not see it differently—she does not cite any decision from any court that she believes in material conflict with the holding below. In fact, petitioner recognizes "the multiple judicial-discipline

9

proceedings * * * that have punished judges for de-
clining to perform same-sex marriages." Pet. 21-22 &
n.4 (identifying decisions in harmony with decision
below). The decision below, by petitioner's own ac-
count, is consistent with every tribunal to confront
the question.

The closest petitioner comes to identifying a con-
flict is to cite a series of cases—mainly from trial
courts—purporting to establish the broad proposition
that there is a "history of accommodating the reli-
gious exercise of our public officials." Pet. 29-30. But
not one of the cases petitioner cites has anything to
do with judicial ethics or the question presented.
That is, in those cases, "there was no issue of public
confidence in the neutrality" of the employees at is-
sue. Pet. App. 27a.

Petitioner's "religious accommodation" cases are,
in any event, consistent with the decision below be-
cause the Wyoming Supreme Court did accommodate
her, permitting her to perform judicial functions oth-
er than marriage. Pet. App. 63a-64a. Whether peti-
tioner may remain a magistrate is a decision the
court left to Judge Haws, at whose pleasure petition-
er serves. *Ibid.*[1]

### B. This is a poor vehicle.

Not only is there no conflict on the question pre-
sented, but this case is a manifestly poor vehicle for
resolution of the issues raised by petitioner.

---

[1] Petitioner speculates that the decision below, if "taken to its
logical end, *risks* driving [petitioner] off the bench completely."
Pet. 24 (emphasis added). But the court held, expressly, that
her conduct did not preclude petitioner from serving as a mu-
nicipal court judge. Pet. App. 64a.

10

Below, the court understood the parties as having stipulated that strict scrutiny applies to petitioner's claims. Pet. App. 14a. Petitioner characterizes this as a concession by respondent. Pet. 33. But it is well settled that parties cannot stipulate to legal conclusions. See *Roberts* v. *Galen of Virginia, Inc.*, 525 U.S. 249, 253 (1999) ("[T]he concession of a point on appeal by respondent is by no means dispositive of a legal issue."); *The Anaconda* v. *Am. Sugar Refining Co.*, 322 U.S. 42, 46 (1944) (A party "can not stipulate away" what "the legislation declares."). Courts, instead, must independently evaluate the legal premises of their holdings in all cases, regardless of purported stipulations.

This poses two problems for further review in this case. First, apparently because of the asserted stipulation, the lower court did not consider the full range of arguments in favor of a standard other than strict scrutiny. See Pet. App. 14a. This Court, accordingly, would lack the benefit of considered analysis by the lower court on several critical issues.

In particular, petitioner is a government employee, and her statements—to the extent that they are speech at all—relate to the performance of her job duties. Accordingly, as we describe in more detail below (see, *infra*, 18-20), the First Amendment likely does not apply to her statements at all. Even if it does, the balancing test described in *Pickering* v. *Board of Education*, 391 U.S. 563, 568 (1968), would apply, not strict scrutiny.

But, because of the framing of the issues below, the lower court considered none of this. The Court should not grant review when the critical doctrines were not so much as mentioned below.

11

That is especially so where, as here, the un-addressed issues likely contain embedded questions of state law. The scope of petitioner's public duties, for example, is an important consideration in the *Pickering* analysis, but the parties presented no evidence on that issue, and the lower court did not address it.

Second, the relative posture of the parties—and whether respondent is bound by any purported concession—is at best unclear.

## C. The decision below is correct.

Review is also unwarranted because the decision below is correct. Strict scrutiny does not apply to the claim at issue here. Even if it did, the lower court's application of that standard was correct.

States may obligate their judges to apply the law impartially—notwithstanding any asserted conflict between the law and a judge's personal beliefs. Were it otherwise, states would be powerless to regulate judges who apply the law in a partial or biased manner, so long as those judges demonstrate that their partiality stems from a sincerely held religious belief. That is not the law; a judge's religious beliefs do not exempt her from anti-bias requirements.

As the court below elaborated, if petitioner "had taken the position that her religion prevented her from conducting interracial marriages, a right which our society now generally accepts, there would be little controversy regarding her discipline." Pet. App. 42a n.12. The authority exercised here is the same.

12

### *1. Because the Code is neutral and generally applicable, strict scrutiny does not apply.*

Although the parties below appear to have stipulated to application of strict scrutiny, and the lower court accepted that stipulation without close analysis (Pet. App. 14a), there is substantial reason to conclude that strict scrutiny does not apply. Petitioner's free exercise claim does not trigger strict scrutiny. And that petitioner attempts to embed a free speech challenge does not alter the constitutional analysis.

a. Petitioner's free exercise claim (Pet. 20-31) does not trigger strict scrutiny.

In *Employment Division, Department of Human Resources of Oregon* v. *Smith*, the Court established that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. 872, 879 (1990). The Court specifically rejected applying strict scrutiny analysis to such neutral laws of general applicability. *Id.* at 886-890.

At bottom, "[t]o make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling'—permitting him, by virtue of his beliefs, 'to become a law unto himself—contradicts both constitutional tradition and common sense." *Smith*, 494 U.S. at 885 (quotation omitted).

*Smith* governs here. The Wyoming Code of Judicial Conduct—taken in relevant part verbatim from the ABA's Model Code of Judicial Conduct—does not "represent[] an attempt to regulate religious beliefs" nor "the communication of religious beliefs." *Smith*,

13

494 U.S. at 882. To the contrary, the Code presents a set of generally applicable rules; it "state[s] overarching principles of judicial ethics that *all* judges must observe." *Wyo. Code of Judicial Conduct*, Scope 2 (July 1, 2009) (emphasis added), https://goo.gl/33Dxiy. It aims to "assist judges in maintaining the highest standards of judicial and personal conduct," under the precept that "judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." *Id.* at Preamble 1, 3.

The Code is also neutral. It does not prescribe or proscribe impartial behavior "only when [judges] are engaged in [such behavior] for religious reasons." *Smith*, 494 U.S. at 877-878. Indeed, it makes no differentiation between judges like petitioner who decline to carry out their official duties impartially because of religious reasons and those who decline to do so for other reasons. Similarly, the Code does not impose penalties on judges for holding certain religious beliefs; rather, it requires impartiality from judges acting in their official capacities. In other words, the Code merely requires that judges of *all* faiths dispense the law impartially, that they "discharge the duties of [their] office with fidelity"—as they have sworn to do. Wyo. Const. art. 6, § 20.[2]

---

[2] Petitioner has abandoned her argument sounding in *Wisconsin* v. *Yoder*, 406 U.S. 205, 235 (1972)—and for good reason. "Unlike the Amish in *Yoder*," requiring petitioner to perform all marriages or none "does not threaten her very 'way of life.'" Pet. App. 29a. Nor is petitioner "compelled to serve as a part-time circuit court magistrate," and she "does not face criminal prosecution." *Ibid.*

14

b. Petitioner is incorrect to suggest (see Pet. 26-29) that the state allows "individualized exemptions," thus taking the law outside of *Smith*. In fact, the Code allows *no* exemptions: judges may *never* act in a way that manifests partiality or bias.

Petitioner's reliance on *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520 (1993), confirms the point. There, city ordinances regulated the slaughter of animals *if* the slaughter was a component of a "sacrifice" or "ritual"—but not if the slaughter was for other purposes. *Id.* at 534. The religious nature of this regulation was confirmed by the fact that it had a carve-out for kosher slaughtering. *Id.* at 536. Because "the ordinances were enacted 'because of,' not merely 'in spite of,' their suppression of Santeria religious practice," they were non-neutral, and instead "had as their object the suppression of religion." *Id.* at 540, 542.

The Code is nothing of the sort. It does not have as its "object the suppression of religion." It instead contains neutral impartiality and anti-bias provisions.

Petitioner notes that judges have discretion as to whether to perform individual marriage ceremonies. In her view, magistrates may decline to perform a marriage for a wide variety of reasons, including if the ceremony conflicts with a football game that she would like to attend. Pet. 27.

Petitioner confuses two different laws. The law authorizing petitioner to conduct marriages, Wyoming Statute § 20-1-106(a), is discretionary; it holds that magistrates, among others, "may perform" marriages.

15

But the law being enforced here—the Wyoming
Code of Judicial Conduct—is not at all discretionary.
Rule 2.3(b), for example, provides that a "judge *shall
not*, in the performance of judicial duties, by words
or conduct manifest bias or prejudice * * * including
but not limited to bias, prejudice, or harassment
based upon race, sex, gender, religion, national
origin, ethnicity, disability, age, sexual orientation,
marital status, socioeconomic status, or political affil-
iation." Code R. 2.3(b) (emphasis added).

Taken together, the effect of Section 20-1-106(a)
and the Code is clear. Magistrates have broad discre-
tion as to when they will perform marriages. But
magistrates may never exercise that discretion in a
manner that "manifest[s] bias or prejudice," as de-
fined by the Code.[3]

A magistrate who declines to officiate a marriage
celebration because she would rather attend a foot-
ball game has not violated the Code. But a judge may
not decline to perform a marriage because she refus-
es to celebrate the marriage of Republicans (or Dem-
ocrats), old people (or young people), the rich (or the
poor), same-race couples (or interracial couples),
straight couples (or same-sex couples), or for any
other reason that "manifest[s] bias or prejudice"
within the meaning of the Code. That is a law of gen-

---

[3] The lower court likened this restraint on the exercise of dis-
cretion to juror selection: while a party may generally "exercise
the right to peremptory challenges of jurors for any reason,"
that discretion does not permit "challenging jurors on the basis
of race or gender." Pet. App. 63a.

16

eral applicability, for which there are no individual-
ized exceptions.[4]

c. Petitioner's putative free-speech claim does
not trigger strict scrutiny. *Smith* acknowledged that
in some "hybrid situation[s]," where a free-exercise
claim intersects with another protected right,
heightened scrutiny may apply. 494 U.S. at 882. This
is not such a hybrid claim.

*First*, the disciplinary action at issue here rests
on petitioner's conduct, not her speech.

As the lower court found, the State has regulated
petitioner's "conduct as a judge," not her "speech as a
private citizen." Pet. App. 59a. The basis of the regu-
latory action was not that petitioner "merely ex-
press[ed] her opinion about same-sex marriage," but
rather that she "expressed how that opinion would
impact her performance of her judicial functions." *Id.*
at 62a.[5]

In this way, petitioner made forward-looking
statements about how she would perform her official
duties—that is, she stated a policy governing how
she would exercise her authority to perform mar-
riages. It makes no difference if that policy is com-

---

[4] Petitioner points out that individuals may be temporarily au-
thorized to perform a marriage ceremony. Pet. 28. The rele-
vance of this observation is unclear. She does not show that
such individuals have acted in a way that manifests bias. Nor
does she show that such individuals are subject to the Code.
She, on the other hand, is admittedly (and, given her concur-
rent judicial appointments, *doubly*) bound by it.

[5] See also *id.* at 23a ("She is not subject to discipline merely
because she has expressed her religious beliefs. She has gone
one or two critical steps farther than that to say that she will
not impartially perform her judicial functions."); *id.* at 36a.

17

municated through spoken word, a sign posted on her office door, or written guidelines identifying the circumstances in which petitioner would perform marriages. It is a policy all the same. And just like a policy of refusing to host military recruiters, this policy is "not inherently expressive." *Rumsfeld* v. *Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). It is, as the lower court found, *conduct*. See, *e.g.*, Pet. App. 12a, 23a, 36a, 59a, 62a.

Petitioner is wrong to contend that she "*did* nothing." Pet. 32. She did not simply "voic[e]" her "religious conflict." *Ibid.* She stated a clear policy for how she would perform her official duties in the future: regardless of any other consideration, she will always refuse to solemnize same-sex marriages. *Ibid.*

This conduct has concrete implications: because of "her clear and public statement refusing to perform same-sex marriages," "no same-sex couple" is "likely" to ask her to perform a marriage. *Id.* at 57a. Moreover, "her conduct does undermine the public's respect for the judiciary." *Id.* at 62a.

This regulation contrasts starkly with *Republican Party of Minnesota* v. *White*, 536 U.S. 765 (2002). There, the Court held that limitations on opinion speech by candidates for elected judicial office violated the First Amendment. *Id.* at 788. The Court contrasted this speech regulation from a separate prohibition on "pledges or promises" that make forward-looking representations "of conduct in office other than the faithful and impartial performance of the duties of the office." *Id.* at 770. That law was "not challenged" and the Court expressed "no view" on it. *Ibid.*

18

*Second*, even if the regulation is a restriction of petitioner's speech, it was speech in her capacity as a public employee concerning how she would perform her official duties.

This Court has repeatedly held that, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti* v. *Ceballos*, 547 U.S. 410, 418 (2006). That is, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Ibid*.

Some speech by government employees is not entitled to any First Amendment protection. As the Court has explained, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.[6]

That is the case here. As the lower court concluded, "the misconduct occurred in [petitioner's] official capacity." Pet. App. 62a. "She did not merely express her opinion about same-sex marriage, she expressed how that opinion would impact her performance of her judicial functions." *Ibid*.

---

[6] Judicial candidates (such as those in *White* and *Williams-Yulee* v. *Florida Bar*, 135 S. Ct. 1656 (2015)) are not state employees.

19

The First Amendment therefore does not offer *any* protection to petitioner's statements regarding the performance of her official duties.[7]

And, *even if* petitioner had been "speaking as [a] citizen[]" about matters of public concern," she still must "face * * * speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

In that context, the balancing test of *Pickering* v. *Board of Education*, 391 U.S. 563, 568 (1968), would apply, providing the state significant leeway to restrict speech that is inconsistent with the employee's public function. Here, as we explain in more detail below, the state has well more than the necessary "adequate justification" (*Garcetti*, 547 U.S. at 418) so as to preclude judges from manifesting partiality or bias in the performance of their judicial functions. See, *infra*, 20-22.

\*   \*   \*

For all of these reasons, strict scrutiny does not apply to petitioner's claim. And the Wyoming Code of Judicial Conduct is manifestly constitutional when

---

[7] This answers petitioner's attempted reliance on the compelled-speech doctrine. See Pet. 35-36. Petitioner appears to suggest that she should be enabled to decline performing judicial functions that would require her "to express messages that she deems objectionable." *Ibid.* But this construction of the First Amendment would turn judging on its head. As petitioner sees it, a judge could claim a First Amendment right to defy *any* law. If a judge "deems objectionable" a state law penalizing individuals for distributing marijuana, petitioner apparently believes that a state judge can decline to enforce it. Not so. The First Amendment does not allow judges to privilege their personal beliefs over their obligation to faithfully apply the law.

20

judged against these less searching standards of review. Petitioner does not appear to disagree.

### 2. *If strict scrutiny applies, the state court properly found it satisfied.*

If strict scrutiny nonetheless applies, the decision below is entirely correct. Wyoming has a compelling interest in maintaining the integrity of its judiciary, and the Code is narrowly tailored to achieve that result.

a. Wyoming has a compelling interest in maintaining the integrity of its judiciary by precluding judges from performing their public functions in a manner that exhibits partiality or bias. See Pet. 14a-21a.

This Court has repeatedly held that "'[j]udicial integrity is * * * a state interest of the highest order.'" *Caperton* v. *A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009). In *Williams-Yulee*, the Court recognized that "[t]he judiciary's authority * * * depends in large measure on the public's willingness to respect and follow its decisions." 135 S. Ct. at 1666. "It follows that public perception of judicial integrity is 'a state interest of the highest order.'" *Ibid.* See also *White*, 536 U.S. at 793 ("Judicial integrity is, in consequence, a state interest of the highest order." (Kennedy, J., concurring)).

In accord with these principles, the Wyoming Supreme Court below held that "the State of Wyoming has a compelling government interest in maintaining the integrity of the judiciary, in this case by enforcing Wyoming Rules of Judicial Conduct 1.2, 2.2, and 2.3." Pet. App. 16a.

21

The court was justified in reaching that conclusion. The Code's Preamble explains the nature of the state's interest: "An independent, fair and impartial judiciary is indispensable to our system of justice." Wyo. Code Preamble 1. Indeed, the Code recognizes that "[t]he United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society." *Ibid.*

The Wyoming Supreme Court was thus well within its authority to conclude that "the state has a compelling interest in maintaining public confidence in the judiciary by enforcing the rules requiring independence and impartiality." Pet. App. 21a. And "the principles of justice and the rule of law" "require[] the consistent application of the law regardless of the judge's personal views." *Ibid.* Indeed, these holdings follow directly from *Caperton* and *Williams-Yulee.*

In the context of this case, the court concluded that "[a]llowing [petitioner] to opt out of same-sex marriages is contrary to the compelling state interest in maintaining an independent and impartial judiciary." Pet. App. 26a. "[L]ike all judges," petitioner "has taken an oath to enforce all laws, and the public depends upon an impartial judiciary, regardless of religious sentiment." *Ibid.* Were it otherwise, there would be a "loss of public confidence in the judiciary if the public knows that its judges are at liberty to pick and choose whom to serve." *Ibid.* (quotation & alteration omitted).

Contrary to petitioner's claims (Pet. 33, 37-38), *White* confirms the state's compelling interest in an impartial judiciary. There, the Court recognized the

22

"root meaning" of "impartiality" is "equal application of the law," which "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." *White*, 536 U.S. at 775-776. That is *precisely* the compelling interest the Wyoming Supreme Court identified here: ensuring that petitioner applies the marriage laws in the same way to same-sex couples as she applies them to any other party. See Pet. App. 18a-19a. In *White*, the Court held that the state law at issue there was "not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense"— not that the state lacked a compelling interest. 536 U.S. at 776.[8] See also Pet. App. 18a-19a.

b. The Wyoming regulations at issue are narrowly tailored to advance this compelling state interest. See Pet. 21a-30a.

To begin with, a "narrowly tailored" law need not "be 'perfectly tailored.'" *Williams-Yulee*, 135 S. Ct. at 1671. "The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary." *Ibid.*

The Code is narrowly tailored to address the precise ill at issue: judges who "by words or conduct

---

[8] *White* separately held that "guaranteeing litigants" "an equal chance to persuade the court on the legal points in their case" "is not a *compelling* state interest." 536 U.S. at 777. But that is not at issue here. For one, the claims against petitioner turn on her statements describing how she will perform her official duties—not on her general views. See, *e.g.*, Pet. App. 12a, 23a, 36a, 59a, 62a. Additionally, there is no open legal question for petitioner to decide. The question is instead whether she will faithfully apply the law.

manifest bias or prejudice" "in the performance of judicial duties." Code R. 2.3(b). See also R. 2.2 ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially."); R. 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.").

A judge who violates these provisions has, by definition, called into question his or her impartiality—and has, at the very least, created an appearance of impropriety. Because these provisions are triggered by the very conduct that the state has an interest in regulating, they are—on their face—narrowly tailored.

The Wyoming Supreme Court explained that the Code creates a clear rule of conduct: "[N]o judge can turn down a request to perform a marriage for reasons that undermine the integrity of the judiciary by demonstrating a lack of independence and impartiality." Pet. App. 63a.

The Wyoming Supreme Court went yet further to ensure narrow tailoring. It declined to order petitioner removed from judicial office; instead, it allowed her to perform all judicial functions *other* than marriage, and it allowed her the choice to perform all marriages impartially or no marriages at all. See Pet. App. 63a-64a. It did so specifically "mindful of [its] goal to narrowly tailor the remedy." *Id.* at 64a.

Petitioner appears to make two principal counter-arguments. First, she contends that a "faith-based conflict with performing a solemn non-adjudicative function says nothing about a judge's

24

ability to fairly decide cases." Pet. 37. Related, she states that she will perform other judicial functions for gay individuals. *Id*. at 37-38. There are multiple problems with this argument.

The Code vindicates more than simply the public's confidence in the impartiality of adjudicative functions. The Rules instead extend to "the duties of judicial office" (Rule 2.3(a)) and "the performance of judicial duties" (Rule 2.3(b)). Rule 2.2 instructs that a judge "shall perform *all* duties of judicial office fairly and impartially." (Emphasis added). Petitioner cannot deny that performing marriage is one of the duties of her judicial office—indeed, it is the *raison d'être* for her appointment as a part-time magistrate. Pet. App. 6a, 10a, 163a.

To the extent that petitioner asserts that her conduct with respect to performance of marriage should not disqualify her from other aspects of judicial office, the Wyoming Supreme Court *agreed*. It declined to remove her from office specifically in order to narrowly tailor the remedy. Pet. App. 64a. Thus, it found her eligible to perform the other sort of judicial functions to which she points. Pet. 38.

Second, petitioner asserts that "a decent and honorable religious belief about the issue of marriage does not equate to prejudice against a class of people." Pet. 37. It appears that this is a veiled contention that petitioner did not, in fact, violate any aspect of the Code. But this Court does not have jurisdiction over that state law question; the Wyoming Supreme Court—the court with final authority over interpretation of the Code—held plainly that petitioner did violate it. See Pet. App. 46a-60a.

25

In all events, that analysis was correct. A "judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question." Pet. App. 56a (quoting Code R. 2.2, cmt. 2). Petitioner's acknowledged refusal to apply the law equally and impartially—as a result of her disagreement with it—is exactly the sort of conduct that a state may deem to undermine the public appearance of an impartial judiciary. As the court below put it, "[t]he objection is to the loss of public confidence in the judiciary if the public knows that its judges are at liberty to pick and choose whom to serve." Pet. App. 26a (quotation & alterations omitted).

The Wyoming Supreme Court was right to hold that "accommodation for religious beliefs" is not required in the public employment context "when the requested accommodation would undermine the fundamental function of the position." Pet. App. 29a. Ultimately, here, there "is no less restrictive alternative than discipline for [petitioner] that would serve the compelling state interest in judicial integrity." *Id.* at 30a.

## D. The Court should not hold the petition pending *Masterpiece Cakeshop*.

Petitioner alternatively asks, without explanation (Pet. 20, 39), the Court to hold the petition pending the disposition of *Masterpiece Cakeshop* v. *Colorado Civil Rights Commission*, No. 16-111. Because the issues in that case differ dramatically from those here, a hold is not warranted.

*First*, the decision below turned on the Wyoming Supreme Court's conclusion that the state has a compelling interest in maintaining the impartiality of its judiciary—and that any restriction of petition-

26

er's speech rights was narrowly tailored against that interest. See Pet. App. 14a-30a. Nothing about *Masterpiece Cakeshop* has any bearing on that holding. Nor has petitioner even attempted to demonstrate that any other issue in *Masterpiece Cakeshop* has the capacity to cast doubt on the decision below.

*Second*, as we explained (see, *supra*, 18-20), there is a separate, independent basis to uphold the state's regulation of petitioner's conduct: petitioner is a state employee, and—to the extent she engaged in speech at all—it was speech about the performance of her public duties. The baker in *Masterpiece Cakeshop* is not a public employee.

*Third*, the central theory in *Masterpiece Cakeshop* is that "[e]xpressive freedom is central to human dignity." *Masterpiece Cakeshop*, Reply 1. According to petitioner there, this "requires that artists be free to make their own moral judgments about what to express through their works." *Ibid.* This case, by contrast, concerns the obligations of a state judge to apply the law impartially and equally to all.

## CONCLUSION

The Court should deny the petition.

27

Respectfully submitted.

EUGENE R. FIDELL
*Yale Law School*
*Supreme Court Clinic*
*127 Wall Street*
*New Haven, CT 06511*
*(203) 432-4992*

PAUL W. HUGHES
*Counsel of Record*
MICHAEL B. KIMBERLY
CHARLES A. ROTHFELD
ANDREW J. PINCUS
*Mayer Brown LLP*
*1999 K Street, NW*
*Washington, DC 20006*
*(202) 263-3000*
*phughes@mayerbrown.com*

*Counsel for Respondent*

DECEMBER 2017

☰

**Never miss a story!**
**SUBSCRIBE to WyoFile's FREE**
**weekly newsletter.**

# THE DRAKE'S TAKE

## Who's leading the anti-gay rights movement in Wyoming?

by **Kerry Drake** | DECEMBER 12, 2017

**0**SHARES
×**0**SHARES

As a progressive I dislike the term "outside agitators" because it's usually wielded by conservatives to discredit what opponents like me think about an issue. The inference is that the opinion of those in power is almost universal, while a small minority is being exploited by out-of-state puppeteers who have no business interfering in Wyoming politics.

Yet I can't describe what happened at a recent legislative meeting in Sundance without pointing out that anti-gay, right-wing Christian extremists based in Arizona riled local residents, fed them misinformation and exploited a lot of baseless homophobia. In other words, outside agitators were to blame.

What began as an innocuous bill sponsored by Rep. Cathy Connolly (D-Laramie) has suddenly torn apart "the moral fabric of Wyoming," according to residents who testified. Connolly's bill would update statutory language by changing references like "husband and wife" to gender-neutral terms like "spouse," "married couple" or "parents."

Connolly, the House minority floor leader, said the current language is causing both male-female and same-sex couples problems in some legal matters, including custody cases.

Connolly sponsored a similar bill earlier this year but withdrew it so she could make sure it was as well-written as possible. She was assured by three lawyers picked by the Legislative Service Office that it is both lawful and necessary, and her bill was sailing through the Joint Corporations, Elections and Political Subdivisions Committee without a hitch until the panel met Nov. 20 in Sundance.

After more than two hours of testimony — overwhelmingly in opposition to the bill — the committee voted 8-6 to kill it. Several members who supported the earlier version voted against the current bill.

The 14-member committee heard a litany of misleading, inaccurate and simply wacko claims about how removing the words "husband and wife" from some current laws would decimate heterosexual marriage, insult the Lord, create a generation of orphans, and even lead to society's approval of bestiality.

That's not all. Clergy would be forced to perform same-sex marriage ceremonies. Women's restrooms would be required to have urinals and men's would need tampon dispensers.

Full disclosure: I did not attend the meeting. But I read WyoFile capitol reporter Andrew Graham's excellent account and listened to the LSO recording of the discussion posted with the story so the public could hear every word.

As recounted by Graham, this is what distraught Campbell County rancher Kim Reed warned the committee:

"What will next constitute a union?" asked Reed. "A man and his sister? A woman and a dog? I hate to think about what comes after this."

The rancher acted as if Wyoming has been immune to the worst things in the world until Connolly's bill soiled the state. "I am afraid for this great state of Wyoming and this country, in light of the state of affairs recently with the random shootings, the acts of terrorism," Reed said. "I do believe things are collapsing here."

While a few people testified that they appreciate Connolly's efforts even though they disagree, one blamed the legislator for daring to remove the words men and women from state statutes.

Erik Akola, who recently came to Wyoming from Alaska, said, "I moved here because men were men and women are women. They're not spouses — so to speak — they're husbands and wives, mothers and fathers."

Sitting right next to Connolly, he said he finds her bill offensive. "It's disgusting to listen to her drivel," he said.

Instead of gaveling Akola down and warning him that personal attacks are unacceptable under legislative rules, Co-chairman Sen. Cale Case (R-Lander) simply interrupted him and said, "That could be improper, sir. Let's not pick on other people."

I don't doubt that some opponents have held their beliefs for a long time. But it's also indisputable that the Alliance Defending Freedom stirred the pot by preying on fears and distributing talking points.

This is the same Christian right group that infamously defended a Kentucky court clerk who refused to issue marriage licenses to gay and lesbian couples, and served as a Wyoming clerk's counsel in a similar case.

The ADF — identified as a hate group by the Southern Poverty Law Center, which tracks such organizations — distributed a so-called "fact" sheet highlighting the ADF's arguments against the bill.

Case and Co-chairman Rep. Dan Zwonitzer (R-Cheyenne) are co-sponsors of the bill. Did they decide to allow this attack on Connolly's character and the LGBT community to continue because they didn't want to be criticized for not letting people speak their minds? If so, it was a poor decision.

People equating homosexuality with pedophilia, incest and beastiality went unchallenged. Would it have been similarly appropriate to allow arguments against the bill that used toxic racial stereotypes? How long would the chair have tolerated arguments that affording women equal protection under the law — as the bill would do — is "disgusting" and an affront to the natural order? After all, the bible says wives should submit to and obey their husbands.

It's not a hypothetical question. We've seen such arguments before. We've also seen what an angry mob, incited by misinformation, is capable of.

Sen. Charles Scott (R-Casper) said he'd prefer to see the bill tabled until next year's interim session because budget bills should be the priority in 2018. He said there would not be enough time to fully debate what has become a controversial bill.

Zwonitzer disagreed. He said budget bills are not always being debated on the House and Senate floors and reminded the longest-serving member in the Legislature's history that many vital issues are decided during budget sessions.

"I am reasonably certain that there are enough legislators, especially in my part of the state, who feel this is a significant issue," Zwonitzer said, noting that others will sponsor the bill if the committee did not.

Sen. Tara Nethercott (R-Cheyenne) supported the bill earlier but voted against it in Sundance. "What's become abundantly clear is that there's an extreme lack of understanding about what this bill does and what is the state of the law in Wyoming," she said.

## Please include WyoFile in your year-end giving with a tax deductible donation today.

Clearly many in the audience were aware that the Supreme Court ruled gays can legally marry in the U.S. But some, amazingly, didn't think that law applied to Wyoming.

Nethercott bought Scott's argument that a budget session is no time to be focusing on a bill that needs more work, but the majority agreed with Zwonitzer's call to vote. Two legislators who had voted in favor of the earlier version of Connolly's bill during the last general session — Rep. Dan Furphy (R-Laramie) and Rep. Jim Blackburn (R-Cheyenne) — changed their minds and opposed it.

Were they actually swayed by the baffling, twisted and ludicrous arguments that many in the audience made, or did they just fold their principals to the loudest voice in the room?

Even more disturbing than most of the testimony were the remarks of Rep. Roy Edwards (R-Gillette), who spent much of the 2017 session fretting over the possibility that transgendered people might actually use a public restroom.

Edwards said the Supreme Court's ruling on same-sex marriage was "decided wrong." He believes that "it's a state issue and that's where it ought to stay."

"I see [same-sex marriage] as changing the moral fabric of this country from the direction it's always been intended ... to a place where I do not want it to end up being." The result would be anarchy, he predicted, because proponents "for all intents and purposes want to tear down the republic that God has given us."

Maybe not all of the agitators are from outside Wyoming after all.

**0**SHARES
   x**0**SHARES

## Did You Like This Story?

**About the Author**
kerry.drake33@yahoo.com

1 19 2018



Kerry Drake is a veteran Wyoming journalist, and a contributor to WyoHistory.org. He also moderates the WyPols blog. He has more than 30 years experience at the Wyoming Eagle and Casper Star-Tribune as a reporter, editor and editorial writer  He lives in Casper.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Please read WyoFile's commenting policy

**6 Responses to** *Who's leading the anti-gay rights movement in Wyoming?*

**Joel Otto** DECEMBER 14, 2017 AT 2:22 PM #                                    REPLY ↰

I wish it were possible to have a reasoned debate about this. This article ridicules opposition to a certain agenda, and does so without addressing the underlying moral concerns. A Supreme Court Decision about homosexual unions no more settles the issue than a similar decision about abortion. Both left and right are capable of intolerance and bigotry.

It is not possible to have an honest discussion about homosexuality without discussing sexuality.

Lander, Wyoming

**Bettina Sparrowe** DECEMBER 14, 2017 AT 8:24 AM #                              REPLY ↰

It was stated at a recent local meeting that we need to have facts on all issues in front of us so we can rebut untruths and feel confident in speaking up . I think many people do not speak up because they are unsure of the facts. I am as lazy as the next person in not wanting to spend time researching issues. Could you write an article on this topic and include how and where to get facts on issues? Is Siri as good as google as other sources (only partly kidding)?

Daniel, Wyoming

**JIM W PHILLIPS** DECEMBER 12, 2017 AT 10:05 PM #                              REPLY ↰

After reading this article, I thought of the old off color cliche about our state: Wyoming, where men are men and sheep are nervous. Maybe not all the sheep are the 4 legged kind.

Newcastle, Wyoming

**Lee Ann** DECEMBER 12, 2017 AT 3:56 PM #                                      REPLY ↰

The committee meeting held in Sundance had quite a chilling effect for any woman who may want to enter politics. It was clear Rep. Connolly did not even have the same support of the rest of the committee afforded to male legislators. I felt sorry she was left hanging out there unsupported and I was embarrassed at how she was treated by the public. A new low for Wyomingites.
sign me 'Straight but Not Narrow'

Riverside, Wyoming

**Mary Grant** DECEMBER 12, 2017 AT 1:03 PM #                                   REPLY ↰

For a minute there, I thought I had been transported back to the 18th century after I read Mr. Graham's excellent initial story. Both articles reminded me that little has changed in my home state since I left many years ago seeking opportunities I knew I would never have if I stayed.

How many others left and are similarly repulsed by Wyoming leaders' ignorance, spinelessness, bigotry and ineptness. Its cowboy legislature wilts while it "reforms" corrections that invite nationwide and ACLU criticism; it provides open access to any and all business promoting industries that leave the state with open wells and scarred landscapes; actively promotes and maintains a boom or bust economy; and steadfastly cuts education and social programs lest it anger the electorate by committing the grevious and unelectable sin of raising taxes.

The last (only?) Planned Parenthood clinic closed in Casper. Female legislative leaders are verbally assaulted and vilified.

Hate groups are in charge of the conversation and the backbones in the Equality State. A lot of people owe Ms. Connolly an apology.

It's embarrassing. It's wrong. It's backward. Wyoming would do well to tune into the national conversation.

San Francisco, California

**Chuck Anziulewicz** DECEMBER 12, 2017 AT 8:21 AM #                            REPLY ↰



by Andrew Graham
DECEMBER 5, 2017

**'Unduly cruel': Gender language debate turns ugly**



by Angus M. Thuermer Jr.

**Budd-Falen: Provocateur or protector?**

FOLLOW WYOFILE

f   🐦   ▪   in   🔊

BECOME AN UNDERWRITER

SIGN UP
FOR WEEKLY NEWSLETTERS

RECENT POSTS BY DATE

January 2018

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |